Robert T Mills (Arizona Bar #018853)
Sean A Woods (Arizona Bar #028930)
**ANGELINI MILLS WOODS + ORI LAW**
5055 North 12th Street, Suite 101
Phoenix, Arizona, 85014
Telephone (480) 999-4556
docket@amwolawaz.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| James W. Denby, et al., | Case No. 2:17-CV-00119-SPL |
| Plaintiffs, | |
| vs. | **PLAINTIFFS' RESPONSE TO CITY AND COUNTY DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** |
| City of Casa Grande, et al., | |
| Defendants. | (Assigned to the Hon. Steven P. Logan |

Plaintiffs James Denby, Elizabeth Torres, and Wilma Logston, by and through undersigned counsel, hereby submit their Response to the City and County Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint. Plaintiffs Response is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants' motion to dismiss any claim violating the Fourth, Fifth, and Fourteenth Amendments should fail on its face as Plaintiffs were subjected to violent and excessive use of force and damage to property when the Defendants attempted to but failed to find Mr. Ochoa. Further, the Defendants, individually and in their official capacities as officers and supervisors entered Plaintiffs' home and deliberately violated their civil rights with reckless and excessive disregard and deliberate indifference to personal property and Plaintiffs' Constitutional rights. Additionally, Plaintiff's First Amended Complaint ("FAC") states sufficient facts to support a cognizable legal theory and therefore is plausible of entitlement to relief. *Bell Atlantic Corp v. Twombly*, 50 U.S. 544, 557 (2007).

## I.    LEGAL ARGUMENT

### A.    Legal Standard

Federal Rule of Civil Procedure "8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The United States Supreme Court has explained that "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Id.*, at 555-56. The United States Supreme Court flatly rejected any "heightened pleading standard" for *Monell* claims, as such a standard would be "impossible to square ... with the liberal system of 'notice pleading' set up by the Federal Rules." *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993). The Court expressly noted the lack of any "particularity" requirement for pleading *Monell* claims and cautioned courts against allowing municipal entities to abuse the motion to dismiss as a device to "weed out unmeritorious claims." *Leatherman*, 507 U.S. at 169. The Ninth Circuit has explained that in order to survive a Motion to Dismiss, a Monell claim need only (1) "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively" and (2) "must plausibly suggest an entitlement to relief." *AE ex rel. Hernandez*, 666 F.3d at 637 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

### B.    Defendants Are Not Protected By Qualified Immunity

Granting dismissal on the basis of qualified immunity pursuant to a Rule 12(b)(6) motion is only appropriate if, on the face of the complaint, the qualified immunity applies. *Groten v. California*, 251 F.3d. 844, 851 (9th Cir. 2001) *Morley v. Walker*, 15 F.3r 756, 76 (9th Cir 1999) (because the allegations in the complaint are regarded as true on a motion to dismiss, dismissal based on qualified immunity is inappropriate). Government officials are not entitled to qualified immunity when: (1) a plaintiff's allegations make out a violation of a constitutional right, and; (2) the right was clearly established at the

time of the official's alleged misconduct. *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1249 (9th Cir. 2016).

In *Saucier*, the Supreme Court established a two-part analysis to determine if qualified immunity applied in a lawsuit "against an officer for an alleged violation of a constitutional right" holding first that it "must be whether a constitutional right would have been violated on the facts alleged" and second, whether or not the right was clearly established. *Id.  Saucier v. Katz,* 533 U.S. 194, 200, 121 S. Ct. 2151, 2155, 150 L. Ed. 2d 272 (2001). The qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. Judges are permitted to exercise their discretion in deciding which of the two prongs should be addressed first considering the case. *Pearson v Callahan* 555 U.S. 223, 242 (2009).

For qualified immunity purposes, "the contours of the right must be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable official would understand that what he is doing violates that right;" and "in the light of pre-existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted). As described herein, Defendants are not protected by qualified immunity. Thus, Defendants' motion to dismiss should be dismissed.

**C.    Skedel, Lapre, Horn, Berry, Gragg, Engstrom, Lujan, Mccabe, Western, Ybarra, Wilson, And Robinson Are Not Entitled To Qualified Immunity**

The Plaintiffs have the same Constitutional rights and protections in their persons and personal property under the Fourth, Fifth, and Fourteenth Amendments against unconstitutional searches and seizures, violations of due process of law, and unconstitutional takings as any other innocent United States citizen. The actions of each individual defendant were part of a coordinated tactical event. There was absolutely no basis for the excessive use of chemical munitions and NFDDs. Ochoa never responded to Defendants. FAC ¶¶ 77, 79, 93, 101. Horn was the acting police chief during the incident. FAC ¶ 10. Berry was employed by the Pinal County Sheriff's Office as a lieutenant in its police department. FAC ¶ 19. Gragg was employed by the Pinal County Sheriff's Office

as a sergeant and was in command prior to the SWAT arriving at the scene. FAC ¶¶ 22, 70. Engstrom was employed by the City of Casa Grande as a police sergeant. FAC ¶ 12. He arrived at the Starting Location at 3:13 P.M. FAC ¶ 33. According to police reports, Engstrom was somehow able to track Ochoa to the backyard via fresh footprints in the alley that lead to the backyard Residence. FAC ¶ 38. At 3:16 P.M., Engstrom reported that Ochoa was opening the back door. FAC ¶ 39. At 3:17 P.M., Engstrom reported that Ochoa came out of the Residence and went right back in. FAC ¶ 40.

Engstrom informed Lujan that he saw Ochoa. FAC ¶ 41. At 3:21 P.M., mere minutes after the CGPD arrived on scene, and with no indication that Ochoa had barricaded himself in the house, nor had any violent intentions, Defendant Horn requested Pinal County Regional SWAT to respond due to a "barricaded subject." FAC ¶ 58. At 4:03 P.M. Engstrom, who was maintaining the perimeter of the Residence was transferred to a tactical assignment. FAC ¶ 60. For the next couple hours, Engstrom was assigned to "cover" the east perimeter wall. FAC ¶ 61. After an hour or so, Engstrom noticed movement coming from a tarp that was covering a car in the backyard of the residence. FAC ¶ 62. Engstrom advised on the tactical channel of the tarp's movement, but was told there was a loose dog in the area and never further investigated the tarp. FAC ¶¶ 63, 65, 67. Lujan, Western, Ybarra, McCabe, Gragg, Wilson, Horn, and Robinson were also at the scene *at the time* Engstrom made the call about the tarp's movement. FAC ¶¶ 32, 42, 47, 58, 70, 91. Despite hearing about movement under a tarp in the backyard, none of the Defendants investigated, despite having a professional and legal obligation to do so.

At 4:21 P.M. two SWAT teams—Bravo and Charlie—arrived at the residence. FAC ¶ 69. Lapre was assigned Bravo team leader and took position inside the Bearcat. ¶ 72. At 5:02 P.M. Berry was advised that the search warrant was signed and on scene. FAC ¶ 83. Lapre fired gas canisters into the Residence at 5:10 P.M. FAC ¶¶ 87-89. During this time, Robinson provided security for Lapre as he launched the chemical munitions into the residence. FAC ¶ 91. At 9:47 P.M., SWAT made entry into the Main House, during this time Skedel deployed two (2) NFDD devices within the residence. FAC ¶¶

4

105-06. Babeu, Berry, Engstrom, Gregg, Horn, Lapre, and Lujan as part of their official duties were responsible for the training and supervision of employee officers or agents that hold the power, authority, insignia, equipment, and arms entrusted to them. FAC ¶ 172. These Defendants failed to adequately train and supervise their employees and were deliberately indifferent to the obvious consequences of their failure to do so. FAC ¶ 174, 179. At 10:03 P.M., five hours after Engstrom saw the movement under the tarp, and after the house had been completely destroyed, Ochoa was located unsurprisingly under the tarp. FAC ¶¶ 120-21.

There was no indication that any other tactics, such as infrared heat were used to determine if there were any bodies within the home. Robots were placed inside the home to look for any persons, yet no one was found. There was no documented search of the outside perimeter of the home before the chemical munitions were fired and the Defendants destroyed the Plaintiffs' premises. This use of excessive force and damage to property exceeded the authority of the police officers involved as it was clear that the individual they were looking for was not present in the house. This became a "dog and pony" show that showed lack of established policy and procedures and failure to monitor the officers involved. The reckless disregard for human property is evident as there was no concern of protection of Plaintiffs' property or person. Taken in the light most favorable to the plaintiff, these facts do not entitle the individual Defendants to qualified immunity under Section 1983.

**D.** **Plaintiff Properly Plead Count I – Violation of the Fourth and Fourteenth Amendment**

The Court must review the Defendants' actions under the Fourth Amendment's objective reasonableness standard. *See Graham v. Connor,* 490 U.S. 386, 395 (1989). Determining "whether the force used to affect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake." *Id.* at 396 (citations and internal quotation marks

5

omitted); *see also Santos v. Gates,* 287 F.3d 846, 853 (9th Cir. 2002). The "question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. The *Graham* test includes an examination of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Robinson v. Solano County,* 278 F.3d 1007, 1014 (9th Cir. 2002) (citing *Graham,* 490 U.S. at 397). In considering "the severity of the crime, the most important [factor], is the need for the force." *Miller v. Clark County,* 340 F.3d 959, 964 (9th Cir. 2003). The force used is "permissible only when a strong government interest *compels* the employment of such force." *Tekle v. United States,* 457 F.3d 1088, 1094 (9th Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original); *see also Drummond v. City of Anaheim,* 343 F.3d 1052, 1057 (9th Cir. 2003).

Here, the Defendants' laid unmitigated and undisputed siege to Plaintiffs' property. Their use of chemical munitions and NFDDs were wanton acts of reckless disregard and deliberate indifference and by all sense of interpretation were certainly unreasonable under the totality of the circumstances test set forth in *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865 (1989). When judging the objective reasonableness of use of force, this court may not use 20/20 hindsight. *See id.* at 396–97. The court must adopt the perspective of a reasonable policeman on the scene. *See id.*

### 1.   Defendants' actions were not objectively reasonable.

The conduct of police officers in executing a search warrant is always subject to judicial review as to its reasonableness, and officers may be held liable under section 1983 for executing a warrant in an unreasonable manner. *Tarpley v. Greene*, 684 F.2d 1, 8–9 (D.C. Cir. 1982). It is a longstanding requirement that officers executing a warrant avoid unnecessary damage to the premises. *Id*. at 9. Destruction "of property that is not reasonably necessary to effectively execute a search warrant may violate the Fourth Amendment." *Id.*

a.    *The use of a battering ram was unreasonable*

Routine deployment of motorized battering rams to enter dwellings is presumptively unreasonable under the Fourth Amendment. *Langford v. Superior Court*, 43 Cal. 3d 21, 233 Cal. Rptr. 387, 729 P.2d 822 (1987), reh'g denied, (Feb. 26, 1987). Defendants CGPD and SWAT made the decision to use a Bearcat as a battering ram. FAC ¶ 74. The Bearcat was driven over a fence, fully demolishing it. FAC ¶ 75. It was then rammed into the wall of the Main House to break windows and knock open the front door of the Residence. *Id.* Defendants then used the Bearcat's PA system to announce their presence and advise Ochoa to come out of the Residence with his hands up, to which there was no response. FAC ¶¶ 76-77.

Defendants should have known that the use of a motorized battering ram to enter the premises would result in a violation of Plaintiffs' constitutional rights. At the time this incident occurred, there was clearly established law that the routine use of a motorized battering ram is considered "presumptively unreasonable unless authorized by a neutral magistrate." *Langford*, 43 Cal. 3d at 29. In this case, Plaintiffs' allegations make out a violation of a constitutional right, and this right was clearly established at the time of the Defendants' actions. As such, Defendants are not entitled to qualified immunity.

b.    ***Deploying twenty-two canisters of chemical munitions and NFDDs into a 1200 sqft home was unreasonable***

Defendants argue that the deployment of twenty-two canisters of gas was reasonable under the totality of the circumstances test set forth in *Graham*. Def. Mot. to Dismiss at 11:1-2. To support their contention, Defendants rely *on Simpson v. Commonwealth of Virginia*, 2016 WL 3923887, *13 (E.D. Va. 2016)—an unpublished case from Virginia. In that case, the "court granted qualified immunity in a matter in which 'as many as 60 gas canisters; were deployed in an effort to extract a mentally ill man whose responses to police included unusual communications, ***and where police believed the man possessed a shotgun.***" Mot. to Dismiss at 11:4-8 (emphasis added). However, in that case a police officer obtained a felony arrest warrant against the Decedent for possession of a firearm by a person acquitted by reason of insanity. *Simpson,*

7

at *2. After police officers unsuccessfully attempted to incapacitate Decedent with a stun gun, they were in constant communication with Decedent. *Id.* The Decedent even informed police there will be no further communication until morning. *Id.* Police then deployed flashbangs into the residence, and Decedent responded by firing a shotgun at police through the window. *Id.* Police then began to deploy tear gas canisters into Decedent's house through the window. *Id.* Each time the police deployed tear gas into the house—as many as sixty canisters of tear gas were deployed into the house—the Decedent responded by firing his shotgun out of his window. *Id.* Then when police deployed the last canisters, Decedent emerged from the front door of his house firing his shotgun. *Id.* Police responded with deadly force. *Id.*

Additionally, Defendants cite a 6th Circuit case, *Bing ex. rel. Bing v. City of Whitehall, Ohio* in an attempt to show that the use of chemical munitions and NFDDs were reasonable under the circumstances. Mot. To Dismiss, at 10:3-8. But in that case, police were dealing with an intoxicated, dangerous felon who responded to the use of these devices by firing a gunshot. *Bing ex. rel. Bing v. City of Whitehall, Ohio*, 456 F.3d 555, 559-61 (6th Cir. 2006). Here, Ochoa was not a dangerous felon and Defendants had no information or reasonable belief that Ochoa was in possession of a gun other than a statement that he might have brass knuckles that also act as a stun gun. FAC ¶ 36. In *Bing*, officers knew the suspect was in the home as they heard him "coughing and gagging." *Id.*, at 561. In this case, police never had any indication that Ochoa was in the home, yet they continued to barrage the property with excessive force.

Here, Ochoa was not wanted on a felony weapons warrant, but a warrant for failure to appear. FAC ¶ 52. Further, Ochoa's girlfriend informed police that he did not have any firearms. FAC ¶ 36. Defendants even saw Ochoa leave and re-enter the promises. FAC ¶ 43. During this time, Ochoa did not make any hostile gestures or threaten any of the Defendants. But Defendants immediately called SWAT to the residence. Further, while Defendants had the perimeter of the property surrounded, Defendant Engstrom noticed

movement under a tarp in the backyard[1]. FAC ¶ 62. Engstrom radioed in the movement, but failed to investigate because he was informed a dog was loose in the area. FAC ¶ 63. However, the backyard was full enclosed. FAC ¶ 64.

Instead of properly investigating the movement under the tarp, Defendants ignored the movement and began an eight-hour siege on the Property. At no point after Engstrom reported the movement under the tarp, was there ever any confirmation Ochoa was still in the Property. Ochoa did not respond to the PA system, the tactical phone, or any other methods used to communicate. The SWAT team even deployed a robot into the home that was able to clear a large portion of the house without any sign of Ochoa. FAC ¶¶ 84-85. Then at 5:10 P.M., two hours since the last report of Engstrom that Ochoa re-entered the house, Defendants launched a single canister of Pepper spray into the house. FAC ¶¶ 40, 87-89. Defendants did not hear any sounds nor could they confirm that Ochoa was even in the house. FAC ¶ 92. Regardless, Defendants then launched twenty-one additional canisters into the property, and each time the result was no different than the first launch. FAC ¶¶ 93, 96.

Defendants acted unreasonably and violated Plaintiffs' Fourth Amendment rights by firing the first canister into the house and by failing to investigate the tarp in the backyard. They compounded the unreasonableness by firing twenty-one more even though Ochoa never reacted in any way to the munitions nor did he make any hostile or threatening acts towards Defendants. Defendants should have known that firing twenty-two canisters of chemical munitions into a 1200 square foot home was unreasonable and excessive and would result in violations of the Plaintiffs' constitutional rights. The clearly established test set forth in *Graham* requires a "careful balancing of the nature and quality

---

[1] According to Engstrom's police report, despite the movement he saw under the white tarp covering a car in the backyard of the Residence, and despite the fact that Engstrom claims to have actually seen Ochoa attempt to exit the back of the Residence two times, he did not further investigate and continued to watch his assigned area as if fully buying the story that a dog loose in the area could have somehow entered the backyard, and climbed under a tarp ending up between the tarp and the top of the vehicle it covered. FAC ¶ 67. The plausibility of that scenario stretches even the wildest of imaginations.

of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865 (1989). A reasonable police officer should have known that it was excessive to barrage a house with nearly two dozen canisters of gas when there was no response from the individual thought to be inside. There was no evidence that Ochoa posed an immediate threat ever and clearly not after launching a chemical attack. There was no indication that any other less extreme tactics, such as infrared heat were used to determine if there were any bodies in the home. Using the standard of a reasonable policeman, it is apparent there was no one in the home after no communication was established, the robot found no evidence of Ochoa, and there was no response from inside the home after the first canister of gas was deployed. Because Plaintiffs' allegations make out a violation of constitutional rights and this right was clearly established at the time of the Defendants' actions, Defendants are not entitled to qualified immunity.

**c.**     *Destruction of Plaintiffs' property was unreasonable*

Damaging property is unreasonable where it is not necessary to the successful execution of the search warrant. In *Watson v. City of Kansas City, Kan.*, 80 F. Supp. 2d 1175 (D. Kan. 1999), police executing a warrant forced entry into sealed basement areas of the apartment buildings, broke a window to gain entry into an occupied apartment, broke the lock on one apartment building and threw around and damaged items in storage. In ruling on the motion to dismiss the court explained, "[w]hile one might assume that defendants had no other way to get into the sealed basement and locked apartment, the Court cannot make such an assumption. Making all inferences in plaintiff's favor, the complaint contains no indication that any of these actions were reasonably necessary to the successful execution of the search warrant." *Id.* at 1196. *See also*, *Mena v. City of Simi Valley*, 226 F.3d 1031 (9th Cir. 2000) (holding that officers appeared to have engaged in unnecessarily destructive behavior, beyond that necessary to execute the warrant, and that reasonable officers would have known that such conduct violates the Fourth Amendment where they used a battering ram to force entry into the home, forced entry into several

10

locked rooms and broke down several open doors); *Turner v. Fallen*, No. 92 C 3222, 1993 WL 15647 (N.D. Ill. 1993) (holding that destruction of property by police during execution of a search warrant for stolen clothing was not reasonably necessary to effectively execute the search warrant where police broke front door of business, broke several ceiling tiles, broke open the cash register and the file cabinet, and smashed glass display cases, particularly because police could have avoided the damage and did not try to find a way into cases without breaking them).

Seizure of "property occurs when there is some meaningful interference with an individual's possessory interests in that property". *Bonds v. Cox* 20 E.3d 697, 701 (6th Cir. 1994) In *Bonds v. Cox,* the court stated that property damage inflicted by law enforcement officers during execution of a search warrant constituted a seizure of property under the Fourth Amendment. The damage claimed included: broken doors, mutilated vinyl siding, a cracked commode, holes in the walls, broken dishes, and trampled personal belongings. According to the court, the alleged property damage clearly rose to the level of a meaningful interference with the owner's possessory interests in the property, thereby constituting a seizure of her property under the Fourth Amendment. Although the owner had no expectation of privacy in the house because she was not living there at the time of the search, and therefore, could not challenge the legality of the search, the Fourth Amendment still protected her interests against a seizure of property. Accordingly, the court remanded the case for further proceedings consistent with the court's ruling that the property damage constituted a seizure of the owner's property protected by the Fourth Amendment.

Here, after the Defendants launched twenty-two canisters and two NFDDs into the house, the police entered the house in an attempt to apprehend Ochoa. During this search, Defendants destroyed everything in the house including without limitation toilets were shattered, couches and pillows were torn, dishes were broken, walls and ceilings were broken, and glass was broken. This is without a doubt an interference with the Plaintiffs' possessory interest in the property.

11

**E.    Plaintiffs Properly Plead Count II - Takings Clause under the Fifth Amendment**

The Fifth Amendment states: "No person shall... be deprived of life, liberty or property without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. Amend. V. Where an innocent third party's property is taken, damaged, or destroyed by the police in the course of apprehending a suspect, the doctrine of public necessity does not insulate a municipality from its liability to pay just compensation to the homeowner. *Wegner v. Milwaukee Mut. Ins. Co.*, 479 N.W.2d 38, 42 (Minn. 1991).

The cases Defendants cite in support of their Motion to Dismiss based on Plaintiffs' Fifth Amendment Takings Clause claims fail to support their position against the facts as pled by Plaintiffs. To support their contention, Defendants cite only to cases of municipal authority taking possession of property that was *lawfully acquired*. For instance, in *Bennis v. Michigan* the Plaintiffs' car was seized by the police after one of the Plaintiffs was caught soliciting a prostitute in his car. 516 U.S. 442, 443-44 (1996). The property owner himself was violating the law and Michigan statutory authority allows the police to seize property that was used by the property owner in the commission of a crime. *Id.* Therefore, when the property owner commits the crime on or in the property, the innocent owner defense would not apply.

The property owners, Plaintiffs, were not involved in any criminal act on the property and therefore, the innocent owner defense applies. The *Bennis* case is therefore distinguished from this matter as there was never any criminal act perpetrated by the property owner. Similarly, the *Young v. County of Hawaii* case fails to support Defendants' argument. In that case, the Hawaii Island Humane Society ("HIHS") executed a valid search warrant to seize seventeen (17) dogs from Young. *Young v. County of Hawaii*, 578 Fed. Appx. 728, 729 (9th Cir. 2014). Additionally, Young's mother had a notarized power of attorney from Young and properly executed transfer paperwork to the HIHS. *Id.* Defendants fail to acknowledge that Plaintiffs were not the suspects of a criminal act but innocent individuals who acquiesced in assisting Defendants

12

in finding Ochoa. They did not acquiesce to the taking of property by the subsequent destructions thereof. Contrary to Defendants' assertions, the property was not taken pursuant to a proper deployment of the state's police power. While the "precise contours of the principle are difficult to discern" the police power "encompasses the government's ability to seize and retain property to be used in evidence in a criminal prosecution." *Amerisource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008), cert. denied, ___ U.S. ___, 129 S.Ct. 1611 (2009). Items "*properly* seized by the government under its police power" are not seized for public use. *Acadia Technology Inc. v. United States*, 458 F.3d 1327, 1332 (Fed. Cir. 2006) (emphasis added).

Here, there was no property "seized" in the traditional sense. Instead, Defendants wantonly and recklessly disregarded the innocent Plaintiffs' rights and destroyed everything in the Plaintiffs' house including without limitation the ceilings, toilets, walls, windows, televisions, beds, pillows, cabinetry, outside fencing, personal items, dishes, and furniture. Plaintiffs have properly pled their Constitutional interest in their property and have further properly pled that the property was unjustifiably seized by the City of Casa Grande and County of Pinal through the wanton destruction thereof.

**F.** **Plaintiffs' Have Properly Pled Count III - Failure to Intervene as a Constitutional Claim**

Failure to intervene when a fellow officer uses excessive force to affect a seizure is a violation of the Fourth Amendment. *U.S. v. Koon*, 34 F.23 1416 (9th Cir. 1994) aff'd in part, rev'd in part, 518 U.S. 81(1996). At no time did any Defendant intervene when property was damaged after it was clear that Ochoa was not in the premises. No Defendants intervened when personal items were smashed for no reason. At no time did the Defendants intervene when they were aware that other, less extreme means could be used to open the premises. The doors were unlocked and at least one of them was completely open. FAC ¶¶ 53-54. Additionally, Defendants were provided keys to the property – keys that were used by Defendants to move a car out of the driveway. *Id.*

13

Notwithstanding the already unlocked and open state of the premises, Defendants chose to ignore and instead destroy the property.

Defendant cites case law that explains that police officers cannot be held liable for a breach of duty unless they had "a realistic opportunity" to intervene. *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). Here, the incident began at roughly 3pm. Lujan, Western, and Engstrom arrived at the scene. FAC ¶¶ 32-33.  Shortly thereafter, Ybarra, McCabe, Wilson and Lapre arrived. FAC ¶¶ 42, 47-48, 59. According to police reports Engstrom tracked Ochoa to the backyard of the Denby residence. FAC ¶ 38. At 3:17 P.M. Engstrom reported that Ochoa came out of the residence and went back inside. FAC ¶ 40. Once the Casa Grande Police Department determined that Ochoa must be inside the residence, Lujan approached the front door of the Main House and William exited the house on crutches. FAC ¶ 44. Denby provided CGPD with his keys so they could move a vehicle that was parked in front of the Main House. FAC ¶ 53. Police were also provided with keys to the Residence, including the Main House. FAC ¶ 54. At this time, police made attempts to communicate with Ochoa through a loud speaker PA system, but there was no response. FAC ¶¶ 55-56. At 4:03 PM Engstrom was maintaining the perimeter wall of the residence. FAC ¶¶ 60. For the next couple of hours, his assignment was to "cover" the east perimeter wall of the Residence. FAC ¶¶ 62. After about an hour of this assignment, Engstrom reported movement coming from a tarp in the backyard. FAC ¶ 62. He radioed in the movement, but never investigated. FAC ¶¶ 63, 67. Further, the backyard was never cleared until after the full assault on the house occurred – nearly seven (7) hours later at 10:03 P.M., when Ochoa was located. FAC ¶¶ 116-17, 120. Accordingly, every officer that heard Engstrom call in the movement and knew that the back yard was never cleared had a duty to intervene and investigate the movement.

The battering ram arrived on scene at 4:21 PM. FAC ¶¶ 69-73. At no time did any officer at the scene intervene to stop the use of the battering ram. FAC ¶ 158. The Defendants fired twenty-two (22) canisters into a 1200 sqft house. FAC ¶ 96. Each canister was designed to cover 120 square meters. FAC ¶ 97. This means that *each*

canister was singularly enough to cover an area of 1291.67 square feet – which is larger than the square footage of the house. After this, none of the officers noted any noise or movement in the house. FAC ¶ 92. Not one officer attempted to intervene to stop the completely unnecessary and unreasonable use of chemical munitions.

Then utilizing two NFDDs, the Defendants entered the house and utterly destroyed it to the point it was uninhabitable. Furniture that was too small for a human to hide inside of or underneath was crushed, smashed, and thrown against walls. FAC ¶ 108. Cushions and pillows were torn open. FAC ¶ 109. Windows were broken and window coverings were ripped and torn apart. FAC ¶ 110. Shower doors, bathroom mirrors, and toilets were shattered, broken, and completely destroyed. FAC ¶¶ 111-12. Several items belonging to the property owner including: televisions, artwork, heirlooms, antiques, and various other items were broken, tossed, and ultimately destroyed. FAC ¶ 114. The ceilings and walls were cracked. FAC ¶ 114. So much senseless destruction occurred inside the Residence that it was rendered completely uninhabitable. FAC ¶ 124. Once again, no officer attempted to stop this clear violation of Plaintiffs' civil rights.

Defendants had multiple, reasonable and realistic opportunities to intervene. It was not unrealistic or unreasonable to intervene in the use of a Bearcat when the doors were already unlocked and open and there was a key available. It was not unrealistic or unreasonable to intervene when pillows and cushions were torn open for no apparent reason. It was also not unrealistic or unreasonable to ask fellow officers why they were continuing to destroy a home after hours of no contact with the suspect, or with no indication that he was inside of the structure – especially when they had a reasonable and realistic idea that he may actually be hiding outside under a tarp. There is nothing to indicate that police were physically incapable of intervention. *See Motion to Dismiss,* at 6:24-26. There were violations of the Fourth, Fifth, and Fourteenth Amendments, so a failure to intervene claim exists. *Shepard v. Perez,* 609 Fed.Appx. 92, (9th Cir. 2015).

15

### G.    Plaintiffs Have Properly Plead Count IV- Municipal Liability

Under *Monell*, "liability can attach if the municipality caused a constitutional violation through official policy or custom, *even if the constitutional violation occurs only once*." *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008) (emphasis added); *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). If "the issue concerns a single constitutional deprivation ... the court must decide, as a matter of state law and before the case may be submitted to the jury, whether the person who committed the violation had final policymaking authority." *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003). A municipality may be held liable under Section 1983 when its policies, carried out by its employees, are "the moving force behind the constitutional violation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 379 (1989). At all times relevant herein, Defendants City of Casa Grande and County of Pinal's police officers were agents and employees of Defendants City of Casa Grande and County of Pinal. FAC ¶ 163. They were carrying out the acts alleged herein while acting under color of the authority and tinder color of the statutes, regulations, policies, customs, and usages of the Defendants City of Casa Grande and County of Pinal. *Id.*

The acts or omissions of the Defendants regarding the use of excessive force were either: (1) caused by inadequate and arbitrary training, supervision, or discipline of officers by the City of Casa Grande and County of Pinal; (2) caused by deliberate indifference of the City of Casa Grande and County of Pinal; (3) consistent with, and done pursuant to, a custom or *de facto* policy of the City of Casa Grande and County of Pinal; or, (4) ratified by final decision makers of the City of Casa Grande and County of Pinal. FAC ¶ 166. Because of the acts, omission, and systematic deficiencies, Defendants' police officers believe that excessive force and unreasonable searches and seizures are permissible and that misconduct would not be properly investigated. FAC ¶ 167. These policies, customs, and regulations of the City of Casa Grande and County of Pinal all had the foreseeable result that the Defendant's officers would engage in the violation of civil

rights of citizens of the state. *Id.* As a direct and proximate result of the illegal acts of Defendants, Plaintiffs' civil rights were violated and they suffered damages. FAC ¶ 168.

### H.    Plaintiffs Have Properly Pled Count V - Failure to Train and Supervise

Defendants state that a plaintiff must demonstrate a 'conscious' or 'deliberate' choice on the part of a municipality to prevail on a failure to train claim. *Flores v. County of Los Angeles,* 758 F.3d 1154 (9th Cir. 2014). In *City of Canton*, the Supreme Court held that inadequate police training "may serve as the basis for §1983 liability" when "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. at 388. At the time the excessive force and unreasonable search and seizure against Plaintiffs occurred, the Defendants had in place policies, procedures, and customs, wherein the city and its police departments would not discipline or take corrective action to known incidents or complaints of excessive force and civil rights violations. These policies show conscious and deliberate indifference to the civil rights of the City of Casa Grande and Pinal County's inhabitants.

Defendants also state that the same standard applies to an official in his individual capacity. Defendants Babeu, Berry, Engstrom, Gregg, Horn, Lapre, and Lujan were responsible for the training and supervision of their employee officers. Furthermore, Plaintiff does not state or allege Defendants' City of Casa Grande, County of Pinal, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, and Lujan's liability is a result of vicarious liability. Defendant specifically alleged that each of the foregoing defendants failed to properly train and supervise. Defendants cite *McFarland v. City of Clovis*, stating "alleging that training is 'deficient' or 'inadequate' without identifying a specific inadequacy is conclusory and does not support a plausible claim." 163 F. Supp. 3d 798, 806 (E.D. Cal. 2016). Here, Plaintiffs have identified a specific inadequacy in policy. For example, the FAC states that the Defendants had in place policies in which the city would not take corrective or responsive action to known incidents of excessive force and civil rights violations. FAC ¶ 164. This is not a vague allegation, it points to the specific part of policy that led to civil rights violations. The Ninth Circuit has held that Plaintiffs are

entitled to the presumption of truth as long as allegations in a complaint do "not simply recite the elements of the cause of action." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The Defendants had a duty to Plaintiffs to properly supervise and train their employees. In not doing so, their conduct led to violations of the Plaintiffs' Fourth, Fifth, and Fourteenth Amendment rights.

## II.   CONCLUSION

As previously noted, the Court must view this motion and the FAC in the light most favorable to the Plaintiff. There is no merit in this case for a defense of qualified immunity. On the face of the FAC, the rights of the Plaintiffs pursuant to 42 U.S.C. Sec. 1983, were violated. Therefore, Plaintiffs respectfully request this Court to deny Defendant's Motion to Dismiss in its entirety. In the alternative, if this Court finds that any part of the First Amended Complaint, on its face, is insufficient, Plaintiffs request that they be given time to amend and plead accordingly.

**RESPECTFULLY SUBMITTED** this 11th day of July 2017.

ANGELINI MILLS WOODS + ORI LAW

By */s/  Sean A. Woods*
    Sean A. Woods
    Robert T. Mills
    5055 North 12th Street, Ste 101
    Phoenix, Arizona 85014
    *Attorneys for Plaintiffs*

### CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July 2017, I electronically transmitted the foregoing document to the Clerk's office using the Court's CM/ECF Filing System and forwarded copies to the following parties via electronic mail or U.S. Mail:

James M. Jellison
JELLISON LAW OFFICES, PLLC
2020 North Central Avenue
Suite 670
Phoenix, Arizona 85004
*Attorney for Defendants*

Santa Rita Unit
Abram Ochoa, ADC# 201115
P.O. Box 24406
Tucson, AZ 85734-4406

*/s/  Jordan C. Wolff*

19