**JELLISON LAW OFFICES, PLLC**
36889 N. Tom Darlington Dr.
Suite B7, Box 2800, #304
Carefree, Arizona 85377
Telephone: (480) 659-4244
Facsimile: (480) 659-4255
E-mail: jim@jellisonlaw.com
JAMES M. JELLISON, ESQ. #012763
Attorney for Defendants Paul Babeu, Francisco X. and Jane Doe Lujan, Kent and Jane Doe Horn, David and Jane Doe Engstrom, Mark and Jane Doe McCabe, Jacob H, and Jane Doe Robinson, C. and Jane Doe Western, Michael and Jane Doe Wilson, JJ and Jane Doe Ybarra, Garric and Jane Doe Berry, Christopher and Jane Doe Lapre, Sgt. Gregg and Jane Doe Gregg, and Rory and Jane Doe Skedel (the individual Defendants are referred to by name, or collectively as the "City and County Defendants")

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| James W. Denby, *et. al.*, | Case No.: 2017-00119-SPL |
| Plaintiffs, | **CITY AND COUNTY DEFENDANTS' MOTION TO DISMISS RE: QUALIFIED IMMUNITY OR, IN ADDITION OR THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY** |
| vs. | |
| City of Casa Grande, *et. al.,* | |
| Defendants. | |
| | **(Oral Argument Requested)** |

The City and County Defendants respectfully submit this motion for the application of qualified immunity as to each of them. This Motion is supported by the following Memorandum of Points & Authorities.

**MEMORANDUM OF POINTS & AUTHORITIES**

This Motion follows a Memorandum and Mandate from the Ninth Circuit Court of Appeals (Docs. 127, 127-1) and a subsequent Order from this Court requiring the parties to resubmit any motions on the issue of qualified immunity. (Doc. 128). Because the ruling on review by the Ninth Circuit was this Court's ruling on Defendants' Motion to Dismiss Second Amended Complaint (Docs. 83, 106), this resubmitted Motion mirrors that Motion to

Dismiss, with the exception of updated case law regarding the standard by which qualified immunity is applied. A little history is in order first.

After this Court's ruling granting dismissal of Plaintiff's First Amended Complaint, Plaintiffs filed their Second Amended Complaint. (Docs. 80, 81, 81-1, 82). In the Second Amended Complaint, Plaintiffs assert four constitutional claims pursuant to 42 U.S.C. §1983 including Fourth Amendment excessive force against property (Count I) as to Casa Grande, Pinal County, and individuals Lapre, Engstrom, Skedel, Gregg, and Robinson; Failure to Supervise/Intervene (Count II) against Casa Grande, Pinal County, Berry, Engstrom, Gregg, Horn, Lujan, Lapre, Skedel, McCabe, Robinson, Western, Wilson, and Ybarra; Municipal Liability pursuant to Policies, Custom, or Practice (Count III) against Casa Grande and Pinal County; and Failure to Train/Supervise (Count IV) against Casa Grande, Pinal County, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, and Lujan. (Doc. 82). Plaintiffs' Second Amended Complaint contains no less than 20 additional paragraphs in which the Defendants are lumped together into allegations supported by legal conclusions only. (Doc. 82, ¶¶ 78, 79, 131, 132, 133, 134, 153, 154, 155, 156, 157, 158, 168, 169, 170, 171, 172, 194, 200, 201).[1] Plaintiffs' new fact allegation is that the signed search warrant obtained for the residence was for the sole purpose of arresting Ochoa. (Doc. 82, ¶¶ 88, 114-115).

On May 1, 2018, Defendants filed their Motion to Dismiss Plaintiffs' Second Amended Complaint, again raising qualified immunity and failure to state plausible *Monell* claims. (Doc. 83). A response, reply, and errata followed. (Docs. 86, 87, 88). On March 29, 2019, this Court filed its Order, granting in part, and denying in part, the motion to dismiss. (Doc. 106). This Court granted dismissal based on Plaintiffs' failure to state a plausible *Monell* claim. (Doc. 106,

---

[1] Conclusory allegations, of course, cannot be credited as facts supporting Plaintiffs' claims. *See, Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 555 (2007).

pgs. 5-6).[2] This Court referenced its Order at Doc. 80 in denying qualified immunity to all of the individual Defendants on the basis that the "claims required further factual development." (Doc. 106, pgs. 4-5). On April 14, 2019, this Court's Order was timely appealed by the individual Defendants. (Doc. 107).

In its Memorandum Decision, the Ninth Circuit Court of Appeals cited *Cunningham v. Gates,* 229 F.3d 1271, 1287 (9th Cir. 2000) for the proposition that, in assessing qualified immunity, a court must "carefully examine the specific allegations against each individual defendant." (Doc. 127-1, pg. 2). The appellate court directed that "[o]n remand, the district court shall, in the first instance, make an individualized determination as to the alleged actions of each Defendant to determine whether dismissal based on qualified immunity may be proper as to each Defendant." *Id.*

In light of the Ninth Circuit's Memorandum and Mandate, and through this Motion, the filings at Docs. 83, 86, 87, and 88 are resubmitted for the Court's review as they pertain to the issue of qualified immunity. In the event this Court expects an independently filed motion, the following is offered.

I.      **STANDARD OF REVIEW.**

The Court must dismiss a complaint under Fed.R.Civ.P 12(b)(6) if it fails to state a cognizable legal theory or sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990). A complaint must contain sufficient factual matter, which, if accepted as true, states a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Facial plausibility exists if the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

---

[2] On June 27, 2019, this Court clarified that the City and County are dismissed from Plaintiffs' action entirely. (Doc. 118).

defendant is liable for the misconduct alleged. *Id.* "Where a complaint pleads facts that are 'merely consistent' with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 557 (2007)). Although in deciding a motion to dismiss the Court must accept the factual allegations in the complaint as true, *Shwarz v. U.S.*, 234 F.3d 428, 435 (9th Cir. 2000), that does not apply to legal conclusions or conclusory fact allegations. *Ashcroft v. Iqbal,* 556 U.S. 662 (2009); *see also, Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft, id.* (citing *Twombly,* 550 U.S. at 555).

When a motion to dismiss raises qualified immunity, the court assesses whether the operative complaint pleads a plausible claim that withstands a qualified immunity defense. *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018).

## II.     STATEMENT OF MATERIAL FACTS.[3]

On December 17, 2014, Plaintiffs James Denby and Wilma J. Logston resided at 116 West 10th Street, Casa Grande, Arizona. (Doc. 81-1, ¶ 29).[4] On December 17, 2014, at approximately 3:05 p.m., Casa Grande Police Department ("CGPD") personnel were dispatched to a domestic disturbance call at 107 ½ W. 11th Street, Casa Grande, Arizona. (Complaint, Doc. 81-1, ¶ 31). Multiple CGPD Officers arrived shortly after the call. (Doc. 81-1, ¶¶ 32-34, 42, 47-48).

---

[3] The City and County Defendants recite the non-conclusory, well-pled factual allegations in the Second Amended Complaint, though they disagree that the alleged facts are either true or accurate in reality. Sergeant Gregg's name is actually spelled "Gragg," and he is a member of the City of Casa Grande Police Department, and is not a Pinal County Sheriff's Sergeant. Defendants Robinson, Western, and Skedel are not married.

[4] Plaintiff Elizabeth J. Torres has been dismissed as a party-plaintiff. (Doc. 106, pgs. 6-7).

1    After arrival at the scene, the Officers learned the domestic disturbance involved
2    Abram Ochoa, who had outstanding warrants for his arrest for theft and aggravated domestic
3    violence/assault. (Doc. 81-1, ¶ 34, ftnt. 1).  Ochoa's girlfriend advised CGPD that Ochoa had
4    potentially gone to 116 West 10th Street (the "subject residence") and that he sometimes
5    possessed a "stun gun in the form of brass knuckles.[5]"  (Doc. 81-1, ¶¶ 35-38).  CGPD Officers
6    proceeded to the subject residence and observed Ochoa enter.  (Doc. 81-1, ¶¶ 39-43).  The
7    home's occupant, non-party William Denby, Jr., also informed CGPD Officers that Ochoa
8    was in the house. (Doc. 81-1, ¶¶ 44-45).  Denby Jr. and Ochoa's girlfriend offered to talk or
9    coax Ochoa out of the subject residence, but the civilian offer of assistance was refused.
10   (Doc. 81-1, ¶¶ 45-46, 57, 60).  Ochoa did not live at, or have permission to be in, the subject
11   residence.  (Doc. 81-1, ¶¶ 50-51).

12    CGPD tried to establish communications with Ochoa using a PA system, but there was
13   no response from the residence. (Doc. 81-1, ¶¶ 55-56).   At approximately 3:21 p.m., Lt.
14   Horn allegedly requested SWAT assistance for a barricaded subject.  (Doc. 81-1, ¶¶ 58, 60).
15   At approximately 4:21 p.m., two SWAT teams arrived and began evaluating the scene and
16   subject residence. (Doc. 81-1, ¶ 72).   At or around 5:00 p.m., a judge had signed a search
17   warrant for the residence for the purpose of effecting the arrest of Ochoa. (Doc. 81-1, ¶¶ 86-
18   88, 114-115).

19    A decision was made to bring in a vehicle called a Bearcat, allegedly capable of use as
20   a battering ram.   (Doc. 81-1, ¶¶ 74, 76-77). The Bearcat arrived on scene, and law
21   enforcement personnel allegedly used it to drive over a fence, break a window and door, and,
22   with its PA system, announce their presence and request Ochoa to come out of the subject
23   residence; SWAT members also deployed a tactical phone. (Doc. 81-1, ¶¶ 80-83).   Ochoa
24   did not respond.  (Doc. 81-1, ¶ 82, 84).

---

26   [5] The City and County Defendants are not entirely sure what this allegation means but take it, at a minimum, to report Ochoa's possession of some kind of stun gun.

Between approximately 5:02 p.m. and 8:21 p.m., Plaintiffs allege law enforcement personnel attempted to remove Ochoa from the residence through continued efforts at on-site negotiation, the use of two robots placed in the residence to remotely look for Ochoa, and through the deployment of approximately twenty-two OC and CS gas canisters and a flash-bang device. (Doc. 81-1, ¶¶ 89-106). SWAT continued to proceed as if Ochoa was still in the house. (Doc. 81-1, ¶ 107).

At approximately 9:47 p.m., a tactical team entered the residence, with two additional flash-bangs deployed in the process. (Doc. 81-1, ¶¶ 110-111). The team determined Ochoa was no longer in the residence. (Doc. 81-1, ¶ 112). Plaintiffs allege unidentified members of the tactical team damaged property during the search including furniture, cushions, pillows, windows and window coverings, showers doors, bathroom mirrors, a toilet, and other items. (Doc. 81-1, ¶¶ 116-122). Upon searching the remaining property, law enforcement discovered Ochoa hiding under a tarp on top of a car. (Doc. 81-1, ¶¶ 124-130).

Any additional facts alleged as to each individual Defendant are recited more fully below.

### III. LEGAL ANALYSIS.

#### A. BASIC LEGAL ISSUES MATERIAL TO PLAINTIFFS' CLAIMS.

To prove a case under §1983, a plaintiff must demonstrate that (1) the action occurred "under color of state law" and (2) the action resulted in the deprivation of a constitutional right or federal statutory right. *Parratt v. Taylor,* 451 U.S. 527, 535 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327 (1986); *see also, Jones v. Williams,* 297 F.3d 930, 934 (9th Cir. 2002).

#### 1. Excessive Force Against Property.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated, and no Warrants shall issue, but upon probable cause."[6]  The touchstone of the Fourth Amendment inquiry is reasonableness, a standard measured in light of the totality of the circumstances and determined by balancing the degree to which a challenged action intrudes on an individual's privacy and the degree to which the action promotes a legitimate government interest.  *U.S. v. Knights,* 534 U.S. 112, 118-19 (2001); *Ohio v. Robinette,* 519 U.S. 33, 39 (1996).  The reasonableness requirement extends to the manner in which the search is conducted.  *U.S. v. Banks,* 540 U.S. 31, 35 (2003).  It is "generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Dalia v. U.S.,* 441 U.S. 238, 257 (1979). The test is whether "the officers executing the warrant employ[ed] a methodology that is, in light of the values protected by the Fourth Amendment and the exigencies of the situation, a reasonable one." *U.S. v. Jones,* 54 F.3d 1285, 1292 (7th Cir. 1995).

"It is plain that while the destruction of property in carrying out a search is not favored, it does not necessarily violate the [F]ourth amendment." *U.S. v. Becker*, 929 F.2d 442, 446 (9th Cir. 1991). "[O]fficers executing search warrants on occasion must damage property in order to perform their duty." *Dalia,* 441 U.S. at 258.  Officers are not obligated to use the least destructive means possible to execute a search warrant.  *Johnson v. Manitowoc County*, 635 F.3d 331, 335 (7th Cir. 2011).  "So long as the officer's conduct remains within the boundaries of reasonableness, an officer has discretion over the details of how best to proceed with a search warrant's execution." *Id.; citing Lawmaster v. Ward*, 125 F.3d 1341, 1349 (10th Cir. 1997). When judging the objective reasonableness of a use of force this Court may not use 20/20 hindsight.  *Graham v. Connor,* 490 U.S. 386, 396 (1989).  The court

---

[6] Challenges to the "reasonableness of a search by government agents clearly fall under the Fourth Amendment, and not the Fourteenth." *Conn v. Gabbert,* 526 U.S. 286, 293 (1999).

weighs a property owner's interest in avoiding the officers' use of force, and methodology, against the officers' interest in using these methods, as measured by the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.,* 396-97.

### 2.  Unconstitutional Failure To Intervene.

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional right of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). "[T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows." *U.S. v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994) *aff'd in part, rev'd in part,* 518 U.S. 81. (1996). An officer who fails to intervene when his fellow officers use excessive force to effect a seizure would be responsible, like his colleagues, for violating the Fourth Amendment. *Id.* However, officers are liable for a breach of this duty only if they had "a realistic opportunity" to intercede. *Cunningham*, 229 F.3d at 1289. Failure to intervene cannot be present where an officer is physically incapable of preventing an incident, which includes an assessment of the officer's location when the incident occurred, and how long it took the incident to transpire. *Ting v. U.S.*, 927 F.2d 1504, 1512 (9th Cir. 1991). "A failure-to-intervene claim requires an underlying constitutional violation." *Shepard v. Perez*, 609 Fed.Appx. 942, 942–43 (9th Cir. 2015).

### 3.  Failure to Train/Supervise.

"[C]ulpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson,* 563 U.S. 51, 61 (2011). "[A] municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Id., quoting City of Canton v. Harris,* 489 U.S. 378, 388 (1989). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for

purposes of failure to train." *Connick.* 563 U.S. at 62. A plaintiff "must demonstrate a 'conscious' or 'deliberate' choice on the part of a municipality in order to prevail on a failure to train claim. *Flores v. County of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014). "[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *City of Canton,* 489 U.S. at 391. As to an official in his individual capacity, the same standard applies – a plaintiff must show the official "was deliberately indifferent to the need to train subordinates, and the lack of training actually caused the constitutional harm or deprivation of rights." *Flores*, 758 F.3d at 1158-59, *quoting Connick,* 563 U.S. at 59. As with other constitutional claims, the failure to plead facts showing a claim for failure to train that is "plausible on its face," is fatal to the maintenance of the claim. *Flores*, 758 F.3d at 1160; *Neylon v. County of Inyo,* 2016 WL 6834097 (E.D. Cal. 2016). There is no *respondeat superior* liability under §1983, so a defendant's position as the supervisor of someone who allegedly violated a plaintiff's constitutional rights does not make the supervisor liable. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978); *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989) (requiring personal participation in the alleged constitutional violations); *May v. Enomoto,* 633 F.2d 164, 167 (9th Cir. 1980) (holding that section 1983 liability must be based on the personal involvement of the defendant).

### B. ALL DEFENDANTS NAMED IN THEIR INDIVIDUAL CAPACITIES ARE ENTITLED TO QUALIFIED IMMUNITY.

Qualified immunity is not merely a defense. Rather, it provides a sweeping protection applicable during the entirety of the litigation process. *Pearson v. Callahan,* 555 U.S. 223, 231 (2009); *Harlow v. Fitzgerald,* 457 U.S. 800, 819 (1982). "An official sued under §1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct."

*Plumhoff v. Rickard*, 134 S.Ct. 2012, 2018-19, 2023 (2014); *Ashcroft v. al–Kidd,* 563 U.S. 731, 735 (2011).  The plaintiff bears the burden to identify clearly established law.  *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000).

The Supreme Court has remarked several times that in Fourth Amendment excessive force cases, "qualified immunity operates 'to protect officers from the sometimes hazy border between excessive and acceptable force.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001). To that end, qualified immunity shields an officer from damages liability when it was not "clearly established that the Fourth Amendment prohibited [his] conduct in the 'situation [he] confronted.'" *Mullenix v. Luna*, 136 S.Ct. 305, 309 (2015) (per curiam) (quoting *Brosseau*, 543 U.S. at 199–200); *see also, White v. Pauly,* 137 S.Ct. 548, 552 (2017). Under that standard, if "we cannot say that only someone 'plainly incompetent' or who 'knowingly violate[s] the law' would have ... acted as [the officer] did," then he is entitled to qualified immunity.  *Mullenix,* 136 S.Ct. at 310 (first alteration in original) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  It bears emphasizing that the analysis must always be trained on the particular facts and circumstances under review; to overcome a qualified immunity defense, it is never enough simply to recite the general proposition that the Fourth Amendment prohibits officers from using an amount of force that is objectively unreasonable. *Brooks v. Clark Cty*., 828 F.3d 910, 919–20 (9th Cir. 2016). Rather, "[t]he dispositive question is 'whether the violative nature of [the officer's] *particular* conduct is clearly established.'" *Mullenix.* at 308 (*quoting Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)). And "[t]his inquiry 'must be undertaken in light of the *specific context* of the case, not as a broad general proposition.'" *Id.* (emphasis added) (quoting *Brosseau*, 543 U.S. at 198).  On the application of qualified immunity in excessive force cases, the Supreme Court recently elaborated:

> Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue....

*City of Escondido v. Emmons,* 139 S.Ct. 500, 503-04 (2019) (emphasis added), citing *D.C. v. Wesby,* 138 S.Ct. 577, 581 (2018).

More than that, and as recognized by the Ninth Circuit, each defendant is entitled to an "individualized analysis" of qualified immunity. *Cunningham*, 229 F.3d at 1289. Here, all persons named as Defendants are sued individually and, therefore, entitled to an individualized assessment of qualified immunity in light of the "particular circumstances" each faced. Plaintiffs' Second Amended Complaint fails to allege a constitutional violation committed by any individually named Defendant, much less a violation of clearly established law.

### *Sgt. Rory Skedel*

Pinal County Sheriff's Sergeant Rory Skedel is alleged to have deployed two (2) "flash-bangs" as part of the physical entry into the residence. (Doc. 81-1, ¶ 111). He is named in Counts I and II only. (Doc. 81-1).

In *Boyd v. Benton,* 374 F.3d 773, 777 (9th Cir. 2004) a SWAT team deployed a flash-bang device when executing a raid. The SWAT team used the flash-bang device upon entry - without looking and into a dark apartment in which several people were sleeping - including Boyd, whom they injured when the device ignited. *Id.* at 778. The court, nonetheless, held it was not clearly established that use of flash-bangs under the circumstances was unreasonable, and applied qualified immunity. *Id.* at 784. In *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 973 (7th Cir. 2003), the court found the deployment of flash-bang devices to be

reasonable where the suspect had a criminal record that included aggravated assault, was known to be in the residence, and had access to weapons. The officers had ample reason to be concerned about their personal safety, and the flash bang devices were not used in the presence of innocent persons or children, and no personal injury resulted. *Id.* In *U.S. v. Myers,* 106 F.3d 936 (10th Cir. 1997), police obtained a warrant to search a residence that was suspected of housing a marijuana growing operation. The court found the use of a flash-bang device was reasonable where a background check revealed that Mr. Myers, one of the occupants of the home, had prior convictions for burglary, theft, and cocaine trafficking. *Id.* at 940. Finally, in *Bing ex rel. Bing v. City of Whitehall, Ohio*, 456 F.3d 555, 569 (6th Cir. 2006), the court concluded that the police use of pepper gas and a first flash-bang device was reasonable in an attempt to extract a dangerous felon from a residence, and while the use of a second flashbang device was not reasonable due to the presence of accelerants, qualified immunity still applied as the law was not clearly established under the circumstances.

Here, Sgt. Skedel allegedly deployed two flash-bang devices in a volatile domestic violence/flight situation - after law enforcement clearly and continuously announced their presence, placed robots in the subject residence, determined no by-standers or children were present, and first attempted to remove the sole occupant/suspect with the use of chemical munitions. There is no allegation Skedel used a flash-bang without warning or with no prior observation, or that he had knowledge the home was occupied by non-suspects or would catch fire through the presence of accelerants. Sgt. Skedel's use of force does not violate the constitution, much less clearly established constitutional law. There is also no allegation Sgt. Skedel failed to intervene in anyone else's application of unconstitutional force, with knowledge and opportunity to intervene. *See, Ting, supra*.

//

//

### *Sgt. Chris Lapre*

Pinal County Sheriff's Sergeant Chris Lapre is alleged to have arrived on scene at approximately 3:38 p.m., was the Bravo team leader and took a position inside the Bearcat, and deployed approximately 22 canisters of chemical munitions into the residence, including a combination of OC (pepper spray) and CS (tear gas). (Doc. 81-1, ¶¶ 61, 72, 75, 93-102). He is named in Counts I, II, and IV. (Doc. 81-1).

In *Bing*, 456 F.3d 555, 569 (6th Cir. 2006), the court held the police's use of pepper gas and a first flashbang device was reasonable under the totality of the circumstances test set forth in *Graham v. Connor,* 490 U.S. 386, 396 (1989). In that case, six canisters of pepper spray were deployed, followed by two flash-bang devices, the second ultimately causing the home to catch fire, and the occupant/suspect to be killed. In *Simpson v. Commonwealth of Virginia,* 2016 WL 3923887, *13 (E.D. Va. 2016), the court granted qualified immunity in a matter in which "as many as 60 gas canisters" were deployed in an effort to extract a mentally ill man whose responses to police included unusual communications, and where police believed the man possessed a shotgun.

Here, Sgt. Lapre is alleged to have deployed approximately 22 canisters of OC and/or CS in a volatile domestic violence/flight situation - after law enforcement clearly and continuously announced their presence, placed robots in the subject residence and determined no by-standers or children were present, and where the suspect – believed to be located somewhere in the home – refused to surrender to authorities. Sgt. Lapre's use of force does not violate the constitution, much less clearly established constitutional law. There is also no allegation Sgt. Lapre failed to intervene in anyone else's application of unconstitutional force, with knowledge and opportunity to intervene. *See, Ting, supra.* Finally, there are no well-pled, non-conclusory allegations as to Sgt. Lapre that he was either responsible, or

deliberately indifferent to a need, to train subordinates regarding the use of force in the execution of search warrants.

### *Lt. Kent Horn, Lt. Garric Berry, Sgt. Brian Gragg, Sheriff Babeu*

Casa Grande Police Lieutenant Kent Horn is alleged to have called SWAT to respond to a barricaded subject at a time when Ochoa, a person with outstanding arrest warrants, had been seen entering the house, and his entry had been confirmed by the home's residents who offered civilian assistance to "coax" Ochoa out of the home. (Doc. 81-1, ¶¶ 34-36, 43-45, 50-51, 55-58). Pinal County Sheriff's Lieutenant Garric Berry was on scene, and was advised that a search warrant had been signed. (Doc. 81-1, ¶ 89). Casa Grande Police Sergeant Brian Gragg is alleged to have been in command at the scene prior to the arrival of SWAT, and to have been presented a signed search warrant as the SWAT team leader. (Doc. 81-1, ¶¶ 73, 87). Paul Babeu was the elected Pinal County Sheriff. (Doc. 81-1, ¶ 18). Lts. Horn and Berry are named in Counts II and IV, Gragg in Counts I, II, and IV, and Babeu in Count IV only. (Doc. 81-1).

There are no allegations that any of these individuals exerted unconstitutional force, caused unconstitutional force to be exerted, or failed to intervene in anyone else's application of unconstitutional force, with knowledge and opportunity to intervene. *See, Ting, supra.* There is no allegation supporting a claim that any of the four were deliberately indifferent to a need to train subordinates in the use of force. Indeed, none of their alleged actions violate clearly established constitutional law. As with any other named Defendant, their role as supervisors does not impose constitutional liability. *See, Monell, supra.* As for Lt. Horn's mere request for tactical team assistance, there is no clearly established constitutional right to be free of such a request, or a resulting deployment. *See Terebesi v. Torreso*, 764 F.3d 217, 232 (2nd Cir. 2014) (qualified immunity applied for decision to deploy tactical team); *see also, Phillips v. James,* 422 F.3d 1075, 1082 (10th Cir. 2005) (police chief's summons of SWAT objectively reasonable in domestic violence case involving weapons).

### *Sgt. David Engstrom*

Casa Grande Police Sergeant David Engstom is named in Counts I, II, and IV. (Doc. 81-1). He is alleged to have arrived on scene at approximately 3:13 p.m. (Doc. 81-1, ¶ 33). Engstrom quickly tracked Ochoa to the subject residence and both saw, and reported, within 3-4 minutes of his arrival on scene, that Ochoa had briefly exited the subject residence, and then went back in. (Doc. 81-1, ¶¶ 38-41). By approximately 4:03 p.m., Engstrom is alleged to have transferred to a tactical assignment, whereupon he was tasked with covering the east perimeter wall of the residence. (Doc. 81-1, ¶¶ 62-63). After approximately an hour in this assignment, Sgt. Engstrom is alleged to have noticed some movement from a tarp that covered a car in the backyard of the subject residence, and advised of the movement on the tactical channel. (Doc. 81-1, ¶¶ 64-65). One of the operators on-scene responded that a dog was loose in the area, which Engstrom allegedly accepted as the cause for the tarp's movement. (Doc. 81-1, ¶ 70). Ochoa was eventually found hiding under that same tarp, but on top of the car's hood. (Doc. 81-1, ¶¶ 128-129). There are no allegations that Sgt. Engstrom exerted unconstitutional force, caused unconstitutional force to be exerted, or failed to intervene in anyone else's application of unconstitutional force, with knowledge and opportunity to intervene. *See, Ting, supra.* There are no well-pled, non-conclusory allegations as to Sgt. Engstrom that he was either responsible, or deliberately indifferent to a need, to train subordinates regarding the use of force in the execution of search warrants. Finally, Sgt. Engstrom's alleged acceptance that the tarp movement was something other than Ochoa is insufficient to allege a violation of any clearly established constitutional principle.

### *Corporal Francisco Lujan*

Casa Grande Police Corporal Francisco X. Lujan is named in Counts II and IV. (Doc. 81-1). He is alleged to have arrived on scene at approximately 3:11 p.m., and was told, approximately five minutes after his arrival, that Ochoa was seen coming out of the residence,

and going right back in. (Doc. 81-1, ¶¶ 32, 39-41). Corporal Lujan approached the front door of the residence, and made contact with the occupant, non-party William Denby, Jr., as he exited. (Doc. 81-1, ¶¶ 44, 47). Corporal Lujan used the Bearcat's PA system to announce police presence and advised Ochoa to come out of the residence with his hands-up, following verbal directions to be given – Ochoa did not respond to Lujan. (Doc. 81-1, ¶¶ 81-82). There are no allegations that Corporal Lujan exerted unconstitutional force, caused unconstitutional force to be exerted, or failed to intervene in anyone else's application of unconstitutional force, with knowledge and opportunity to intervene. There are no well-pled, non-conclusory allegations as to Corporal Lujan that he was either responsible, or deliberately indifferent to a need, to train subordinates regarding the use of force in the execution of search warrants. *See, Ting, supra.* Finally, none of his alleged actions violate clearly established constitutional law.

### *Officers McCabe, Western, Ybarra, Wilson, and Robinson*

For Casa Grande Police Officers Mark McCabe, Chris Western, and Jeremy Ybarra, the bare allegations of the Complaint are that they "arrived" at the scene. (Doc. 81-1, ¶¶ 32, 47, 48). Officer Michael Wilson is only alleged to have "arrived" at the scene, and observed Ochoa briefly exit from, and return into, the residence. (Doc. 81-1, ¶¶ 42, 43). Officer Jacob Robinson allegedly provided security for Lapre as he deployed chemical munitions into the residence. (Doc. 81-1, ¶ 97). These Defendants are named only in Count II, with the exception of Officer Robinson who is named in Counts I and II.

There are no allegations that any of these individuals exerted unconstitutional force, caused unconstitutional force to be exerted, or failed to intervene in anyone else's application of unconstitutional force, with knowledge and opportunity to intervene. *See, Ting, supra.* Moreover, in *Chuman v. Wright,* 76 F.3d 292, 295 (9th Cir. 1996), the Ninth Circuit rejected a "'team effort' standard [that] allows [a] jury to lump all the defendants together, rather than require it to base each individual's liability on his own conduct." In that case, the court held

that a police officer's "[b]eing a mere bystander [to his colleagues' conduct] was insufficient" to support § 1983 liability. *Id.* at 294.  Here, the allegations do not support a plausible constitutional claim for any of these five Defendants, much less one supported by clearly established law.

### C. IN ADDITION, OR IN THE ALTERNATIVE, THE INDIVIDUAL DEFENDANTS RESUBMIT THEIR MOTION FOR SUMMARY JUDGMENT.

In its Order at Doc. 128, this Court states that "the parties shall resubmit *any* motions on the issue of qualified immunity . . ." (emphasis added).  Although the Ninth Circuit's Memorandum and Mandate apply only to the denial of Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, this Court's Order suggests that any previously filed Rule 56 motion also needs to be resubmitted by the May 28, 2020 deadline to be considered. If that is the intent of the Court's Order, the City and County Defendants, additionally or in the alternative, resubmit their Rule 56 Motion, and associated filings, at Docs. 91, 92, 92-1, 101, 101-1, 101-2, 101-3, 102, and 105.

### IV.  CONCLUSION.

Whether by motion to dismiss or motion for summary judgment, each individual Defendant is entitled to qualified immunity.

DATED this 28th day of May, 2020.

JELLISON LAW OFFICES, PLLC

s/James M. Jellison
James M. Jellison
*Attorney for the City and County Defendants*

I hereby certify that on May 28, 2020,
I electronically transmitted the attached document
to the Clerk's Office using the CM/ECF System for filing,
with service to the following registrant(s).

1  Robert T. Mills
   Sean A. Woods
2  Mills + Woods Law PLLC
   5055 North 12th Street
3  Suite 101
   Phoenix, AZ 85014
4  *Attorneys for Plaintiffs*

5
   s/James M. Jellison
6