1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8   James W. Denby, et al.,                )   No.  CV-17-00119-PHX-SPL
                                            )
9                                           )
                   Plaintiffs,              )
10                                          )   **ORDER**
    vs.                                     )
11                                          )
                                            )
12  City of Casa Grande, et al.,            )
                                            )
13                 Defendants.              )
                                            )
14  _____)

15          Before the Court is a Motion for Summary Judgment (Doc. 201) filed by Defendants

16  David and Jane Doe Engstrom, Jacob H. Robinson, Christopher and Jane Doe Lapre, Sgt.

17  Gragg and Jane Doe Gragg, and Rory Skedel (collectively, "Defendants").[1] The Motion is

18  fully briefed and ready for review. (Docs. 201, 203, 210, 211 & 215). For the following

19  reasons, the Court denies Defendants' Motion.[2]

20  ///

21

22          [1] Plaintiff's Second Amended Complaint also names "Jane Doe Robinson" and
    "Jane Doe Skedel" as Defendants. (Doc. 82 at 1). However, Defendants indicate that
23  Defendants Robinson and Skedel were not married at the time of the events in this matter
    and that Plaintiff is incorrect to name their spouses as Defendants. (Doc. 201 at 1, n.1).
24  Additionally, Plaintiff's Second Amended Complaint spells Defendant Gragg's last name
    as "Gregg." (*See, e.g.*, Doc. 82 at 5). The Court adopts the spelling used in Defendant
25  Gragg's Motion for Summary Judgment (*See* Doc. 201 at 1, n.1).

26

27          [2] Because it would not assist in resolution of the instant issues, the Court finds the
    pending motion is suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R.
28  Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

1

## I.      **BACKGROUND**

2       This action arises from a December 2014 incident at a residence owned by Plaintiff

3   James W. Denby ("Plaintiff") in Casa Grande, Arizona. (Doc. 82 at 6). At approximately

4   3:05 P.M. on the afternoon of December 17, 2014, the Casa Grande Police Department

5   ("CGPD") responded to a "domestic disturbance" complaint at a house nearby Plaintiff's.

6   (*Id.*). Upon arrival, the officers learned the dispute involved Abram Ochoa ("Mr. Ochoa"),

7   who had at least one outstanding arrest warrant for an unrelated incident.[3] (*Id.* at 7). The

8   officers were made aware that Mr. Ochoa had potentially fled to Plaintiff's residence down

9   the street (the "Residence"). (*Id.*). CGPD declined offers from Mr. Ochoa's girlfriend and

10  Plaintiff Denby's son to help persuade Mr. Ochoa to leave the Residence voluntarily. (*Id.*

11  at 8). The officers used a loudspeaker PA system to attempt communication with Mr.

12  Ochoa, but they did not receive any response from the Residence. (*Id.*).

13      Shortly after arriving, CGPD requested assistance from the Pinal County Regional

14  SWAT ("SWAT"). (*Id.*). SWAT arrived approximately one hour later and decided to use

15  a "Bearcat" as a battering ram to gain access to the Residence. (*Id.* at 10). SWAT drove the

16  Bearcat over a chain-linked fence and into the front of the Residence, breaking the windows

17  and front door. (*Id.* at 11). SWAT then unsuccessfully attempted to communicate with Mr.

18  Ochoa through the Bearcat's PA system and through a tactical phone deployed through the

19  broken windows and wall. (*Id.*). At approximately 5:00 P.M., a judged signed a search

20  warrant for the Residence, permitting officers to enter the Residence for the sole purpose

21  of arresting Mr. Ochoa. (*Id.*). Over the course of several hours, SWAT deployed robots,

22  fired a total of twenty-two (22) canisters of pepper spray and tear gas, and deployed

23  multiple Noise Flash Diversionary Devices ("NFDDs" or "flash grenades") into the

24  Residence. (*Id.* at 11–12). Through it all, the officers did not see Mr. Ochoa nor any signs

25  of movement or response from inside the Residence. (*Id.* at 13). Next, SWAT developed a

26

---

27      [3] Mr. Ochoa is also a named Defendant in this action. However, he appeared in this
    case separately, (*see* Doc. 68), and does not join Defendants' Motion for Summary
28  Judgment. (*See* Doc. 201 at 1).

tactical plan to enter the Residence and act on the search warrant. (*Id.* at 13). They entered at 9:47 P.M., nearly seven hours after they first arrived at the Residence. (*Id.*). During the search, SWAT team members and CGPD officers destroyed several items in the Residence, including furniture, cushions, pillows, windows, window coverings, bathroom mirrors, shower doors, toilets, televisions, artwork, and antiques. (*Id.* at 13–14). At approximately 10:03 P.M.—seven hours after CGPD was originally dispatched to the area—Mr. Ochoa was found *outside* the Residence and hiding under a tarp on the property. (*Id.* at 14). Mr. Ochoa had apparently been hiding under the tarp during the entire incident. (*Id.*).

Although Plaintiffs initially filed this case in state court, Defendants removed it to this Court on January 13, 2017.[4] (Doc. 1). Plaintiffs amended their complaint twice. (*See* Docs. 31 & 82). Three of Plaintiffs' five original claims have been dismissed, along with several of the originally named Defendants. (*See* Docs. 21, 118 & 136). Only Defendants Engstrom, Robinson, Lapre, Gragg, Skedel, and Ochoa remain. As it relates to these Defendants—excluding Defendant Ochoa—only two claims remain: (i) violation of Plaintiff's Fourth and Fourteenth Amendment rights, pursuant to 42 U.S.C. § 1983 (Count I) and (ii) failure to intervene with respect to a constitutional violation (Count II). (Doc. 82 at 16–21). Defendants Engstrom, Robinson, Lapre, Gragg, and Skedel now seek summary judgment in their favor as to both claims and dismissal from this action. (*Id.*).

## II.   LEGAL STANDARD

A court must grant summary judgment if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat the motion, the non-moving party must show that there are genuine factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[4] Plaintiff Denby was originally joined by Plaintiffs Elizabeth J. Torres and Wilma J. Logston. (Doc. 82 at 1). However, Plaintiffs Torres and Logston were later dismissed from the action and Mr. Denby is the sole remaining Plaintiff. (*See* Doc. 106 & 188).

242, 250 (1986). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. "The Court must assume the nonmoving party's version of the facts to be correct, even in qualified immunity cases," *Soto v. Paredes*, No. CIV–05–4105–PHX–MHM, 2008 WL 906461, at *1 (D. Ariz. Mar. 31, 2008) (citing *Liston v. Cnty. of Riverside*, 120 F.3d 965, 977 (9th Cir. 1997)), and all inferences must be drawn in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.   **DISCUSSION**

Defendants Engstrom, Gragg, Lapre, Robinson, and Skedel argue they are entitled to qualified immunity and that summary judgment in their favor is therefore appropriate with respect to Plaintiff's two remaining claims. The Court will first address Plaintiff's Fourth Amendment claim and conduct the requisite qualified immunity analysis before turning to Plaintiff's failure to intervene claim.

### A. Fourth Amendment Claim & Qualified Immunity Analysis

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Est. of Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson*, 555 U.S. at 231 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

In determining whether an officer is entitled to qualified immunity, the Court must consider (1) whether there has been a violation of a constitutional right, and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (citing *Pearson*, 555 U.S. at 231). The Court may exercise its discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. Once a qualified-immunity defense is raised, the plaintiff bears the burden of proving the violation of a constitutional right and that the right was clearly established. *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000).

### 1. *Constitutional Violation Prong*

The first prong of the qualified immunity analysis asks whether the facts shown by Plaintiff—when viewed in Plaintiff's favor—make out a constitutional violation. *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (citing *Pearson*, 555 U.S. at 232). The constitutional right at issue is the Fourth Amendment's protection from unreasonable searches and seizures. Plaintiff contends that his Fourth Amendment rights were violated when Defendants excessively and unnecessarily destroyed Plaintiff's property during their search of his Residence. (Doc. 82 at 16–19).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. "It is plain that while the destruction of property in carrying out a search is not favored, it does not necessarily violate the fourth amendment." *United States v. Becker*, 929 F.2d 442, 446 (9th Cir. 1991) (citation omitted). "[O]fficers executing a search warrant occasionally 'must damage property in order to perform their duty.'" *Liston*, 120 F.3d at 979 (quoting *Dalia v. United States*, 441 U.S. 238, 258 (1979)). However, Ninth Circuit and Supreme Court authority has made clear that "unnecessarily

destructive behavior, beyond that necessary to execute a warrant effectively," may sometimes amount to a Fourth Amendment violation. *Id.* (citation omitted). As with any Fourth Amendment inquiry, "[t]he test of what is necessary to 'execute a warrant effectively' is reasonableness." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose* ("*Hells Angels*"), 402 F.3d 962, 971 (9th Cir. 2005). When determining whether officers executed a search warrant unreasonably, a court must determine whether the degree of intrusion matched the underlying purpose of the intrusion. *Id.*

Here, the underlying purpose of Defendants' intrusion was clear and unambiguous: to find and arrest Mr. Ochoa. Defendants were originally responding to a domestic disturbance complaint involving Mr. Ochoa at a house nearby Plaintiff's. (Docs. 203 at 2 & 211 at 2). Defendants were aware that Mr. Ochoa had an active arrest warrant; in fact, one officer had attempted to serve the arrest warrant the day prior. (Docs. 203 at 2 & 211 at 3). Defendants learned that Mr. Ochoa had fled the house and they pursued him to Plaintiff's Residence where they set up a perimeter. (Docs. 203 at 2–3 & 211 at 3–4). The SWAT Team was requested and soon arrived, while the process to obtain a search warrant for the Residence had begun. (Docs. 203 at 6–7 & 211 at 9–12). Shortly thereafter, the search warrant was signed. (Docs. 203 at 8 & 211 at 16). It directed Defendants to search the Residence to find and arrest Mr. Ochoa. (*See* "Affidavit for Search Warrant," Doc. 203-12 at 5 (requesting "authorization to enter the premises . . . for the purpose of arresting [Mr. Ochoa]") & "Search Warrant," Doc. 203-12 at 6 (authorizing search of Residence for purpose identified in Affidavit)).

Having identified the underlying purpose of Defendants' intrusion—to find and arrest Mr. Ochoa—the question is whether the degree of the intrusion was reasonable in light of this purpose. *See Hells Angels*, 402 F.3d at 971. In analyzing reasonableness, the Court must consider the totality of the circumstances, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The analysis is purely objective. *See id.* at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively

reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."). The Court must consider the facts and circumstances confronting the officers, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" (the "*Graham* factors"). *Id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). The most important of these factors is whether the suspect poses an immediate threat.[5] *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). "Although the reasonableness of force used ordinarily is a question of fact for the jury, defendants may be entitled to summary judgment if the 'use of force was objectively reasonable under the circumstances.'" *Soto*, 2008 WL 906461, at *1 (citing *Liston*, 120 F.3d at 976, n.10)).

The degree of intrusion in this case was significant. Defendants' actions resulted in near complete destruction of Plaintiff's home and numerous pieces of Plaintiff's personal property. All exterior windows of the Residence were destroyed, either via Defendants' use of the Bearcat or via launched chemical munitions. A chain-link fence around the Residence and the Residence's front door were demolished by the Bearcat. The engine of Plaintiff's PT Cruiser was destroyed when chemical munitions were deployed, and a canister was fired directly into the vehicle's engine compartment. All furniture in the home was destroyed. Home appliances were destroyed. Televisions were destroyed. Cushions and pillows were torn open. Window coverings were torn apart. Shower doors, bathroom mirrors, and a toilet were smashed. Personal items including artwork, heirlooms, clothes, family pictures, and antiques were destroyed, smashed, or damaged. Even the Residence's foundation sustained significant damage because of the damaged toilet, which caused water to run unchecked in the Residence for days. The Residence sustained significant chemical

---

[5] The *Graham* factors are not exhaustive. The Court may also consider factors such as whether the suspect resisted or was armed, the number of officers involved, whether the suspect was sober, the availability of alternative methods of capturing or subduing the suspect, or any other dangerous or exigent circumstances that existed. *Chew*, 27 F.3d at 1440, n.5 (citing *Hunter v. Dist. of Columbia*, 943 F.2d 69, 77 (D.C.Cir.1991)).

damage from Defendants firing at least twenty-two canisters of chemical munitions into the home and failing to decontaminate or properly ventilate the home following the incident. Defendants do not dispute that any of these damages occurred.

Altogether, the damages sustained by Plaintiff's Residence and personal property far exceed the damages that occurred in other cases where courts did not find a constitutional violation. *See, e.g.*, *Johnson v. Manitowoc Cnty.*, 635 F.3d 331, 333–34, 336 (7th Cir. 2011) (finding search reasonable where officers jackhammered concrete in garage, damaged main door to trailer, removed wall panels and carpet, and cut up a couch). In fact, the damages in this case even exceed the damages that occurred in many cases where courts *did* find sufficient evidence for a constitutional violation. *See, e.g.*, *Hells Angels*, 402 F.3d at 974 (finding Fourth Amendment violation where officers jack-hammered sidewalk, cut mailbox off its post, and broke a refrigerator); *Neal v. Cal. City*, No. 1:14–cv–00269–AWI–JLT, 2015 WL 4227466, at *11 (E.D. Cal. July 10, 2015) (denying defendants' request for summary judgment—and finding that a jury could reasonably find Fourth Amendment violation—where officers disassembled appliances and video game systems, cut holes in sofas and pillows, removed clothes from dryers, broke picture frames, and forcibly opened safe). Although this does not mean that Defendants necessarily violated Plaintiff's constitutional rights, the Court finds that the degree of intrusion in this case—that is, the extent of the property damage—was more than sufficient to sustain a Fourth Amendment violation.

Consideration of the *Graham* factors further supports this finding. As to the third *Graham* factor—whether the suspect was actively resisting arrest or attempting to evade arrest by flight—it is undisputed that Mr. Ochoa was actively resisting arrest by evading the officers from the initial scene and then by hiding under the tarp outside Plaintiff's Residence for over six hours. That said, the parties dispute the applicability of the other two *Graham* factors. As to the first *Graham* factor—the severity of the crime at issue—Defendants contend that Mr. Ochoa was "wanted on a serious offense," (Doc. 201 at 13), while Plaintiff contends that Mr. Ochoa was merely wanted for a failure-to-appear on non-

violent charges.[6] (Doc. 211-1 at 13). The fact that Mr. Ochoa's arrest warrant was based only on his failure to appear for non-violent charges is supportive of Plaintiff's position on this factor; such a crime is not a particularly serious offense. However, this overlooks the reason Defendants were dispatched to the scene in the first place: reports of a domestic disturbance involving Mr. Ochoa, a man who had a history of domestic violence, including assaults of his girlfriend and the suspected stabbing of his brother just two weeks prior.[7] The fact that Defendants were responding to and—at least initially—investigating reports of domestic violence is supportive of Defendants' position on the first factor.

As to the second (and most important) *Graham* factor—the immediacy of the threat posed by the suspect—Defendants argue that Mr. Ochoa posed "an immediate threat to law enforcement officers or others in the general area." (Doc. 201 at 13). Plaintiff, meanwhile, contends that "there were no active threats to justify the level of force used." (Doc. 210 at 5). The Court finds that Mr. Ochoa's general background and criminal history increased the potential threat he posed, but that the actual circumstances of the incident at Plaintiff's Residence did not give rise to an immediate threat of the nature contended by Defendants. To be sure, the threat level was heightened by Mr. Ochoa's history of domestic violence and other criminal activity, gang affiliations, and methamphetamine abuse. (*See* Doc. 203-16 at 1–4 (detailing Mr. Ochoa's felony history)). Defendants were aware of this background information, and it was reasonable for them to perceive a more dangerous situation because of it. Likewise, the risk of injury was further increased by Mr. Ochoa's fleeing from the initial scene, his apparent illegal entry into Plaintiff's Residence, and the

---

[6] To support this contention, Plaintiff relies on the testimony of his expert witness, Mark Hafkey, who declares that he analyzed Mr. Ochoa's CAD and ACIC records and concluded that Mr. Ochoa "had an arrest warrant merely for a failure-to-appear on non-violent charges." (Doc. 211-1 at 13).

[7] Plaintiff points out that Defendants have failed to offer any evidence—other than the Affidavit of Defendant Lapre—of this purported stabbing. (Doc. 211 at 44). The Court has taken this absence of evidence into consideration and does not give great weight to the alleged stabbing in this analysis.

presence of guns inside that Residence.

That said, numerous *other* circumstances reasonably eased or even eliminated many of these concerns. First, Mr. Ochoa never displayed any threatening or intimidating behavior at any point during the nearly seven-hour incident. He never flashed or used any weapons. He never yelled or used any hostile or aggressive language. He merely ran, and then hid, from Defendants. Second, Defendants were made aware that Mr. Ochoa was not under the influence of any drugs or alcohol. Third, Defendants were aware that—even if Mr. Ochoa *was* inside the Residence—no other person was inside the Residence with him or otherwise in immediate danger. Fourth, Defendants had control and a thorough understanding of the entire scene. Plaintiff provided them with keys and immediate, unrestricted access to the entire Residence. He also drew them a map of the Residence's interior and told them exactly where his firearms were located—in his bedroom. Defendants established a perimeter and had constant, uninterrupted surveillance of the Residence for nearly seven hours. Plaintiff claims to have observed officers "wandering casually through his yard and walking up to windows and doors" and points out Defendant Robinson's admission "that he was 'close enough to the residence to move a curtain back from a window' to look into the room." (Doc. 210 at 4). This shows both the officers' control of the scene and their general ease with its threat level.

Fifth, the length of the incident—nearly seven hours—combined with the complete absence of *any* communication with Mr. Ochoa or observance of *any* sounds or movement inside the Residence further eased the level of threat. Despite Defendants' contention, this was *not* the sort of multi-hour, hotly contested standoff between officers and an armed suspect who was barricading himself, actively rejecting the officers' commands and negotiation attempts, and outwardly threatening to harm himself, the officers, or some other person. *Compare with Lech v. City of Greenwood Vill.*, 791 Fed. Appx. 711, 713 (10th Cir. 2019) (suspect fired bullet from inside garage and struck officer's car during "high-risk,

barricade situation").[8] Rather, the officers' use of the PA system, the throw phone, the chemical munitions, and the robots—not to mention the numerous, largely unobstructed views into the Residence that they had through the broken windows—allowed them to clear most rooms in the house and confirm that Mr. Ochoa was likely not inside. The truth of the situation—that Mr. Ochoa was not in the Residence at all and that he was not seeking to threaten or harm but rather merely hide from the officers—become increasingly clear with every uneventful hour that passed without any signs of or contact with Mr. Ochoa. In turn, the immediacy of the threat posed by Mr. Ochoa should have decreased.

Sixth, and finally, any concerns that Mr. Ochoa had access to Plaintiff's firearms were reasonably eased, particularly as the day wore on. As noted above, Plaintiff told the officers *exactly* where his firearms were located—in his bedroom. He further explained that his bedroom door was locked, and that even if the room was breached, the guns were either locked in a gun safe or had trigger locks. The secured location of the guns was even confirmed during the incident, when Defendants had "a direct line of sight into the Home to Plaintiff's locked bedroom door and could see it remained unopened, thus proving Ochoa never had access to Plaintiff's firearms, even if he had been in the Home." (Doc. 210 at 3). In sum, the Court finds that Mr. Ochoa posed a moderate threat to the officers, given his background and his fleeing from the initial scene. However, the Court cannot find that the threat he posed was so severe or immediate as to freely permit all conduct by Defendants, without any regard for the damages it may cause.

To be sure, *some* of the tactics used by Defendants in executing the search warrant—and the damages resulting therefrom—may have been reasonable. Over the course of nearly seven hours, Defendants steadily escalated their use of force: (1) using the PA system to make commands; (2) using the Bearcat to break windows and deploy a throw-

---

[8] The Court notes that *Lech* is not a Fourth Amendment case. Rather, the constitutional provision at issue in *Lech* was the takings clause of the Fifth Amendment. *Lech*, 791 Fed. Appx. at 714. Nonetheless, the case shares factual similarities to the present case, and Defendants rely on *Lech* in their Motion. (Doc. 201 at 11).

phone into the Residence; (3) deploying a robot into the Residence; (4) firing chemical munitions into the Residence; (5) sending a second, smaller robot into the Residence; (6) firing two NFDDs into the Residence; and (7) making a physical, dynamic entry into the Residence. In their Motion, Defendants cite to caselaw holding that the use of tactics such as chemical munitions, flash grenades, and dynamic entries with armored vehicles such as a Bearcat are often reasonable when a dangerous suspect refuses to leave a building and submit himself to officers. (Doc. 201 at 10–11, 15–16 & 18 (listing cases)). According to the caselaw, when such tactics are reasonably used, damage to property—*e.g.*, broken windows and doors, or flooring damage—can be expected and generally does not render the search unreasonable. *See West v. City of Caldwell*, 931 F.3d 978, 982 (9th Cir. 2019) (finding use of tear gas reasonable under circumstances); *Cook v. Gibbons*, 308 Fed. Appx. 24, 30–31 (8th Cir. 2009) (case relied upon by Defendants where court found officers' use of tear gas, flash grenades, and dynamic entry via rammed side door to be reasonable).

In this case, however, Plaintiff raises numerous factual disputes relating to whether it was reasonable for Defendants to use these escalating tactics in the first place. For example, Plaintiff argues that Defendants' use of the Bearcat was "unnecessarily destructive, excessive, and therefore unreasonable" given that Defendants had the keys and full, unlimited access to the Residence. (Doc. 210 at 16). Similarly, Plaintiff argues that Defendants' use of at least twenty-two canisters of chemical munitions was unnecessary and unreasonable because the Residence was just 1,300 square feet and Defendants were increasingly aware that Mr. Ochoa was not inside. (*Id.* at 17). Plaintiff argues that Defendants lacked any reasonable belief that Mr. Ochoa was inside the Residence to begin with because of the unreliability of the statements made by Plaintiff's son, the impossibility of footprints existing, and the layout of the Residence. (*Id.* at 5, 12–13). Plaintiff offers expert testimony that Mr. Ochoa could not be considered a "barricaded subject" and that the officers should not have called for the SWAT Team given the circumstances and their failure to complete the requisite risk assessment. (*Id.* at 3–4). Plaintiff also argues that Defendants lacked a reasonable belief that Mr. Ochoa was armed, given the true and

accurate statements of Plaintiff at the scene describing where his guns were located in the Residence and the manner in which they were secured. (*Id.* at 3, 15–16). Plaintiff offers expert testimony and refers to "nationally accepted police practices" to argue that Defendants should have searched the yard and under the tarp sooner. (*Id.* at 3–6, 14–15). Plaintiff argues that, after arresting Mr. Ochoa, Defendants exacerbated the chemical damages and left water running in the Residence by abandoning the Residence and failing to secure the property, call the fire department, or properly decontaminate the Residence. (*Id.* at 6–7). Altogether, the Court finds that Plaintiff raises numerous factual disputes that have a direct bearing on the reasonableness of Defendants' tactics and escalating use of force. Such disputes are properly left for the jury to decide. *See Neal*, 2015 WL 4227466, at *11 ("Although a jury could find that those activities were an appropriate means of effectuating [] the search, it could just as easily find that Defendants' conduct [was] unnecessary to conduct the search.").

Plaintiff also suggests numerous alternatives that Defendants failed to consider. For example, Plaintiff contends that Defendants could have: (i) used their K-9 unit, which was "stationed at the house [during] the entirety of the incident" (Doc. 210 at 6); (ii) used the keys and tactical shields to open the door instead of breaking it open with the Bearcat (*Id.* at 6, 13); (iii) walked away and set up surveillance (*Id.* at 13); (iv) used a helicopter with infrared cameras (*Id.*); (v) simply left the scene and arrested Mr. Ochoa another day, given that he was wanted on non-violent offenses (*Id.* at 13–14); (vi) check under the tarp, given that movement was seen at one point (*Id.* at 14); or (vii) allowed Mr. Ochoa's girlfriend to speak on the PA system (*Id.*). Although the Court will not speculate as to the viability of any of these alternatives, the availability of alternative methods of capturing or subduing the suspect is a factor that courts may consider. *See Chew*, 27 F.3d at 1440, n.5.

Setting aside Defendants' use of chemical munitions, NFFDs, and the Bearcat, the Court notes that the excessive damage sustained by Plaintiff's Residence and personal property also included damages having no apparent relation to such tactics. This independently supports a finding of a constitutional violation. Specifically, Defendants

offer no explanation for the destruction of Plaintiff's furniture, appliances, televisions, PT Cruiser, artwork, heirlooms, clothes, family pictures, and antiques. Presumably, such personal property could have been spared even *with* a reasonable use of chemical munitions, NFFDs, and the Bearcat. More importantly, such property is entirely unrelated to the search's objective. As noted above, the sole purpose of all the actions taken by Defendants—from their arrival, including their search of the Residence, and until Mr. Ochoa was finally found—was to find and arrest Mr. Ochoa. This purpose was plain and simple; it did not include any orders or motivations to search for contraband or recover evidence—purposes that would have widened the scope of reasonably searchable areas in the Residence and possibly justified damage to Plaintiff's personal property. *See Neal*, 2015 WL 4227466, at *11 (explaining why searches may need to be more thorough when target of search is evidence or contraband); *see also Jackson ex rel. Jackson v. Suffolk Cnty.*, 87 F. Supp. 3d 386, 401–02 (E.D.N.Y. 2015) ("The reasonableness of the damage must be evaluated with reference to the target of the search, such as a more invasive contraband search."). As it stands, however, there is no reasonable explanation for Defendants' destruction of numerous objects far too small for Mr. Ochoa to be hiding in.

Finally, the Court must find that *each* individual Defendant engaged in some conduct amounting to a constitutional violation. *See Cunningham v. Gates*, 229 F.3d 1271, 1287 (9th Cir. 2000) ("[I]n resolving a motion for summary judgment based on qualified immunity, a court must carefully examine the specific factual allegations against each individual defendant."). That said, the actions of each individual Defendant need not rise to the level of a constitutional violation. *See Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004); *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1090 (9th Cir. 2011) ("Section 1983 liability extends to those who perform functions 'integral' to an unlawful search, even if their individual actions do not themselves rise to the level of a constitutional violation."). Rather, the Ninth Circuit holds that liability may be imposed on an officer so long as he was an "integral participant" in the unlawful conduct. *Boyd*, 374 F.3d at 780. Although the "integral participation" doctrine "does not implicate government agents who are 'mere

bystanders' to an unconstitutional search," *see Bravo*, 665 F.3d at 1090, the Ninth Circuit has recognized that officers who provide armed backup to other officers conducting the search—even if they do not themselves enter the residence or building being searched—may be considered full, active participants. *Boyd*, 374 F.3d at 780 (citations omitted).

Here, each Defendant was *at least* an "integral participant" in the search of Plaintiff's Residence and therefore can be held liable for any constitutional violations that occurred. First, Defendant Engstrom "was part of the entry team into the [R]esidence, and located toward the end of the line or 'stack' of SWAT Team Operators." (Docs. 203 at 17 & 211 at 35). Although the parties agree that Defendant Engstrom did not personally operate the Bearcat or fire the NFDDs or chemical munitions, they acknowledge that he was charged with maintaining the officers' perimeter of the Residence and that he was "assigned to cover the east perimeter wall" for a few hours. (Docs. 203 at 16–17 & 211 at 33–34). Given his participation in the entry team—and his duties of providing cover and maintaining the officers' perimeter around the Residence—the Court concludes that Defendant Engstrom was an "integral participant" in the search.

Second, Defendant Robinson "took a perimeter position on the west side of the [R]esidence to ensure Ochoa did not flee from the area of the residence he could observe, and to provide security for law enforcement personnel doing their jobs." (Docs. 203 at 28 & 211 at 58). He also provided cover for Defendant Lapre when Defendant Lapre was firing chemical munitions into the Residence. (Docs. 203 at 29 & 211 at 59–60). Although Defendant Robinson was not part of the entry team, he stated in his Affidavit that he provided security for the other officers during the entirety of the incident, including during the officers' entry and search of the Residence. (Doc. 203-10 at 3). Given his role as providing armed cover for the other Defendants during the search, the Court concludes that Defendant Robinson was an "integral participant" in the search.

Third, Defendant Lapre was a member of the SWAT Team and the designated leader of the Bravo Team. (Docs. 203 at 22 & 211 at 44–45). Defendant Lapre assumed the role of grenadier and fired the twenty-two cannisters of chemical munitions into the Residence.

(Docs. 203 at 25 & 211 at 51). He was also part of the entry team. (Docs. 203 at 27–28 & 211 at 56). Given his direct participation in the search of the Residence, the Court finds that Defendant Lapre was an "integral participant" in the search.

Fourth, Defendant Gragg was a Sergeant for the CGPD and the Assistant SWAT Team Commander on the day of the incident. (Doc. 203-5 at 2). Defendant Gragg did not operate the Bearcat, deploy chemical munitions, or deploy the NFDDs. (*Id.* at 4). He was not part of the entry team and did not enter the Residence. (*Id.*). He did not search the outside of the residence and the parties do not indicate that he provided cover for any other officers during the incident. (*Id.*). Instead, Defendant Gragg remained at the command post—which was down the street from the Residence—during the entirety of the incident. (*Id.* at 3). Although he could not see the Residence from the command post, he states in his Affidavit that he "would have provided some directions to the SWAT Team operators." (*Id.* at 4). According to the testimony of Plaintiff's expert witness—who reviewed and analyzed the evidence in this case—Defendant Gragg was the scene supervisor prior to the SWAT Team's arrival, and he remained in charge of the scene even after their arrival, "as there is no evidence higher command personnel ever relieved him." (Doc. 211-1 at 23). Given his role as supervisor and his knowledge of all significant decisions relating to the entry and search of the Residence, the Court finds that Defendant Gragg was an "integral participant" in the search. *See Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005) (citations, quotations, and alteration omitted) ("A supervisor can be liable under § 1983 if he sets in motion a series of acts by others . . . which he knew or reasonable should have known, would cause others to inflict the constitutional injury. . . . Liability can exist without direct participation by the supervisor.").

Fifth, Defendant Skedel was a member of the SWAT Team and the designated leader of the Charlie Team. (Docs. 203 at 32 & 211 at 66–67). Defendant Skedel deployed the two NFDDs that were fired into the Residence—one of which destroyed the toilet and eventually caused the water damage to the Residence's foundation. (Docs. 203 at 34 & 211 at 71). Defendant Skedel also provided cover for Defendant Lapre while Defendant Lapre

was firing the chemical munitions. (Docs. 203 at 32 & 211 at 68). Defendant Skedel was part of the entry team. (Docs. 203 at 35 & 211 at 74). Given his direct participation in the search of the Residence—including his use of the NFDDs, his cover of Defendant Lapre, and his participation on the entry team—the Court finds that Defendant Skedel was an "integral participant" in the search.

In sum, each of the remaining Defendants were far more than mere bystanders during the search of Plaintiff's Residence. The Court finds that each of them were "integral participants" in the search and that they can therefore be held liable for any constitutional violations that occurred. Moreover, although the search in and of itself was justified based on the need to find and arrest Mr. Ochoa, this did not free Defendants from their obligation to execute the search reasonably. Plaintiff has demonstrated sufficient evidence showing that the significant damage caused by Defendants' intrusion was not reasonably necessary and that they likely violated Plaintiff's Fourth Amendment rights. The Court concludes that the evidence put forth by the parties—viewed in the light most favorable to Plaintiff— demonstrates that the authority to search for and arrest Mr. Ochoa "did not justify the level of intrusion and excessive property damage that occurred during the search" of Plaintiff's Residence. *Hells Angels*, 402 F.3d at 972. The Court bases this conclusion on the narrow purpose of Defendants' search, the surprisingly extensive damage that occurred to Plaintiff's Residence and personal property, and the relatively low safety threat that was posed by the circumstances. With respect to the first prong, the Court finds that the evidence demonstrates that a constitutional violation occurred.

### 2. "Clearly Established" Prong

The second prong of the qualified immunity analysis asks whether the constitutional right was "clearly established" at the time of the alleged constitutional violation. *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022) (citation omitted). This inquiry is "a pure question of law for the court to decide." *Mendoza v. Block*, 27 F.3d 1357, 1360 (9th Cir. 1994) (citation omitted). "A constitutional right is clearly established if the official had fair notice that her conduct was unlawful but still engaged in it." *Wright v. Beck*, 981 F.3d 719,

734 (9th Cir. 2020) (internal quotations and citation omitted). To determine whether the official had "fair notice," courts usually look to binding precedent in search of "a case where an officer acting under similar circumstances . . . was held to have violated" the Constitution. *White v. Pauly*, 580 U.S. 73, 79 (2017). For a right to be considered "clearly established," it is generally important that the precedential caselaw be factually similar to the case at issue. *See Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 580 U.S. at 79) ("For a right to be clearly established, case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law.").

In reviewing caselaw, courts "must be careful not to . . . defin[e] clearly-established law 'at a high level of generality.'" *Wright*, 981 F.3d at 734 (quoting *Ashcroft*, 563 U.S. at 742). This is because "broad pronouncements of an abstract right usually fail to provide a clear sense of the outer limits of lawful conduct." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 202 (2001)); *see also Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987) (stressing consequences of defining the right too generally because it allows plaintiff "to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights"). For example, it is obvious that all citizens enjoy a "clearly established" right against unreasonable searches and seizures under the Fourth Amendment. *See id.* at 734–35. This "constitutional truism" is entirely unhelpful, however, in determining the "objective legal reasonableness" of an officer's conduct during a *particular* search or seizure. *Id.* Therefore, courts usually must conduct this inquiry "'in light of the specific context of the case, not as a broad general proposition,' and determine whether the right, as explicated, carries over to the facts" of the case at issue. *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). "Such specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotations and alterations omitted).

Here, Plaintiff cites to *Mena v. City of Simi Valley*, a case in which officers executed a knock-and-announce search warrant on the plaintiff's residence. 226 F.3d 1031, 1035 (9th Cir. 2000). During the search, the officers broke several doors that were already unlocked and open. *Id.* at 1041. According to the plaintiff's testimony, one of the officers allegedly kicked an already-open door on the patio and stated, "I like to destroy these kind of materials, it's cool." *Id.* The Ninth Circuit affirmed the lower court's ruling that such conduct amounted to a Fourth Amendment violation, finding that the officers "appear to have damaged Plaintiffs' property in a way that was 'not reasonably necessary to execute the search warrant.'" *Id.* (quoting *Becker*, 929 F.2d at 446). Plaintiff also cites to *Hells Angels*, a case in which officers executed search warrants at the residences and clubhouse of members of the Hells Angels. 402 F.3d at 965. The officers were searching for items with indicia of Hells Angels affiliation to support a sentencing enhancement in a separate murder trial. *Id.* In carrying out the searches, the officers jack-hammered a sidewalk, cut a mailbox off its post, and broke a refrigerator. *Id.* at 974. The Ninth Circuit affirmed the lower court's denial of qualified immunity, finding the destruction caused by the officers to be unnecessary to execute the narrow purpose of the warrants. *Id.* at 974–75.

Defendants' primary contention is that the cases identified by Plaintiff contain "stark factual differences" from the present case and therefore "preclude a conclusion that the unreasonableness of any individual Defendants' actions was clearly established in December 2014." (Doc. 215 at 3). Defendants distinguish *Mena* by pointing out that the officers in that case were "relying on consent which [] was subject to scrutiny as to scope," whereas Defendants here were "duty-bound under a valid judicial warrant to find and apprehend Ochoa," a duty which "carried with it the implication that [the officers] would have to break open doors in order to enter the residence, and while in the residence." (Doc. 215 at 3). The Court is entirely unpersuaded by this argument. Defendants are incorrect that the officers in *Mena* were relying on consent; the word "consent" does not even appear in the Ninth Circuit's decision. *See Mena*, 226 F.3d at 1034–35. Rather, the officers in *Mena*—just like Defendants in this case—were acting on a valid judicial search warrant.

*Id.* If anything, the warrant in *Mena* authorized a more thorough—and potentially a more destructive—search than the search authorized in this case because it directed the officers to search for "deadly weapons, specifically firearms including ammunition, casings, holsters and cleaning equipment, knives and accessories such as sheaves; and evidence of street gang membership or affiliation with any street gang." *Id.* at 1034. Such evidence could have been hidden anywhere, which justified a thorough and detailed search and explained why the officers would have been handling the plaintiff's personal property. Here, in contrast, Defendants were not authorized to search for evidence. Rather, they were charged only with finding and arresting Mr. Ochoa, which narrowed the scope of searchable areas to only those areas where a person could reasonably be hiding.

Defendants also attempt to distinguish *Mena* by pointing out that, in this case, Plaintiff does not allege that any doors were already open or that he witnessed an officer destroying his property "gratuitously" or because he thought it was "cool." (Doc. 215 at 3–4). Rather, Defendants argue they have each provided "undisputed testimony explaining what force they used, and how that use of force was connected to a safe and effective execution of the warrant." (*Id.* at 4). The Court remains unpersuaded. Although Plaintiff does not specifically contend that unlocked, already-open doors were unnecessarily broken by Defendants, Plaintiff *does* contend that Defendants' use of the Bearcat to break down the Residence's front door was equally as unnecessary because Defendants could have simply entered the house using the keys provided to them by Plaintiff. However, even ignoring this damage to the front door—or damage to *any* of Plaintiff's doors for that matter—the damage sustained by Plaintiff's Residence in this case far exceeded the damage sustained by the plaintiff's house in *Mena*, a fact which is conveniently ignored by Defendants' fixation on "gratuitously destroyed doors." Although Defendants here may not have kicked open unlocked doors and stated that they thought causing such damage was "cool," they instead acted just as—or perhaps, *more*—unreasonably by unnecessarily destroying Plaintiff's furniture, appliances, televisions, PT Cruiser, artwork, heirlooms, clothes, family pictures, and antiques.

20

Turning to *Hells Angels*, Defendants point out that the officers in that case were charged with seizing indicia evidence to support a sentence enhancement for gang affiliation—a purpose which was rather narrow given that "very few items" were needed. (Doc. 215 at 8). The officers in *Hells Angels* far exceeded the scope of their warrant by unnecessarily seizing "truckloads" of indicia evidence, including unnecessary items such as concrete that was jack-hammered from the sidewalk, a mailbox which was cut off its post, and a door ripped off of a refrigerator. *See Hells Angels*, 402 F.3d at 974. Here, Defendants argue that they did not engage in such unnecessary destruction because they were judicially charged with finding and apprehending Mr. Ochoa, and they had comparably little time to plan their execution of the warrant. (Doc. 215 at 8). Defendants are correct that their search in this case had a different purpose from the search executed in *Hells Angels*. As discussed above, however, the purpose of Defendants' search—to find and arrest Mr. Ochoa—did not justify the *extensive* destruction caused to Plaintiff's Residence. This is *no different* than in *Hells Angels*, where the officers caused extensive, unnecessary destruction that was not justified by the purpose of their search.

In sum, the Court finds that cases such as *Mena* and *Hells Angels*—each decided well before the events at issue in this case—provided "fair notice" to Defendants that their unnecessary destruction of Plaintiff's Residence and personal property was unconstitutional. Although *Mena* and *Hells Angels* have numerous factual differences from the present case, such differences only highlight that Defendants' actions in this case were just as, or perhaps more, unconstitutional. Whereas the officers in *Mena* and *Hells Angels* were searching for evidence—which could have been hidden anywhere—Defendants here were only searching for Mr. Ochoa. Whereas the officers in *Mena* caused significant damage to doors and the officers in *Hells Angels* caused significant damage to three items of personal property, Defendants here caused near total-destruction of Plaintiff's *entire Residence* and destroyed a litany of items of personal property.

Moreover, the Ninth Circuit has recognized that, in some cases, it is less important to identify perfectly analogous caselaw. In *Wright*, the Ninth Circuit explained that "an

official may have 'fair notice' that conduct is unlawful, 'even without a body of relevant case law,' if the violation is so 'obvious' that no reasonable official would have engaged in such behavior." *Wright*, 981 F.3d at 735 (citation omitted). "The need for an on-point case is further diluted when the 'clearly established' rule is concrete and specific." *Id.* In such circumstances, the Ninth Circuit has "not hesitated to deny qualified immunity to officials . . . even without a case directly on point." *Id.* (citations omitted); *see also United States v. Lanier*, 520 U.S. 259, 271 (1997) (quotations, citation, and alteration omitted) ("[I]n [some] instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful."); *Boyd*, 374 F.3d at 781 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001)) ("However, a victim's constitutional rights may be clearly established in the absence of a case 'on all fours prohibiting the particular manifestation of unconstitutional conduct at issue.' . . . Rather, when an officer's conduct 'is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established.'"); *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082–83 (10th Cir. 2015) ("[S]ome things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing."). Therefore, the Ninth Circuit has "not hesitated to deny qualify immunity to officials in certain circumstances, 'even without a case directly on point.'" *Wright*, 981 F.3d at 735; *see also Bonivert v. City of Clarkson*, 883 F.3d 865, 872 (9th Cir. 2018) (citation omitted) ("[I]f qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations of the Fourth Amendment.").

Notably, in *Wright*, the Ninth Circuit cited to both *Mena* and *Hells Angels* as specific examples of cases where qualified immunity was denied even in the absence of on-point caselaw. *Id.* at 735. As to *Mena*, the Ninth Circuit explained:

> The need for an on-point case is further diluted when the "clearly established" rule is concrete and specific. For example, in *Mena*, at the time of the allegedly unlawful conduct, it was "clearly established" that officers violate the Fourth Amendment during the execution of a search warrant when they engage in "unnecessarily destructive behavior." 226 F.3d at 1041 (quoting *Liston v. City of Riverside*, 120 F.3d 965, 979 (9th Cir. 1997)). Thus, we concluded that an officer who destroyed an already-ajar door to a home during the execution of a search warrant was not entitled to qualified immunity, even though we did not cite a specific on-point case. *Id.* That is because what conduct constituted needless destruction was, in that instance, self-evident. *See id.*

*Id.* In the present case, the Court agrees with Defendants that Plaintiff could have done a better job in his Response of analogizing the facts of this case to the facts of precedential cases. Likewise, the Court recognizes that the cases identified by the parties are, in many ways, factually dissimilar to the present case. However, cases like *Mena* and *Hells Angels* clearly established that unnecessarily destructive behavior during the execution of a search warrant amounts to a constitutional violation. If the officers' conduct in *Mena* and *Hells Angels* was held to be unnecessarily destructive, it is without question that Defendants in this case had fair notice that their own conduct—which was undoubtedly *more* destructive and took place during a search with a *narrower* purpose—violated Plaintiff's constitutional rights. Therefore, although the Court does not "identify a case with the exact factual situation involved here," it concludes that, in light of the precedent that *did* exist at the time of Defendants' search, their actions violated Plaintiff's clearly established constitutional rights. *See Id.* at 736–37 (citing *Mena*, 226 F.3d at 1041); *see also Neal*, 2015 WL 4227466, at *11–12 (finding that—at time of search in April 2013—clearly established law existed holding that officers violate constitutional rights when they destroy property unrelated to purpose of search, which, in that case, was to discover evidence of narcotic sales).

### B.  Failure to Intervene Claim

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham*, 229 F.3d at 1289 (quotations omitted) (quoting *United States v. Koon*, 34 F.3d 1416, 1447, n.25 (9th Cir.

1994)). "Importantly, however, officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Id.* (citation omitted).

As noted above, Defendants Engstrom, Robinson, Lapre, Gragg, and Skedel were each integral participants in the search of Plaintiff's Residence rather than mere bystanders. *See supra* pt. III, sec. A(1). Given their integral participation in the search—which ranged from directing other officers from the command post (Defendant Gragg), to providing cover for other officers from the perimeter (Defendant Robinson), to actual participation on the entry team (Defendants Engstrom, Lapre, and Skedel)—the Court finds that Plaintiff has demonstrated sufficient evidence showing that each of these five Defendants had reason to be aware of the constitutional violations occurring and realistic opportunities to intercede, but failed to take any action to stop or impede the violations. The Court denies Defendants' request for summary judgment as to the failure to intercede claim.

## IV.    CONCLUSION

In sum, the Court finds that Plaintiff has demonstrated sufficient evidence to prove that Defendants' search of his Residence—which Defendants were each integral participants in—was carried out in a manner which violated Plaintiff's clearly established Fourth Amendment right against unnecessary and excessive destruction of property. Defendants are therefore not entitled to qualified immunity. The Court denies Defendants' request for summary judgment.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 201) is **denied**.

Dated this 4th day of April, 2023.

Honorable Steven P. Logan
United States District Judge