# EXHIBIT 1

1  Robert T. Mills (Arizona Bar #018853)
   Sean A. Woods (Arizona Bar #028930)
2  Jordan C. Wolff (Arizona Bar #034110)
   ~~ANGELINI MILLS WOODS + ORI LAW~~
3  MILLS AND WOODS LAW, PLLC
4  5055 North 12th Street, Suite 101
   Phoenix, Arizona 85014
5  Telephone (480) 999-4556
   docket@~~amwolawaz~~millsandwoods.com
6  *Attorneys for Plaintiffs*

7          **IN THE UNITED STATES DISTRICT COURT**

8          **IN AND FOR THE DISTRICT OF ARIZONA**

9

10  James W. Denby, a single man; Elizabeth
    J. Torres, a single woman; ~~Wilma J.~~        Case No. 2:17-CV-00119-SPL
11  ~~Logston; a single woman,~~
                                                   ~~SECOND~~ **THIRD AMENDED**
12              Plaintiffs,                        **COMPLAINT**

13          vs.                                    (Assigned to the Hon. Steven P. Logan)

14
    ~~City Of Casa Grande, a governmental~~
15  ~~entity; County Of Pinal, a governmental~~
    ~~entity; Paul Babeu, a single male;~~
16  ~~Francisco X. Lujan and JANE DOE~~
    ~~LUJAN, a married couple; Kent Horn and~~
17  ~~Jane Doe Horn, a married couple;~~ David
    Engstrom ~~and Jane Doe Engstrom, a~~
18  ~~married couple;~~ ~~Mark McCabe and Jane~~
    ~~Doe McCabe, a married couple;~~ Jacob H.
19  Robinson~~; and Jane Doe Robinson, a~~
    ~~married couple;~~ ~~C. Western and Jane Doe~~
20  ~~Western, a married couple; Michael~~
    ~~Wilson and Jane Doe Wilson, a married~~
21  ~~couple; J J Ybarra and Jane Doe Ybarra, a~~
    ~~married couple; Garrie Berry and Jane~~
22  ~~Doe Berry, a married couple;~~ Christopher
    Lapre ~~and Jane Doe Lapre, a married~~
23  ~~couple~~; Sgt. ~~Gregg~~ Gragg ~~and Jane Doe~~
    ~~Gregg, a married couple~~; Rory Skedel
24  ~~and Jane Doe Skedel, a married couple~~;
    Abram Ochoa, a single man; ~~John And~~
25  ~~Jane Does 1 through 80,~~

Defendants.

Plaintiffs James W. Denby and ~~,~~ Elizabeth J. Torres~~, and Wilma J. Logston~~ (collectively referred to as "Plaintiffs"), by and through their counsel, ~~Angelini Mills Woods + Ori Law~~Mills and Woods Law, for their ~~Second~~ Third Amended Complaint (the "Complaint") against Defendants ~~City Of Casa Grande; County Of Pinal; Paul Babeu; Francisco X. Lujan and Jane Doe Lujan; Kent Horn and Jane Doe Horn;~~ David Engstrom ~~and Jane Doe Engstrom~~; ~~Mark McCabe and Jane Doe Mccabe;~~ Jacob H. Robinson ~~and Jane Doe Robinson~~; ~~C. Western and Jane Doe Western; Michael Wilson and Jane Doe Wilson; J J Ybarra and Jane Doe Ybarra; Garric Berry and Jane Doe Berry;~~ Christopher Lapre ~~and Jane Doe Lapre~~; Sgt. ~~Gregg~~ Gragg~~and Jane Doe Gregg~~; Rory Skedel ~~and Jane Doe Skedel~~; and Abram Ochoa~~, and John and Jane Does 1-80~~ hereby allege as follows:

## NATURE OF ACTION

1.     Pursuant to 42 U.S.C. §1983 *et seq.*, Plaintiffs bring this action for violations of the United States Constitution, including without limitation the Fourth, fifth, and Fourteenth Amendments.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1331.

3.     This Court has supplemental jurisdiction of Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a) because all of Plaintiffs' claims share common operative facts. Resolving all state and federal claims in a single action serves the interests of judicial economy, convenience and fairness to the parties.

4.     Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims occurred in this district, and pursuant to 38 U.S.C. § 4323(c)(2) because Defendant maintains a place of business in this district.

## PARTIES

5.     At all relevant times, James W. Denby ("Denby") was a resident of Pinal County, Arizona.

2

6.      At all relevant times, Elizabeth J. Torres ("Torres") was a resident of Maricopa County, Arizona.

7.      At all relevant times, Wilma J. Logston ("Logston") was a resident of Pinal County, Arizona.

8.      Defendant the City of Casa Grande is a governmental entity that acts by and through its officials, employees, and agents, including without limitation each of the other Defendants in this action.

9.      Defendant County of Pinal is a governmental entity that acts by and through its officials, employees, and agents, including without limitation each of the other Defendants in this action.

10.     Defendant Kent Horn ("Horn") was employed by the City of Casa Grande as a lieutenant in its police department. Upon information and belief, at all related times, Horn was the acting police chief. Among his various duties he is required to uphold the law and protect and serve citizens, including exercising reasonable prudence in all actions taken that could be detrimental to a private citizen's rights. He is being sued in his individual and official capacity.

11.     Defendant Francisco X. Lujan ("Lujan") was employed by the City of Casa Grande as a corporal in its police department. Among his various duties he is required to uphold the law and protect and serve citizens, including exercising reasonable prudence in all actions taken that could be detrimental to a private citizen's rights. He is being sued in his individual and official capacity.

12.7.   Defendant David T. Engstrom ("Engstrom") was employed by the City of Casa Grande as a sergeant in its police department. Among his various duties he is required to uphold the law and protect and serve citizens, including exercising reasonable prudence in all actions taken that could be detrimental to a private citizen's rights. He is being sued in his individual and official capacity.

13.     Defendant Mark McCabe ("McCabe") was employed by the City of Casa Grande as a police officer. Among his various duties, he is required to uphold the law and

3

~~protect and serve citizens, including exercising reasonable prudence in all actions taken that could be detrimental to a private citizen's rights. He is being sued in his individual and official capacity.~~

~~14.~~8.    Defendant Jacob H. Robinson ("Robinson") was employed by the City of Casa Grande as a police officer. Among his various duties, he is required to uphold the law and protect and serve citizens, including exercising reasonable prudence in all actions taken that could be detrimental to a private citizen's rights. He is being sued in his individual and official capacity.

~~15.    Defendant C. Western ("Western") was employed by the City of Casa Grande as a police officer. Among his various duties, he is required to uphold the law and protect and serve citizens, including exercising reasonable prudence in all actions taken that could be detrimental to a private citizen's rights. He is being sued in his individual and official capacity.~~

~~16.    Defendant Michael Wilson ("Wilson") was employed by the City of Casa Grande as a police officer. Among his various duties, he is required to uphold the law and protect and serve citizens, including exercising reasonable prudence in all actions taken that could be detrimental to a private citizen's rights. He is being sued in his individual and official capacity.~~

~~17.    Defendant J J Ybarra ("Ybarra") was employed by the City of Casa Grande as a police officer. Among his various duties, he is required to uphold the law and protect and serve citizens, including exercising reasonable prudence in all actions taken that could be detrimental to a private citizen's rights. He is being sued in his individual and official capacity.~~

~~18.    Defendant Paul Babeu ("Babeu") was employed by the Pinal County Sheriff's Office as the sheriff in its police department. Among his various duties, he is required to uphold the law and protect and serve citizens, including exercising reasonable prudence in all actions taken that could be detrimental to a private citizen's rights. He is being sued in his individual and official capacity.~~

4

19. ~~Defendant Garric Berry ("Berry") was employed by the Pinal County Sheriff's Office as a lieutenant in its police department. Among his various duties, he is required to uphold the law and protect and serve citizens, including exercising reasonable prudence in all actions taken that could be detrimental to a private citizen's rights. He is being sued in his individual and official capacity.~~

~~20.~~9.   Defendant Christopher. Lapre ("Lapre") was employed by the Pinal County Sheriff's Office as a sergeant. Among his various duties, he is required to uphold the law and protect and serve citizens, including exercising reasonable prudence in all actions taken that could be detrimental to a private citizen's rights. He is being sued in his individual and official capacity.

~~21.~~10. Defendant Rory Skedel ("Skedel") was employed by the Pinal County Sheriff's Office as a sergeant. Among his various duties, he is required to uphold the law and protect and serve citizens, including exercising reasonable prudence in all actions taken that could be detrimental to a private citizen's rights. He is being sued in his individual and official capacity.

~~22.~~11.  Defendant Sgt. ~~Gregg~~ Gragg ("~~Gregg~~Gragg") was employed by the Pinal County Sheriff's Office as a sergeant. Among his various duties, he is required to uphold the law and protect and serve citizens, including exercising reasonable prudence in all actions taken that could be detrimental to a private citizen's rights. He is being sued in his individual and official capacity.

~~23.    The County of Pinal is liable for its promulgated policies, practices or customs that result in violations of the United States Constitution.~~

~~24.    The City of Casa Grande is liable for its promulgated policies, practices or customs that result in violations of the United States Constitution.~~

~~25.    Defendants JANE/JOHN DOES are named because at all relevant times described herein, Defendants Jane Doe Horn, Jane Doe Engstrom, Jane Doe Lujan, Jane Doe McCabe, Jane Doe Robinson, Jane Doe Western, Jane Doe Wilson, Jane Doe Ybarra, Jane Doe Berry, Jane Doe Lapre, and Jane Doe Skedel were acting for the benefit of their~~

5

1    ~~respective marital communities, if any, and therefore the respective marital communities,~~
2    ~~if any, are liable for the actions of Defendants Horn, Engstrom, Lujan, McCabe,~~
3    ~~Robinson, Western, Wilson, Ybarra, Berry, Gregg, Lapre, and Skedel.~~

4    ~~26.   John and Jane Does 1 through 40 are certain unknown Casa Grande~~
5    ~~employees who through their own actions or inactions have caused or assisted others in~~
6    ~~causing the incidents and resulting harm set forth below. Despite diligent efforts by~~
7    ~~Plaintiffs, the identity of these individuals have not yet been ascertained but they are well~~
8    ~~known by Defendants. Plaintiffs will amend this Complaint to allege the true names and~~
9    ~~capacities of the various Doe Defendants when they are learned.~~

10   ~~27.   John and Jane Does 41 through 80 are certain unknown Pinal County~~
11   ~~employees who through their own actions or inactions have caused or assisted others in~~
12   ~~causing the incidents and resulting harm set forth below. Despite diligent efforts by~~
13   ~~Plaintiffs, the identity of these individuals have not yet been ascertained but they are well~~
14   ~~known by Defendants. Plaintiffs will amend this Complaint to allege the true names and~~
15   ~~capacities of the various Doe Defendants when they are learned.~~

16   ~~28.~~12.  Upon information and belief, at all relevant times, Defendant Abram Ochoa
17   was a resident of Pinal County, Arizona.

18   **FACTUAL ALLEGATIONS**

19   ~~29.~~13.  On or about December 17, 2014, James W. Denby, ~~Elisabeth~~Elizabeth
20   Torres, and Wilma J. Logston resided at 116 West 10th Street, Case Grande, Arizona (the
21   "Residence").

22   14.    The Residence was a single-family home and was approximately 2,364
23   square feet, which included the main house ("Main House") of approximately 1,348
24   square feet and a separate guest house ("Guest House") in the backyard of approximately
25   1,016 square feet. The Residence was enclosed by a fence.

26   15.    At that time, ~~Elisabeth~~Elizabeth Torres and Wilma Logston were the named
27   grantees listed in the deed of the Residence.

28

16. However, at that time ~~Elisabeth~~Elizabeth Torres, Wilma Logston and James Denby all understood and intended that James Denby was the sole owner of the Residence and was supposed to be the sole grantee named in the deed to the Residence.

17. A quitclaim deed was recorded on December 16, 2015 naming James Denby as the sole grantee on the deed as of December 16, 2015.

18. This quitclaim deed was signed by ~~Elisabeth~~Elizabeth Torres and Wilma Logston as grantors in order to accurately reflect the true ownership of the Residence.

19. This quitclaim deed was deemed to be invalid because it did not contain the full legal description of the property in question.

20. The deed was then corrected on July 10, 2017 to reflect the proper legal description for Pinal County, but failed to amend the date of the change to December 2014.

21. Denby held the homeowner insurance policy on the house for years – including at all relevant times of this TAC.

22. For years prior to the December 17, 2014 incident, and to the present date, Denby was solely responsible for maintaining the property.

23. For years prior to the December 17, 2014 incident, and to the present date, Denby personally paid all property tax bills.


~~30.~~24. At approximately 3:05 P.M. on December 17, 2014, the Casa Grande Police Department ("CGPD") was dispatched to respond to a domestic disturbance at 107 ½ W 11th Street in Casa Grande (the "Starting Location").

~~31.~~25. Lujan and Western arrived at the Starting Location at 3:11 P.M.

~~32.~~26. Engstrom arrived at the Starting Location at 3:13 P.M.

33.27.  Upon information and belief, after multiple CGPD officers arrived at the Starting Location, they learned the incident involved Abram Ochoa ("Ochoa"), who had warrants out for his arrest for unrelated incidents.[1]

34.28.  According to police reports, Ochoa's girlfriend, Adela Castillo ("Castillo") informed CGPD that Ochoa had left the scene.

35.29.  Castillo also informed the CGPD that Ochoa had no firearms, but he did sometimes have a stun gun in the form of brass knuckles.

36.30.  Castillo further informed CGPD that Ochoa had potentially gone to the Residence down the street.

37.31.  According to police reports, Engstrom was somehow able to track Ochoa to the backyard via fresh footprints in the alley that lead to the backyard Residence despite not knowing what type of shoes Ochoa wore or what Ochoa's shoe size was.

38.32.  At 3:16 P.M., Engstrom reported that Ochoa was opening the back door.

39.33.  At 3:17 P.M., Engstrom reported that Ochoa came out of the Residence and went right back in.

40.34.  Engstrom then informed Lujan that he saw Ochoa.

41.35.  Wilson arrived on the scene at 3:17: P.M.

42.36.  Despite arriving at the scene after Ochoa had already been reported as having gone back inside the Residence, Wilson reported that he saw Ochoa exit the Residence, look directly at him, then went back into the Residence.

43.37.  When CGPD made the determination that Ochoa must be in the Residence, Lujan approached the front door of the Main House, and William Denby Jr. ("William"), Denby's son, exited the house on crutches.

44.38.  William told CGPD that Ochoa was in the house and he offered to assist in requesting Ochoa exit the Residence by re-entering the Main House and talking to him.

---

[1] According to police reports, these included two thefts at area Walmarts wherein Ochoa attempted to exit the stores with large televisions, and an aggravated domestic violence assault charge.

8

45.39.  CGPD declined William's assistance and then searched William and put him in the back of a patrol car where he remained for several hours.

46.40.  Ybarra arrived on the scene as Lujan made contact with William and remained at the Residence until Ochoa was apprehended.

47.41.  McCabe arrived and left the Residence at roughly the same time as Ybarra.

48.42.  Denby arrived at the Residence shortly after police arrived.

49.43.  Plaintiffs did not give permission for Ochoa to be at the Residence nor were they aware Ochoa was at the Residence prior to arriving at the scene.

50.44.  Ochoa did not live or reside at the Residence.

51.45.  Plaintiffs were unaware that Ochoa had an arrest warrant for failing to appear.

52.46.  Additionally, Denby provided CGPD with his keys so that they could drive and move a vehicle that was parked in the front of the Main House of the Residence away from the Residence to provide more visibility for police personnel.

53.47.  Upon information and belief, the CGPD were also provided with keys to the Residence, including the Main House.

54.48.  At this point, the only attempts CGPD made to communicate with Ochoa was through a loud speaker PA system.

55.49.  There was no response from the Residence.

56.50.  At some time during the incident Castillo also offered to assist CGPD in their attempts to have Ochoa exit the Residence by utilizing the PA system to call for him. CGPD refused any assistance and removed Castillo to the command center, which she promptly fled and returned to the Starting Location.

57.51.  At about 3:21 P.M., mere minutes after CGPD arrived on scene, Horn requested that Pinal County Regional SWAT ("SWAT") respond due to a "barricaded subject."

58.52.  At the time Horn called in SWAT there was no indication that Ochoa had barricaded himself in the house or had any violent intentions.

9

59.53.  By the time Horn called in SWAT, CGPD knew that Denby and Castillo had offered to assist in coaxing Ochoa out of the house but had been denied the opportunity to assist.

60.54.  At 3:38 P.M., Lapre arrived on the scene.

61.55.  At 4:03 P.M., Engstrom, who was maintaining the perimeter of the Residence was transferred to a tactical assignment.

62.56.  For the next couple of hours, Engstrom was assigned to "cover" the east perimeter wall of the Residence.

63.57.  After approximately one hour, and according to his police report, Engstrom noticed movement coming from a tarp that was covering a car in the backyard of the Residence.

64.58.  Engstrom, apparently thinking it was odd that he saw movement in an otherwise uninhabited area in the Residence with only one known human potentially in either the Main House or the surrounding area, advised on the tactical channel that he saw the movement.

65.59.  Inexplicably, another operator mentioned in response that there was "a dog loose in the area."

66.60.  The Residence's backyard is fully surrounded by a cinder block fence with an RV gate on the south wall.

67.61.  According to the police reports, the backyard was under full surveillance and entry into the backyard or exit from the backyard should have been impossible without a police officer or SWAT member observing it – whether it was a dog or a person.

68.62.  Additionally, according to police reports, officers reported actually seeing a dog walking around to the front of the Residence, so they were well aware of the dog's location – the dog was not under a tarp on the hood of a car in the backyard of the Residence.

69.63.  According to Engstrom's police report, despite the movement he saw under the white tarp covering a car in the backyard of the Residence, and despite the fact that

Engstrom claims to have actually seen Ochoa attempt to exit the back of the Residence two times, he did not further investigate and continued to watch his assigned area as if fully buying the story that a dog loose in the area could have somehow entered the backyard, and climbed under a tarp ending up between the tarp and the top of the vehicle it covered.

70.64.  Again, upon information and belief, the area where Engstrom saw movement was fully enclosed by a fence and officers were well aware of the reported dog's location – the dog was not under a tarp in the backyard of the Residence.

71.65.  At or about 4:21 P.M., two (2) SWAT teams—Bravo and Charlie—arrived at the Residence and began evaluating the scene/residence.

72.66.  Upon information and belief, Sgt Gregg was in command prior to SWAT arriving.

73.67.  Upon arriving on the scene, SWAT believed it was necessary to bring an armored vehicle, which was referred to as the Bearcat.

74.68.  Lapre was assigned Bravo team leader and took position inside the Bearcat.

75.69.  The Bearcat was also used as a battering ram.

76.70.  CGPD and SWAT made the decision to use a Bearcat as a battering ram in this instance.

77.71.  Upon information and belief, every police officer at the Residence, including Berry, Engstrom, Gregg, Horn, Lujan, Lapre, McCabe, Engstrom, Skedel, Gregg, Robinson, Western, Wilson, and Ybarra were aware that a decision was made to use the Bearcat as a battering ram.

78.72.  Upon information and belief, Berry, Engstrom, Gregg, Horn, Lujan, Lapre, McCabe, Engstrom, Skedel, Gregg, Robinson, Western, Wilson, and Ybarra knew that using the Bearcat as a battering ram was a violation of the Plaintiffs' constitutional rights.

79.73.  The Bearcat was placed on the west side of the Residence, and was then driven over a chain-linked fence, fully demolishing the fence, and into the wall to break windows and the front door on the Residence.

11

80.74.  Lujan, CGPD, and SWAT attempted to use the Bearcat's P.A. system to announce their presence and advised Ochoa to come out of the Residence with his hands up and to follow verbal direction.

81.75.  There was no response or movement from within the Residence.

82.76.  During this time, SWAT team members then deployed a tactical phone into the freshly demolished windows and wall and attempted to contact Ochoa.

83.77.  There was no response when SWAT attempted to contact Ochoa through the tactical phone.

84.78.  After some time, CGPD and SWAT made the decision to launch chemical munitions into the Residence in an attempt to force Ochoa out of the Residence.

85.79.  At or about 5:00 P.M., a judge signed a search warrant for the Residence.

86.80.  Brian Walsh, a detective for CGPD, presented a copy of the signed search warrant to SWAT team leader Sgt. Gregg.

87.81.  The signed search warrant permitted that CGPD enter the Residence and the surrounding curtilage for the sole purpose of arresting Ochoa.

88.82.  At 5:02 P.M., Lt. Berry was advised that the search warrant was signed and on scene.

89.83.  According to the police reports, Miller and SWAT team Bravo deployed a medium robot into the Residence, and the robot was able to enter through the front door, which had been pushed opened by the Bearcat.

90.84.  According to the police reports, the medium robot was able to clear a large portion of the house without any sign of Ochoa.

91.85.  During this time, the on-site negotiators still failed to make contact with anyone inside the Residence.

92.86.  According to the police reports, at 5:05 P.M., minutes after the search warrant being signed, and after the medium robot had been placed in the Residence, SWAT announced via the PA system that Ochoa had five (5) minutes to exit the Residence or further force would be used against him.

93.87.  The five (5) minutes expired without any signs of movement or response from Ochoa or any affirmative information that he was still in the Residence.

94.88.  Accordingly, Lapre began firing oleoresin capsicum ("OC") canisters into the Residence.

95.89.  OC canisters contain what is commonly referred to as pepper spray.

96.90.  Robinson provided security for Lapre as he launched the chemical munitions into the Residence.

97.91.  After the initial deployment of OC, no voices, coughing, or movement were heard within the Residence.

98.92.  Because there was no response to the OC munitions, SWAT decided to escalate from OC to CS gas.

99.93.  CS canisters contain what is commonly referred to as a type of "tear gas."

100.94.      SWAT continued its assault on the Residence with CS gas.

101.95.      At least twenty-two (22) 40mm canisters of OC and CS gas were deployed into the house.

102.96.      Upon information and belief, each 40mm canister is designed to spread chemical agents in a coverage area of up to 120 square meters – equivalent to approximately 1,297 square feet.

103.97.      According to the police reports, during the chemical assault, SWAT deployed another robot into the Residence.

104.98.      Additionally, at 7:43 P.M., a Noise Flash Diversionary Device ("NFDD") was deployed. NFDD's are commonly referred to as "flash-bang" devices.

105.99.      According to the police reports, the robot searched the house until its batteries expired at 8:21 P.M.

106.100.      Despite no one purportedly seeing Ochoa in the Residence since 3:17 P.M.; no response from the chemical munitions assault; and two robots failing to see any movement or signs of Ochoa, CGPD and SWAT continued to act as though Ochoa was still in the house.

13

107.101.    Upon information and belief, and importantly, at no time had Ochoa ever made any statements to CGPD or SWAT, nor had he threatened anyone – including members of the public.

108.102.    After deployment of chemical munitions, destruction of the outer walls and windows of the Main House, and deployment of two (2) robots into the Main House, SWAT finally decided that now was the time to begin to develop a tactical plan to enter the Main House and clear the inner structure with SWAT team members in an attempt to locate Ochoa.

109.103.    At 9:47 P.M., SWAT made entry into the Main House.

110.104.    During the time of entry, Skedel deployed two (2) more NFDD devices within the Residence.

111.105.    After searching the entire Main House, SWAT unsurprisingly determined that Ochoa was not within the Main House.

112.106.    Upon information and belief, during the search of the Main House, SWAT team members demolished anything and everything they could get their hands on.

113.107.    The search warrant only permitted the Defendants to enter the Residence for the sole purpose of arresting Ochoa.

114.108.    The search warrant did not permit the Defendants to look through and destroy Plaintiffs' personal property.

115.109.    Furniture that was objectively too small to hide a human body was crushed, smashed, thrown against walls, or otherwise destroyed.

116.110.    Cushions and pillows were torn open and thrown aside.

117.111.    Windows and window coverings were ripped, broken, and torn apart.

118.112.    Shower Doors and bathroom mirrors were smashed.

119.113.    Toilets were completely obliterated.

120.114.    Homeowner property was tossed aside and stomped and smashed including televisions, artwork, heirlooms, antiques, and other items.

121.115.     The ceiling and walls were cracked and drywall and tiles were left hanging.

122.116.     SWAT and CGPD operated with complete indifference to and reckless disregard of the Plaintiffs' constitutional rights and property – indeed, it appears that SWAT and CGPD treated the entire situation as an opportunity to enact their video game fantasies in real life from utilizing the Bearcat to drive over fences and knock down doors and windows, to firing twenty-two (22) 40mm rounds of chemical munitions into an approximately 1300 square foot interior structure, to their "take no prisoners" approach to the complete demolition and destruction of the Plaintiffs' personal property and Residence.

123.117.     Once the Main House was cleared, SWAT now decided to start searching the entire property.

124.118.     Upon information and belief, this was the first time CGPD or SWAT searched the backyard of the Residence.

125.119.     Engstrom, who had earlier seen movement under the tarp in the backyard, was part of the tactical team that breached the Main House, did not find Ochoa, and then searched the backyard.

126.120.     According to his police report, Engstrom went directly to the car with the tarp, partially lifted the tarp and looked under the car, but did not locate Ochoa.

127.121.     At 10:03 P.M., SWAT finally located Ochoa after additional members of SWAT joined Engstrom in the backyard.

128.122.     After fully removing the tarp from the car, Ochoa was found under the white tarp on top of the hood of the car in the carport.

129.123.     The tarp under which Ochoa was found was the same white tarp under which Engstrom had noticed movement five (5) hours earlier, but failed to investigate.

130.124.    Upon information and belief, Defendants City of Casa Grande, Pinal County, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, Lujan did not train its police officers how to properly inspect and clear the perimeter of the Residence.

131.125.    Upon information and belief, Defendants City of Casa Grande, Pinal County, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, Lujan did not train its police officers how to properly react when there were no signs that anyone was in the Residence after the first chemical ammunition was deployed.

132.126.    Upon information and belief, Defendants City of Casa Grande, Pinal County, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, Lujan did not did not train its police officers how to determine the correct amount of chemical munitions to use when being deployed into an approximately 1,300 square foot residential building.

133.127.    Upon information and belief, Defendants City of Casa Grande, Pinal County, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, Lujan knew that deploying a Bearcat battering ram; multiple robots; at least twenty-two (22) chemical munitions; and, multiple NFDDs into an approximately 1,300 square foot residential building was excessive, and they knew it would damage and destroy everything within the Residence.

A.    **Damage to the Residence**

134.128.    After Ochoa was apprehended and CGPD and SWAT purportedly finished their investigation, the Plaintiffs returned to the Residence.

135.129.    Upon information and belief, neither SWAT nor CGPD provided any warning or instruction to the Plaintiffs about the dangers of the chemical munitions and the effects they can have on a person's health.

136.130.    To the Plaintiffs' utter astonishment and dismay, the Residence was completely destroyed and rendered completely uninhabitable.

137.131.    The damage included, but is not limited to: structural damage; all insulation and wood in the attic contaminated with chemical agents; collapsed ceiling; all windows were broken; the front and back entry doors were destroyed; the toilet was destroyed which caused subsequent water damage to the foundation; mirrors and shower

doors were shattered; all the furniture was destroyed; all electronics in the Residence were destroyed; all personal items including clothes, four generations of family pictures, antiques, and art work was destroyed; all kitchen, cleaning, and laundry room supplies were destroyed; all the food in the Residence was contaminated and needed to be discarded; and three (3) feet of soil under the Residence was contaminated and need to be removed.

138.132.      Prior to initiating chemical munitions, CGPD and SWAT failed to inform Denby that they deployed OC and CS munition in the house, and again, they did not inform him or the other Plaintiffs of the associated hazardous conditions the munitions created.

139.133.      Without this critical knowledge, Denby entered the Residence and eventually was taken to the hospital because he inhaled the various chemical agents within the Residence.

140.134.      To date, the Residence remains uninhabitable because Defendants have failed to compensate or otherwise repair or replace Plaintiffs' damaged property.

141.135.      Plaintiffs' family have lived in this home since the early 1900s when their grandparents and great-grandparents homesteaded and farmed the land.

142.136.      Defendants' failures to act as a reasonable officer in a similar situation would have acted by failing to, without limitation, properly execute a search warrant; by failing to preserve Plaintiffs' property rights; and by failing to inform Plaintiffs' of the serious health hazards presented by the introduction of chemical munitions were done with conscious indifference to and reckless disregard of Plaintiffs' constitutional rights and Defendants have therefore deprived Plaintiffs' of their rights under the Arizona and United States Constitutions.

**COUNT I     VIOLATION OF PLAINTIFFS' CIVIL RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDMENTS and 42 U.S.C. § 1983**
*(Defendants City of Casa Grande, County of Pinal, Lapre, Engstrom, Skedel, Greagg, and Robinson)*

17

143.137.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of the Complaint.

144.138.    The Fourth Amendment to the United States Constitution, which applies to the Defendants pursuant to the Due Process Clause of the Fourteenth Amendment, forbids one who acts under the color of state law from unreasonable search and seizure in violation of a person's security and interests.

145.139.    Plaintiffs have a firmly established right under the Fourth Amendment to be free from unreasonable seizure.

146.140.    The Fourth Amendment requires that the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.

147.141.    Excessive or unnecessary property destruction during a search violates the Fourth Amendment. It was not necessary and reasonable to use a battering ram, twenty-two (22) 40mm capsules of chemical agents, and NSDDs for entrance to the Residence under these circumstances. Nor was it necessary to physically destroy Plaintiffs' personal property during the ensuing search of the Main House.

148.142.    A Fourth Amendment seizure of personal property occurs when there is some meaningful interference with an individual's possessory interests in that property.

149.143.    Destroying Plaintiffs' doors, windows, bathroom fixtures, furniture, personal property, and destroying the habitability of the Residence deprived and meaningfully interfered with their possessory interest in their property.

150.144.    The Constitution protects persons from such unreasonable searches and seizures.

151.145.    The Defendants City of Casa Grande, County of Pinal, Lapre, Engstrom, Skedel, GreggGragg, and Robinson separately and in concert, engaged in the illegal conduct to the injury of the Plaintiffs, and deprived Plaintiffs of the rights,

18

privileges and immunities secured to Plaintiffs by the Fourth Amendment to the Constitution of the United States and the laws of the United States.

152.146.        Defendants City of Casa Grande, County of Pinal, Lapre, Engstrom, Skedel, GreggGragg, and Robinson knew that the search warrant only permitted police officers to enter the Residence for the purpose of arresting Ochoa.

153.147.        Defendants City of Casa Grande, County of Pinal, Lapre, Engstrom, Skedel, Graegg, and Robinson knew by destroying Plaintiffs' doors, windows, bathroom fixtures, furniture, personal property, and destroying the habitability of the Residence that they exceeded the scope of the search warrant and were violating Plaintiffs' constitutional rights.

154.148.        Defendants City of Casa Grande, County of Pinal, Lapre, Engstrom, Skedel, GreggGragg, and Robinson knew that Ochoa was not in the house, but still proceeded with destroying nearly all, if not all, of Plaintiffs' property within the Residence.

155.149.        Despite Defendants City of Casa Grande, County of Pinal, Lapre, Engstrom, Skedel, GreggGragg, and Robinson knowing that Ochoa was not in the Residence none of the Defendants attempted to intervene and stop other Defendants from violating Plaintiffs' constitutional rights.

156.150.        Defendants City of Casa Grande, County of Pinal, Lapre, Engstrom, Skedel, Greagg, and Robinson had reasonable time while they were both in the house and outside the house firing chemical munitions and destroying Plaintiffs' property to stop the harm caused by the other Defendants.

157.151.        As described herein, Defendants' City of Casa Grande, County of Pinal, Lapre, Engstrom, Skedel, Greagg, and Robinson destruction of Plaintiffs' property was not reasonably necessary to the performance of their duties.

158.    Defendants City of Casa Grande and County of Pinal adopted, promulgated, ratified, and approved policies, procedures, and customs that violated the Fourth and

Fourteenth Amendment to the United States Constitution because said policies, procedures, and customs were deliberately indifferent to Plaintiffs' rights.

159. By adopting, promulgating, ratifying, and approving such policies, procedures, and customs, Defendants City of Casa Grande and County of Pinal were objectively unreasonable and undertook actions with willful, reckless, and malicious indifference to the rights of Plaintiffs, and with no regard to the likelihood that harm would and did result and that unnecessary financial damages and pain and suffering would be inflicted.

160.152.    Defendants Lapre, Engstrom, Skedel, GreggGragg, and Robinson were acting under the color of law.

161.153.    Plaintiffs suffered damages as a direct and proximate result of the illegal acts of Defendants City of Casa Grande, County of Pinal, Lapre, Engstrom, Skedel, Greagg, and Robinson.

162.154.    As set forth above, Defendants Lapre, Engstrom, Skedel, GreggGragg, Robinson, and Engstrom violated the Fourth Amendment of the United States Constitution by causing Plaintiffs' property to be searched and seized without probable cause thereby depriving Plaintiffs of their rights, privileges, and immunities as guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

163.155.    The acts and/or omissions of Defendants were willful, wanton, reckless, malicious, oppressive and/or done with a conscious or reckless disregard for the rights of Plaintiffs. Plaintiffs, therefore, prays for an award of punitive and exemplary damages against these individual defendants in an amount to be determined according to proof.

164.156.    Pursuant to 42 U.S.C. § 1988 and other applicable law, Plaintiffs are also entitled to an award of incurred attorneys' fees and costs.

**COUNT II    FAILURE TO ~~PROPERLY SUPERVISE AND FAILURE TO~~ INTERVENE**

*(Defendants ~~City of Casa Grande, County of Pinal, Berry,~~ Engstrom, Gre~~a~~gg, ~~Horn, Lujan,~~ Lapre, Engstrom, Skedel, ~~Gregg~~Gragg, ~~McCabe,~~ Robinson, ~~Western, Wilson, Ybarra~~)*

~~165.~~157.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of the Complaint.

~~166.~~158.    Law enforcement officers who have a realistic opportunity to prevent a fellow officer from violating a citizen's constitutional rights have a duty to intervene to protect the victim from the unconstitutional retaliation, use of force or violation of due process of law.

~~167.~~159.    Defendants ~~City of Casa Grande, County of Pinal, Berry,~~ Engstrom, ~~Gregg~~Gragg, ~~Horn, Lujan,~~ Lapre, Engstrom, ~~McCabe,~~ Skedel, Gre~~a~~gg, and Robinson, ~~Western, Wilson, and Ybarra~~ were aware that each of the other Defendants were violating Plaintiffs' constitutional rights.

~~168.~~160.    The siege on the Residence lasted for nearly seven (7) hours and Defendants ~~City of Casa Grande, County of Pinal, Berry,~~ Engstrom, ~~Gregg~~Gragg, ~~Horn, Lujan,~~ Lapre, Engstrom, Skedel, ~~McCabe, Gregg~~Gragg, and Robinson, ~~Western, Wilson, and Ybarra~~ had a reasonable opportunity to prevent the harm and/or prevent further harm.

~~169.~~161.    Defendants ~~City of Casa Grande, County of Pinal, Berry,~~ Engstrom, ~~Gregg~~Gragg, ~~Horn, Lujan,~~ Lapre, Engstrom, Skedel, ~~McCabe, Gregg,~~ and Robinson, ~~Western, Wilson, and Ybarra~~ knew that they had exceeded the scope of the search warrant and were violating the Plaintiffs' constitutional rights when they destroyed Plaintiffs' doors, windows, bathroom fixtures, furniture, personal property, and destroying the habitability of the Residence.

~~170.~~162.    However, as set forth herein, Defendants ~~City of Casa Grande, County of Pinal, Berry,~~ Engstrom, ~~Gregg~~Gragg, ~~Horn, Lujan,~~ Lapre, ~~Engstrom, McCabe,~~ Skedel, ~~Gregg,~~ and Robinson, ~~Western, Wilson, and Ybarra~~ did not intervene nor attempt to stop the violation of the Plaintiffs' constitutional rights despite knowing they were

21

violating the Plaintiffs' constitutional rights and having a reasonable opportunity to prevent the harm.

171.    Defendants' Casa Grande and Pinal County failure to train, supervise and/or implement appropriate policy was deliberately indifferent to the federally protected rights of the Plaintiffs and violated their rights.

172.163.    The acts and/or omissions of Defendants were willful, wanton, reckless, malicious, oppressive and/or done with a conscious or reckless disregard for the rights of Plaintiffs. Plaintiffs; therefore, prays for an award of punitive and exemplary damages against these individual defendants in an amount to be determined according to proof.

173.164.    Plaintiffs suffered damages as a direct and proximate result of the illegal acts of Defendants.

**COUNT III   MUNICIPAL LIABILITY- POLICIES, CUSTOM OR PRACTICE - 42 U.S.C. § 1983**
*(Defendants City of Casa Grande and Pinal County)*

174.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of the Complaint.

175.    This cause of action is brought pursuant to 42 U.S.C § 1983, wherein Plaintiffs seeks to redress a deprivation under color of law of a right, privilege or immunity secured to Plaintiffs, respectively, by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

176.    At all times relevant herein, Defendants City of Casa Grande and County of Pinal's police officers were agents and employees of Defendants City of Casa Grande and County of Pinal and were carrying out the acts alleged herein while acting under color of the authority and color of the statutes, regulations, customs, and usages of the Defendants City of Casa Grande and County of Pinal.

177.    At the time of the excessive force and unreasonable search and seizure against Plaintiffs, Defendants City of Casa Grande and County of Pinal had in place and had ratified, policies, procedures, customs, and practices by which the city and its police

22

departments therein would not discipline, prosecute or in any way take corrective or responsive action to known incidents and/or complaints of excessive force and civil rights violations.

178.    Upon information and belief, said policies, procedures, customs, and practices called for the refusal of the Defendants City of Casa Grande and County of Pinal to investigate or document complaints of previous incidents of civil rights violations but instead, to officially claim that such incidents were justified and proper, or simply fail to report said misconduct.

179.    Upon information and belief, Defendants City of Casa Grande and County of Pinal did not investigate the conduct of its police officers despite knowing that its officers failed to properly secure the backyard; used a battering ram; launched at least twenty two (22) chemical munitions into a 1,300 square foot house; used multiple NFDDs; and, exceeded the scope of the warrant that permitted the Defendants to enter the Residence to arrest Ochoa and not to destroy nearly all, if not all, of Plaintiffs' personal property.

180.    Additionally, the foregoing was unnecessary because if the Defendants properly secured the premises when the they arrived at the Residence or when Engstrom reported movement under the tarp, the Defendants would have discovered Ochoa hiding under the very same tarp where Engstrom reported movement.

181.    It was the policy, practice and/or custom of the Defendants City of Casa Grande and County of Pinal to inadequately supervise and train its officials regarding the use of excessive force and/or unreasonable search and seizure, including those identified herein, thereby failing to adequately prevent and discourage civil rights violations on the part of its officials.

182.    The acts or omissions of the Defendants, and each of them, as alleged herein regarding the use of excessive force were either: (1) caused by inadequate and arbitrary training, supervision, or discipline of officers by the City of Casa Grande and County of Pinal; (2) caused by deliberate indifference of the City of Casa Grande and County of

23

Pinal; (3) consistent with, and done pursuant to, a custom or *de facto* policy of the City of Casa Grande and County of Pinal; or, (4) ratified by final decision makers of the City of Casa Grande and County of Pinal.

183. The foregoing acts, omissions and systematic deficiencies are policies and customs of Defendants City of Casa Grande and County of Pinal, and as such cause Defendants' police officers to believe that excessive force and unreasonable searches and seizures are permissible and that such misconduct would not be honestly and properly investigated, all with the foreseeable result that Defendants' officers would engage in violation of civil rights of citizens and residents of this state.

184. Defendants Casa Grande and Pinal County developed and maintained inappropriate policies, practices and/or customs regarding the use of excessive force and/or unreasonable search and seizure exhibiting deliberately indifference to the constitutional rights of the Plaintiffs and its citizens.

185. Defendants' Casa Grande and Pinal County failure to train, supervise and/or implement appropriate policies was deliberately indifferent to the federally protected rights of the Plaintiffs and violated their rights.

186. Plaintiffs suffered damages as a direct and proximate result of the illegal acts of Defendants.

187. The acts and/or omissions of Defendants were willful, wanton, reckless, malicious, oppressive and/or done with a conscious or reckless disregard for the rights of Plaintiffs. Plaintiffs, therefore, prays for an award of punitive and exemplary damages against these individual defendants in an amount to be determined according to proof. Pursuant to 42 U.S.C. § 1988 and other applicable law, Plaintiffs are also entitled to an award of incurred attorneys' fees and costs.

**COUNT IV    FAILURE TO TRAIN AND SUPERVISE SUPERVISE - 42 U.S.C. § 1983**
*(Defendants City of Casa Grande, Pinal County, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, Lujan)*

24

188.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of the Complaint.

189.    This cause of action is brought pursuant to 42 U.S.C § 1983, wherein Plaintiffs seeks to redress a deprivation under color of law of a right, privilege or immunity secured to Plaintiffs, respectively, by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

190.    Upon information and belief, Defendants Babeu, Berry, Engstrom, Gregg, Horn, Lapre, and Lujan as part of their official duties were responsible for training and supervision of employee officers or agents that hold the power, authority, insignia, equipment, and arms entrusted to them.

191.    Supervising officers and/or agents had a duty to Plaintiffs to properly supervise employee officers or agents that hold the power, authority, insignia, equipment, and arms entrusted to them.

192.    Defendants City of Casa Grande, County of Pinal, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, and Lujan were responsible for training and supervising their subordinates.

193.    Defendants City of Casa Grande, County of Pinal, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, and Lujan failed to adequately train and supervise their employees.

194.    The training policies of Defendants City of Casa Grande and County of Pinal were not adequate to train its police officers to handle the usual and recurring situations such as the one described herein.

195.    Defendants City of Casa Grande and County of Pinal's police officers acted under the color of law.

196.    The actions of City of Casa Grande and County of Pinal's police officers deprived the Plaintiffs of their rights under the United States Constitution.

197.    Defendants City of Casa Grande, County of Pinal, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, and Lujan knew that employees would confront a situation as described herein.

25

198.    Defendants City of Casa Grande, County of Pinal were deliberately indifferent to the constitutional rights of the Plaintiffs and its citizens.

199.    Defendants City of Casa Grande, County of Pinal, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, and Lujan were deliberately indifferent to the need to train and supervise their subordinates, and the lack of training and supervision actually caused the constitutional harm and/or deprivation of rights to the Plaintiffs.

200.    Defendants City of Casa Grande, County of Pinal, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, and Lujan were deliberately indifferent to the federally protected rights of the Plaintiffs and violated their rights.

201.    Defendants City of Casa Grande, County of Pinal, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, and Lujan were deliberately indifferent to the obvious consequences of their failure to supervise and train their police officers adequately.

202.    Defendants City of Casa Grande, County of Pinal, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, and Lujan failure to adequately supervise and train amounted to deliberate indifference to the fact that inaction would obviously result in the violation of Plaintiffs' constitutional rights.

203.    The foregoing unconstitutional failures to train were a direct and legal cause of harm to Plaintiffs.

204.    Defendants City of Casa Grande, County of Pinal, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, and Lujan failure to adequately train and supervise proximately caused the violation of Plaintiffs' constitutional rights.

205.    Defendants City of Casa Grande, County of Pinal, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, and Lujan's failures to train, as described herein, were within the control of Defendants, and within the feasibility of Defendants, and each of them, to alter, adjust and/or correct so as to prevent some or all of the unlawful acts and injuries complained of herein by Plaintiffs.

206.    The failure of Defendants City of Casa Grande, County of Pinal, Babeu, Berry, Engstrom, Gregg, Horn, Lapre, and Lujan to provide adequate training caused the

26

1    deprivation of the Plaintiffs' rights by Defendants City of Casa Grande and County of

2    Pinal's police officers.

3           207.    Defendants City of Casa Grande, County of Pinal, Babeu, Berry, Engstrom,

4    Gregg, Horn, Lapre, and Lujan's failure to supervise and train is so closely related to the

5    deprivation of Plaintiffs' rights as to be the moving force that caused the Plaintiffs' injury.

6           208.    The acts and/or omissions of Defendants were willful, wanton, reckless,

7    malicious, oppressive and/or done with a conscious or reckless disregard for the rights of

8    Plaintiffs. Plaintiffs, therefore, prays for an award of punitive and exemplary damages

9    against these individual defendants in an amount to be determined according to proof.

10          209.    Pursuant to 42 U.S.C. § 1988 and other applicable law, Plaintiffs are also

11   entitled to an award of incurred attorneys' fees and costs.

12                          ~~COUNT V~~**COUNT III      TRESPASS**
13                              *(Defendant Ochoa)*

14          ~~210.~~165.       Plaintiffs re-allege and incorporate by reference the allegations set

15   forth in the preceding paragraphs of the Complaint.

16          ~~211.~~166.       Defendant Ochoa physically entered and remained at the Residence

17   without Plaintiffs' permission.

18          ~~212.~~167.       Plaintiffs, by and through Defendants City of Casa Grande and

19   County of Pinal, demanded that Defendant Ochoa remove himself from the Residence.

20          ~~213.~~168.       Despite the demands, Defendant Ochoa remained within the

21   Residence.

22          ~~214.~~169.       Defendant Ochoa had to be physically removed from the Residence

23   by City of Casa Grande and County of Pinal police officers after he was found hiding

24   under a tarp in the Plaintiffs' backyard.

25          ~~215.~~170.       The physical invasion upon Plaintiffs' property is the direct and

26   proximate cause of the damage to the Residence.

27

28

                                          27

216.171.        As a direct and proximate result of Defendant Ochoa's acts and omissions, Plaintiffs sustained substantial financial losses, severe and permanent injuries, and have and continue to endure extreme pain and suffering.

217.172.        Accordingly, Plaintiffs have been damaged in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that the Court enter judgment against the Defendants and in for of the Plaintiffs, as follows:

A.    For actual damages in an amount to be proven at trial;

B.    For compensatory, consequential and incidental damages in an amount to be proven at trial;

C.    For punitive and exemplary damages against the Defendants, in an amount appropriate to punish the wrongful conduct alleged herein and to deter such conduct in the future;

D.    For equitable or injunctive relief, as may be requested by Plaintiffs or as may be appropriate;

E.    Awarding Plaintiffs pre- and post-judgment interest on the foregoing amounts at the maximum rate recoverable by law;

F.    For Plaintiffs incurred costs, including all incurred attorneys' fees and court costs, pursuant to 42 U.S.C. § 1988 and other applicable law;

G.    For such other relief as this Court may deem proper.

**RESPECTFULLY SUBMITTED** this 17th 1st day of AugustApril 20182025.

28

~~ANGELINI MILLS WOODS + ORI~~MILLS AND WOODS LAW

By____/s/Sean A. Woods_____
     Robert T. Mills
     Sean A. Woods
     ~~Jordan C. Wolff~~
     5055 N 12th Street, Suite 101
     Phoenix, AZ 85014
     *Attorneys for Plaintiffs*

1

## CERTIFICATE OF SERVICE

2

3    I hereby certify that on this ~~17th~~ 1st day of ~~August~~April ~~2018~~2025, I electronically transmitted the foregoing document to the Clerk's office using the Court's CM/ECF Filing System and forwarded copies to the following parties via electronic mail:

4

5    JELLISON LAW OFFICES, PLLC
     18801 North Thompson Peak Parkway

6    Suite D-235

7    Scottsdale, Arizona 85255
     Telephone: 480.659.4244

8    JAMES M. JELLISON, ESQ., #012673
     E: jim@jellisonlaw.com

9    E: admin@jellisonlaw.com

10   ~~JELLISON LAW OFFICES, PLLC~~
     ~~James M. Jellison~~

11   ~~2020 North Central Avenue~~

12   ~~Suite 670~~
     ~~Phoenix, Arizona 85004~~

13   *Attorney for Defendants ~~City of Casa Grande and Pinal County~~*

14

15   */s/ ~~Jordan C. Wolff~~Ben Dangerfield*_____

16

17

18

19

20

21

22

23

24

25

26

27

28

30

# EXHIBIT 2

CCD16121562831M2102D

## DECLARATIONS

### ARIZONA HOMEOWNERS POLICY - GOLD STAR SPECIAL DELUXE FORM (ED 6/94) AZ

NON-ASSESSABLE POLICY ISSUED BY AMERICAN FAMILY MUTUAL INSURANCE COMPANY
A MEMBER OF THE AMERICAN FAMILY INSURANCE GROUP MADISON, WI.

**PLEASE READ YOUR POLICY**

POLICY NUMBER 02BR-1139-01-73-PHGS-AZ

**NAMED INSURED**

DENBY, JIM
116 W 10TH ST
CASA GRANDE, AZ 85122-4019

**EFFECTIVE**
FROM 04-09-2014   TO 04-09-2015
ACCT   015-003-299-49

COVERAGES AND LIMITS PROVIDED
001 FAMILY FRAME STUCCO DWELLING IN TOWN CLASS 4

| SECTION I | LIMITS |
|---|---|
| DWELLING | $189,200 |
| PERSONAL PROPERTY ON PREMISES | $141,900 |
| PERSONAL PROPERTY OFF PREMISES 100% SUBJECT TO POLICY LIMITATION | |
| LOSS OF USE - ACTUAL LOSS SUSTAINED WITHIN 12 MONTHS OF THE LOSS | |
| DEDUCTIBLE AMOUNT - ALL PERIL | $1,000 |

| SECTION II | |
|---|---|
| PERSONAL LIABILITY | $300,000 |
| MEDICAL EXPENSE | $10,000 |

ADDITIONAL PROTECTION/ENDORSEMENTS
GOLD STAR HOMEOWNERS AMENDATORY  (END 587A ED 10/99)
FUNGI OR BACTERIA EXCLUSION (END 595 ED 6/02)
OPTION  2 - EXTENDED COVERAGE ON JEWELRY, WATCHES AND FURS
OPTION 14 - PERSONAL PROPERTY REPLACEMENT COVERAGE
OPTION 13 - OTHER STRUCTURES
ADDITIONAL PROTECTION SCHEDULE (END 436 ED 3/01)
ARIZONA AMENDATORY HOMEOWNERS (END 584D(AZ) ED 3/13)

THIS POLICY INCLUDES INCREASED BUILDING LIMIT COVERAGE UP TO 120% OF THE DWELLING
LIMIT SHOWN ABOVE, SUBJECT TO POLICY PROVISIONS

CUSTOMER LONGEVITY DISCOUNT/CLAIM FREE DISCOUNT HAVE BEEN APPLIED
HOME & AUTO DISCOUNT HAS BEEN APPLIED
AGE OF CUSTOMER DISCOUNT HAS BEEN APPLIED

LATEST BUILDING COST INDEX IS 237

Declarations effective on the date shown above.  These declarations form a part of this policy and replace all other declarations which may
have been issued previously for this policy.  If this declarations is accompanied by a new policy, the policy replaces any which may have been
issued before with the same policy number.

AUTHORIZED
REPRESENTATIVE           *President*        *Secretary*        COUNTERSIGNED        *Licensed Resident Agent*

AGENT  036-418              PHONE (520) 350-2500
CHRIS CAHILL
21300 N JOHN WAYNE PKWY STE 110
MARICOPA  AZ  85139-8964

Form No. HO-47C                                              Stock No. 23281

Denby/AF 001623
Tyson & Mendes, LLP

CCD16121562831M2103D

**ARIZONA HOMEOWNERS POLICY**
GOLD STAR SPECIAL DELUXE FORM

THIS POLICY IS NON-ASSESSABLE
AMERICAN FAMILY MUTUAL INSURANCE COMPANY
6000 AMERICAN PARKWAY
MADISON, WISCONSIN 53783-0001
(608) 249-2111
A MUTUAL INSURANCE COMPANY

READ YOUR POLICY CAREFULLY

This policy is a legal contract between you (the policyholder) and the American Family Mutual Insurance Company. This cover sheet provides only a brief outline of some important features in your policy. The policy itself sets forth, in detail, the rights and obligations of you and our company. It is important that you read your policy carefully.

## YOUR HOMEOWNERS POLICY QUICK INDEX REFERENCE

Named Insured
Location of Your Property
Policy Period
Coverages                          ● See Declarations
Amounts of Insurance
Loss Deductible

| | ● Beginning on Page | |
|---|---|---|
| **INSURING AGREEMENT** | | 1 |
| **DEFINITIONS** | | 1 |
| **PROPERTY COVERAGES - Section I** | | 2 |
| Dwelling | | |
| Garage - Other Structures | | |
| Personal Property | | |
| Loss of Use | | |
| **SUPPLEMENTARY COVERAGES - Section I** | | 3 |
| Collapse | | |
| Credit/Debit Card, Forgery and Counterfeit Money | | |
| Debris Removal | | |
| Emergency Removal of Property | | |
| Grave Markers | | |
| Increased Building Replacement Coverage | | |
| Inflation Protection Coverage | | |
| Lock Replacement Coverage | | |
| Loss Assessments | | |
| Outdoor Antennas | | |
| Personal Property Replacement Coverage | | |
| Pollutant Cleanup and Removal | | |
| Protective Repairs | | |
| Refrigerated Food Products | | |
| Trees, Plants, Shrubs and Lawns | | |
| **PERILS INSURED AGAINST - Section I** | | 5 |

| | ● Beginning on Page | |
|---|---|---|
| **EXCLUSIONS - Section I** | | 7 |
| **CONDITIONS - Section I** | | 7 |
| **LIABILITY COVERAGES - Section II** | | 9 |
| Personal Liability Coverage | | |
| Medical Expense Coverage | | |
| **SUPPLEMENTARY COVERAGES - Section II** | | 10 |
| Claim and Defense Expenses | | |
| Damage to Property of Others | | |
| Emergency First Aid | | |
| Loss Assessments | | |
| **EXCLUSIONS - Section II** | | 10 |
| **CONDITIONS - Section II** | | 12 |
| **GENERAL CONDITIONS** | | 13 |
| Cancelation | | |
| Non-Renewal | | |
| Policy Period, Renewal of Coverage, Premiums and Changes | | |
| **ADDITIONAL PROTECTION YOU MAY BUY** | | 14 |

HO-5 (AZ) Ed. 6/94

Stock No. 03777

Denby/AF 001624
Tyson & Mendes, LLP

CCD16121562831M2104D

## INSURING AGREEMENT

**We** will provide the insurance described in this policy in return for **your** premium payment and compliance with all policy terms. **We** will provide this insurance to **you** in reliance on the statements **you** have given **us** in **your** application for insurance with **us**.

**You** warrant the statements in **your** application to be true and this policy is conditioned upon the truth of **your** statements.

**You** and all **insureds** must comply with the policy terms. Any failure to comply with policy terms by **you** or any other **insured** will affect the coverage afforded by this insurance for **you** and all **insureds**.

## DEFINITIONS

The following words in this policy have defined meanings. They will be printed in **bold** type.

1. **Bodily Injury** means bodily harm, sickness or disease. It includes resulting loss of services, required care and death. **Bodily injury** does not include:
   a. any of the following which are communicable: disease, bacteria, parasite, virus or other organism which are transmitted by any **insured** to any other person;
   b. the exposure to any such communicable disease, bacteria, parasite, virus or other organism; or
   c. emotional or mental distress, mental anguish, mental injury, or any similar injury unless it arises out of actual bodily harm to the person.

2. **Business** means any profit motivated full or part-time employment, trade, profession or occupation and including the use of any part of any premises for such purposes. The providing of home day care services to other than **insureds**, for which an **insured** receives monetary or other compensation for such services is also a **business**.

3. **Credit/Debit Card** means any card, plate, coupon book or other credit device for the purpose of obtaining money, property, labor, services on credit or for deposit, withdrawal or transfer of funds.

4. **Domestic Employee** means a person employed by an **insured** to perform duties for the maintenance or use of the **insured premises**. This includes persons who perform domestic services elsewhere for an **insured**. This does not include persons while performing duties for an **insured's business**.

5. **Insured**
   a. **Insured** means **you** and, if residents of **your** household:
      (1) **your** relatives; and
      (2) any other person under the age of 21 in **your** care or in the care of **your** resident relatives.
   b. Under Personal Liability and Medical Expense Coverages, **insured** also means:
      (1) any person or organization legally responsible for a watercraft or animal owned by any person included in paragraph a. to which Section II Coverages apply. This does not include a person or organization using or having custody of the watercraft or animal in the course of any **business** or without **your** specific permission.
      (2) any person while working as a **domestic employee** of any person included in paragraph a.
      (3) with respect to vehicles covered by this policy, a **domestic employee** of any person included in paragraph a. while engaged in the employment of that person.
      (4) with respect to vehicles covered by this policy, any other person using such vehicle on the **insured premises** with **your** permission.

   c. If **you** die, the person having proper temporary custody of covered property replaces **you** as the named **insured**. This applies only to insurance on covered property and legal liability arising out of that property. If **you** die, any person who is an **insured** continues to be an **insured** while residing on the **insured premises**.
   d. Each person described above is a separate **insured** under this policy. This does not increase **our limit**.

6. **Insured Premises**
   a. Described Location:
      (1) If **you** own the one or two family dwelling described in the Declarations, the **insured premises** means: that dwelling, related private structures and grounds at that location where **you** reside;
      (2) If **you** own the townhouse or row house at the location described in the Declarations, the **insured premises** are: that townhouse or row house, related private structures and grounds used or occupied solely by **your** household for residential purposes at that location.
   b. For Personal Liability and Medical Expense Coverages, **insured premises** also include:
      (1) other premises listed in the Declarations;
      (2) the part of any residential premises **you** acquire for **your** occupancy during the policy period if **we** are notified within 30 days following the date **you** acquired such premises;
      (3) vacant land (other than farm land) owned by or rented to an **insured**. This includes land on which a one or two family dwelling is being built for the personal use of an **insured**;
      (4) an **insured's** individual or family cemetery lots and burial vaults;
      (5) the part of any residential premises not owned by an **insured**, while an **insured** is temporarily residing there; and
      (6) any premises **you** use in connection with the described location.
   c. For Personal Liability Coverage:
      The **insured premises** also includes any other premises which an **insured** may occasionally rent for other than **business** purposes.

7. **Limit** means the limit of liability that applies for the coverage.

8. **Medical Expenses** means usual and customary charges for necessary medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services.

9. **Occurrence** means an accident, including exposure to conditions, which results during the policy period, in:
   a. **bodily injury;** or
   b. **property damage.**
   Continuous or repeated exposure to substantially the same general harmful conditions is considered to be one **occurrence**.

Denby/AF 001625
Tyson & Mendes, LLP

CCD16121562831M2105D

10. **Pollutant** means any solid, liquid, gaseous or thermal irritant or contaminant, in any form, including, but not limited to lead, asbestos, formaldehyde, radon, any controlled chemical substance or any other substance listed as a hazardous substance by any governmental agency. It also includes smoke, vapor, soot, fumes, alkalis, chemicals, garbage, refuse and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

11. **Property Damage** means physical damage to or destruction of tangible property, including loss of use of this property. Loss of use of tangible property does not include any resulting loss of value of such damaged property.

12. **Vacant** means being without contents or occupant, including when the **insured** has established another residence and does not intend to reoccupy this dwelling.

13. **We, us** and **our** refer to the American Family Mutual Insurance Company.

14. **You** and **your** refer to the person or people shown as the named **insured** in the Declarations. These words also refer to **your** spouse who is a resident of **your** household.

## PROPERTY COVERAGES - SECTION I

### COVERAGE A - DWELLING

We cover:
1. the described dwelling on the **insured premises** including additions, built-in components and fixtures;
2. construction material located on or next to the **insured premises** for use in connection with **your** dwelling; and
3. attached and/or wall-to-wall carpeting in the described dwelling.

### Dwelling Extension:

We cover:
1. other structures on the **insured premises** not attached to the dwelling, and those structures connected to the dwelling by only a utility line, fence or similar connection;
2. fences, driveways, sidewalks and permanently installed yard fixtures; and
3. construction material located on or next to the **insured premises** for use in connection with the other structures.

This is additional insurance for an amount up to 10% (in the aggregate) of Coverage A - Dwelling.

Coverage A - Dwelling and Dwelling Extension do not cover:
1. outdoor antennas including their lead-in wiring, accessories, masts and towers, except as covered by Supplementary Coverages;
2. detachable building items covered by Coverage B - Personal Property;
3. curtains, drapes and other window coverings, all whether or not installed, except as covered by Coverage B - Personal Property;
4. structures designed or used in whole or in part for **business;**
5. structures rented or held for rental to other than a tenant in **your** dwelling, unless used solely as a private garage;
6. any land or the value of any land, including land on which the dwelling or other structures are located, or the cost to restore, repair, rebuild or stabilize land. If a covered loss causes damage to the dwelling or other structures and to the land, **we** do not cover any increased cost to repair or rebuild the dwelling or other structures because of damage to the land; or
7. natural water.

### COVERAGE B - PERSONAL PROPERTY

1. **We** cover:
   a. personal property owned by or used by any **insured** anywhere in the world.
   b. if you ask **us** to, and when not insured by the owner, personal property owned by any **insured;**
      (1) others while it is on the part of the **insured premises** occupied exclusively by any **insured;** or
      (2) a house guest or **domestic employee** while it is in any residence occupied by an **insured.**
   This coverage also includes:
   a. window air conditioners;
   b. curtains, drapes and other window coverings, whether or not installed;
   c. outdoor equipment; and
   d. yard fixtures not permanently installed.

2. **Limitations on Specific Property**
   a. **We** will provide coverage up to 10% of the Coverage B - Personal Property **limit** but not less than $2500 for any personal property:
      (1) when taken outside the United States; or
      (2) which is usually at any **insured's** residence, other than the dwelling described in the Declarations. This includes property of a student, who is an **insured,** at a residence occupied by the student while away at school. This limitation does not apply to personal property in a newly acquired principal residence located in the United States for the first 30 days **after you** begin to move there.
   b. The following special **limits** apply to certain categories of personal property. These **limits** do not increase the Coverage B **limit** shown in the Declarations. Each **limit** below is the total **limit** for each loss for all property in that category:
      (1) $200 on money, bank notes, negotiable instruments (as defined by statute), bullion, gold other than goldware, silver other than silverware, platinum, coins, medals and numismatic property;
      (2) $1000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets, stamps and other philatelic property. This dollar **limit** applies to these categories regardless of the medium (such as paper or computer software) on which the material exists. This **limit** includes the cost to research, replace or restore the information from the lost or damaged material.
      Multiple withdrawals from a single account over any period of time are considered to be one loss and **our** liability for the total of such withdrawals will not exceed the maximum **limit** for this category of personal property at the time the loss was discovered;
      (3) jewelry, watches, precious and semi-precious stones, gems and furs as provided under Option 2;
      (4) $1000 on any type of watercraft, including their trailers, equipment, accessories and outboard motors;
      (5) $1000 on camping trailers, camper bodies and trailers not used with watercraft;
      (6) $1200 on property used or intended for use in any **business,** while on the **insured premises.** This does not include electronic data processing equipment or the recording or storage software used with such equipment;
      (7) $250 on property used or intended for use in any **business** while away from the **insured premises.** This does not include electronic data processing equipment or the recording or storage software used with such equipment;
      (8) $5000 for loss by theft of silverware and goldware;
      (9) $5000 for loss by theft of firearms and accessories;

HO-5 (AZ) Ed. 6/94      Page 2 of 16      Stock No. 03777

Denby/AF 001626
Tyson & Mendes, LLP

CCD16121562831M2106D

(10) $5000 on electronic data processing equipment and the recording or storage software used with such equipment. Coverage for this property is provided only:
   (a) when located on the **insured premises**; or
   (b) while off the **insured premises** when removed temporarily for up to 30 days. However, property of a student, who is an **insured**, is covered at a residence occupied by the student while away at school.
   The recording or storage software will be covered only up to:
   (a) the retail value of the software, if pre-programmed; or
   (b) the retail value of the software in blank or unexposed form, if blank or self-programmed;

(11) $5000 on any one article and $10,000 in the aggregate for loss by theft of any rug, carpet (except attached wall-to-wall carpeting), tapestry, wall hanging or other similar article;

(12) $1200 on any one item for loss by sudden and accidental damage from artificially generated electrical currents. This does not include electronic data processing equipment or the recording or storage software used with that equipment; or

(13) $7500 for loss by theft of tools.

3. **Personal Property Not Covered**
   Coverage B does not cover:
   a. property separately described or specifically insured by this policy or any other insurance;
   b. animals, insects, birds and fish;
   c. land motor vehicles or motor propelled vehicles or machines, whether assembled or unassembled, including their equipment and accessories. We do cover those motorized land conveyances designed for assisting the handicapped or used solely for the service of the **insured premises** and not licensed for road use;
   d. aircraft and parts, whether assembled or unassembled. **We** do cover model aircraft not used or designed for transporting cargo or persons;
   e. **business** property owned by others while away from the **insured premises**;
   f. property rented or held for rental to others when not on the **insured premises**;
   g. property of a roomer, boarder, tenant or other resident who is not an **insured**;
   h. outdoor antennas, their lead-in wiring, accessories, masts and towers, except as covered by Supplementary Coverages;
   i. trees, plants, shrubs and lawns, except as covered by Supplementary Coverages;
   j. any device, accessory or antenna designed for reproducing, detecting, receiving, transmitting, recording or playing back data, radar, sound or picture (or any film, tape, wire, record, disc or other medium designed for use with such device) which may be operated from the electrical system of a land motor vehicle, farm equipment or watercraft and while in or on the land motor vehicle, farm equipment or watercraft;
   k. **credit/debit cards** except as covered by Supplementary Coverages;
   l. land; or
   m. natural water.

## COVERAGE C - LOSS OF USE

The **limit** for Coverage C is the actual loss incurred by **you** within 12 months following the date of loss for all the following coverages.

1. If a loss covered under this section makes that part of the **insured premises** where **you** reside uninhabitable, **we** will pay:
   **Additional Living Expense**, meaning any necessary increase in living expenses incurred by **you** so that **your** household can maintain its normal standard of living.
   Payment will be for the shortest time required to repair or replace the damaged property or, if **you** permanently relocate, the shortest time required for **your** household to settle elsewhere.

2. If a loss covered under this section makes that part of the **insured premises** rented to others or held for rental by **you** uninhabitable, **we** will pay:
   **Fair Rental Value**, meaning the fair rental value of that part of the **insured premises** rented to others or held for rental by **you** less any expenses that do not continue while the premises is uninhabitable.
   Payment will be for the shortest time required to repair or replace that part of the premises rented or held for rental.

3. If a civil authority prohibits **you** from use of the **insured premises** as a result of direct damage to neighboring premises by a Peril Insured Against in this policy, **we** cover the Additional Living Expense or Fair Rental Value loss as provided above for a period not exceeding two weeks during which use is prohibited.
   The periods of time under 1, 2 and 3 above are not limited by expiration of this policy.
   **We** do not cover loss or expense due to cancelation of a lease or agreement or arising out of **your** mortgage agreement.

## SUPPLEMENTARY COVERAGES - SECTION I

**We** provide the following Supplementary Coverages. These coverages are subject to all terms of this policy, except where modified by the *Supplementary Coverage.*

1. **Collapse. We** cover risk of direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:
   a. Perils Insured Against in Coverage B. These perils apply to covered building(s) and personal property for loss insured by this Supplementary Coverage;
   b. hidden decay;
   c. hidden insect or vermin damage;
   d. weight of people, animals, equipment or contents;
   e. weight of rain or snow which collects on a roof; or
   f. use of defective material or methods in construction, reconstruction, renovation or remodeling if the collapse occurs during the course of the construction, reconstruction, renovation or remodeling.
   Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf, dock, outdoor equipment or a structure that is not a building is not included under items b, c, d, e and f unless the loss is a direct result of the collapse of a building.
   Collapse does not include settling, cracking, shrinking, bulging or expansion.
   This coverage does not increase the **limit** applying to the damaged covered property.

Denby/AF 001627
Tyson & Mendes, LLP

CCD16121562831M2107D

2. **Credit/Debit Card, Forgery and Counterfeit Money.**
   a. We will pay for loss sustained by an **insured**, but not to exceed $1000 per loss, when such **insured**:
      (1) becomes legally obligated to pay for the theft or un-authorized use of **credit/debit cards** issued to or registered in any **insured's** name;
      (2) suffers a loss through forgery or alteration of checks, drafts, certificates of deposit and notes including negotiable orders of withdrawal; or
      (3) accepts in good faith counterfeit United States or Canadian paper currency.
   b. We will not pay for loss if:
      (1) the **insured** has not complied with the provisions under which the **credit/debit card** was issued;
      (2) the loss is caused by the dishonesty of any **insured**;
      (3) the loss results from **business** activities of any **insured**; or
      (4) the loss occurs while a person, not an **insured**, has possession of the **credit/debit card** with an **insured's** permission.

   All loss, whether the result of a single act or a series of acts, committed by any one person or any one person in conjunction with other persons, shall be considered one loss.
   This coverage is additional insurance.
   No deductible applies to this coverage.

3. **Debris Removal.** We will pay reasonable expenses **you** incur to remove debris of covered property following a covered loss from a peril we insure against.
   If the damage to that property and the cost of debris removal is more than **our limit** for the property, we will pay up to an additional 5% of that **limit** for debris removal.
   We will also pay up to $500 in the aggregate for any one loss for reasonable expenses incurred by **you** in removing any fallen trees from the **insured premises** if:
   a. the tree damages a covered building;
   b. the falling of the tree is caused by any peril we insure against under Coverage B; and
   c. this coverage is not provided elsewhere in this policy.
   We do not cover debris removal of any trees:
   a. grown for **business** purposes; or
   b. located more than 250 feet from the dwelling on the **insured premises**.
   We will not pay the costs, expenses, fines or penalties to:
   a. extract **pollutants** from land or water;
   b. remove, restore, replace or dispose of polluted land, ground water or underground resources;
   c. extract, remove or dispose of **pollutants** from natural resources, buildings or other structures away from any **insured premises**;
   d. remove or dispose of covered property that has polluted land, water, ground or underground resources;
   e. remove or dispose of ash, dust, particulate matter or lava flow from outside of a dwelling; or
   f. test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or dispose of **pollutants**;
   whether or not such actions are done voluntarily or at the direction or request of any governmental body, agency or other jurisdiction.
   Coverage for items a, b, d, e and f will apply only as provided in Supplementary Coverages – Section I, under **Pollutant** Cleanup and Removal.

4. **Emergency Removal of Property.** We will pay for loss to covered property while being removed or while removed from the **insured premises** because of danger from a Peril Insured Against. Such property is covered against accidental direct loss from any cause for a period up to 30 days. This coverage does not increase the **limit** applying to the property being removed.

5. **Grave Markers.** We will pay up to $5000 for direct loss by Perils Insured Against in Coverage B to cover grave markers.
   This coverage is additional insurance.

6. **Increased Building Replacement Coverage.** We will settle covered losses to the dwelling under Coverage A – Dwelling and to detached garage(s) under Dwelling Extension at replacement cost without regard to the **limit**, subject to the following provisions:
   a. **You** have insured **your** dwelling and detached garage(s) to 100% of their replacement cost as determined by **our** Residential Building Cost Guide.
   b. **You** have notified **us** within 90 days of the start of any new detached garage valued at $5000 or more or any additions to or remodeling of a dwelling or detached garage which increase their replacement cost value by $5000 or more.
   c. **You** have paid any additional premium due for the increase in value. If **you** fail to notify **us** within 90 days, **our** payment will not exceed the **limit** applying to the building, as outlined in Conditions – Section I, under Loss Value Determination.
   The Increased Building Replacement Coverage only applies to dwellings and detached garage(s) that are repaired or replaced after a covered loss. This coverage does not apply to dwellings or detached garage(s) under construction until completed and occupied.

7. **Inflation Protection Coverage.** We will increase the insurance for Section I Coverage A – Dwelling and Coverage B – Personal Property at the same rate as the increase in the Residential Building Cost Index. This index is identified on **your** latest Declarations page.
   To determine the amount of insurance on a given date, divide the latest available index by the index level shown on **your** latest Declarations.
   Multiply the resulting factor by the **limits** for Coverages A and B. At each renewal, we will correct the amount of Coverages A and B to the nearest $100* in accordance with the changes in the Residential Building Cost Index. (For rounding, $50.00 or more is raised to one hundred dollars, $49.99 or less is treated as $0.00.) We will adjust the renewal premium accordingly.
   We will not reduce the **limits** to less than those previously specified without **your** consent.
   *When the rounded amount for Coverage B does not equal the minimum required, the Coverage B amount will then be rounded up to the next $100.

8. **Lock Replacement Coverage.** We will pay the necessary costs **you** incur to replace or re-key exterior dwelling door locks on the **insured premises** when the dwelling door keys or automatic garage door transmitter(s) are stolen in a covered theft loss.
   This coverage is additional insurance.
   No deductible applies to this coverage.

9. **Loss Assessments.** We will cover an amount up to $1000 for **your** share of special loss assessments charged during the policy period and levied against **you** by a corporation or association of property owners in accordance with the governing rules of the association. This $1000 **limit** is the most we will pay for any one loss, regardless of the number of assessments. This coverage only applies when the assessment is made as a result of direct loss to the property, owned by all members collectively, caused by a Peril Insured Against under Section I of this policy.
   This coverage applies only to loss assessments charged against **you** as owner or tenant of the **insured premises**.
   We do not cover loss assessments charged against **you** or a corporation or association of property owners by any governmental body.

Denby/AF 001628
Tyson & Mendes, LLP

CCD161215628311M2108D

In the event of an assessment, this coverage is subject to all other terms of this policy. This coverage is excess insurance over any insurance collectible under any policy or policies covering the association of property owners.

10. **Outdoor Antennas. We** will pay up to $1000 for direct loss by Perils Insured Against in Coverage B to outdoor antennas or dish antennas including their lead-in wiring, accessories, masts and towers.
This coverage is additional insurance.

11. **Personal Property Replacement Coverage. We** will pay for qualifying personal property as provided under Option 14, Personal Property Replacement Coverage.

12. **Pollutant Cleanup and Removal. We** will pay up to $10,000 to cover **your** expense to extract **pollutants,** or covered property which becomes a **pollutant,** from land, water, insured buildings or other structures, or **your** personal property. Such loss must occur on the **insured premises** and must be caused by or result from a covered cause of loss under Section 1 of this policy, during the policy period.
This coverage is additional insurance.

13. **Protective Repairs. We** will pay the reasonable cost **you** incur for necessary repairs made to protect covered property from further damage following a covered loss from a peril **we** insure against.
This coverage does not increase the **limit** applying to the property being repaired.

14. **Refrigerated Food Products. We** will pay for loss to food products in freezer or refrigerator units on the **insured premises,** but not to exceed $500 per loss to each freezer or refrigerator, when caused by power interruption or mechanical failure.
Power interruption or mechanical failure does not include:
a. removal of the plug from an electrical outlet; or
b. turning off an electrical switch unless caused by a Peril Insured Against.
This coverage does not increase the **limit** applying to the damaged property.
No deductible applies to this coverage.
The Power Failure exclusion does not apply to this coverage.

15. **Trees, Plants, Shrubs and Lawns. We** cover trees, plants, shrubs and lawns on the **insured premises. We** pay only for loss caused by the following perils: Fire, Lightning, Explosion, Riot, Civil Commotion, Aircraft, Vehicles not owned or operated by an occupant of the **insured premises,** Vandalism or Malicious Mischief, Theft or Collapse of a building or any part of a building. The **limit** for this coverage will not exceed 5% of the **limit** that applies to the dwelling for all trees, plants, shrubs and lawns nor more than $500 for any one tree, plant or shrub including the cost of removing the debris of the covered item.
**We** do not cover trees, plants, shrubs or lawns:
a. grown for **business** purposes; or
b. located more than 250 feet from the dwelling on the **insured premises.**
This coverage is additional insurance.

## PERILS INSURED AGAINST - SECTION I

### COVERAGE A - DWELLING AND DWELLING EXTENSION

**We** cover risks of accidental direct physical loss to property described in Coverage A - Dwelling and Dwelling Extension, unless the loss is excluded in this policy.

### LOSSES NOT COVERED

**We** do not cover loss to the property described in Coverage A - Dwelling and Dwelling Extension resulting directly or indirectly from or caused by one or more of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

1. Losses excluded under EXCLUSIONS - SECTION I.

2. **Collapse,** other than as provided in Supplementary Coverages - Section I, under Collapse.

3. **Continuous or Repeated Seepage** or leakage of water or steam from within a plumbing, heating, air-conditioning or automatic fire protection sprinkler system or from within a household appliance which occurs over a period of weeks, months or years.

4. **Freezing** of a plumbing, heating, air-conditioning or automatic fire protection sprinkler system or household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing while the residence is **vacant,** unoccupied or under construction, unless **you** have taken precaution to:
a. maintain heat in the building; or
b. shut off the water supply and drain the system and appliances of water.

5. **Freezing, Thawing, Pressure or Weight of Water or Ice,** whether or not driven by wind, to:
a. a fence, pavement, patio, foundation, retaining wall, bulkhead, pier, wharf or dock; or
b. an outdoor swimming pool, outdoor sauna, outdoor whirlpool or hot tub, including filters, pipes, pumps and other related equipment.

6. **Other Causes of Loss:**
a. wear and tear, marring, scratching, deterioration;
b. inherent vice, latent or inherent defect, mechanical breakdown;
c. smog, rust, corrosion, frost, condensation, mold, wet or dry rot;
d. smoke from agricultural smudging or industrial operations;
e. settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings;
f. birds, vermin, rodents, insects or domestic animals.
If any of these cause water or steam to escape from a plumbing, heating, air-conditioning or automatic fire protection sprinkler system or household appliance, **we** cover loss caused by the water or steam. **We** also cover the cost of tearing out and replacing any part of a building necessary to repair the system or appliance.
**We** do not cover loss to the system or appliance from which this water or steam escaped.

7. **Theft** in or from a dwelling while under construction, or of materials and supplies for use in the construction, until completed and occupied.

Denby/AF 001629
Tyson & Mendes, LLP

CCD16121562831M2109D

8. **Vandalism or Malicious Mischief** or breakage of glass and safety glazing if the dwelling has been **vacant** for more than 30 consecutive days immediately before the loss. A dwelling under construction is not considered **vacant**.

However, we do cover any resulting loss to property described in Coverage A - Dwelling and Dwelling Extension from items 2 through 8 above, not excluded or excepted in this policy.

**COVERAGE B - PERSONAL PROPERTY**

We cover risks of accidental direct physical loss to property described in Coverage B - Personal Property when caused by a peril listed below, unless the loss is excluded in this policy.

1. **Fire or Lightning.**

2. **Windstorm or Hail. We** do not cover loss to:
   a. the property inside a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening; or
   b. any type of watercraft, including their trailers, equipment and accessories, and outboard motors, unless inside a fully enclosed building or structure.

3. **Explosion.**

4. **Riot or Civil Commotion.**

5. **Aircraft,** including self-propelled missiles and spacecraft.

6. **Vehicles.**

7. **Smoke,** if the loss is sudden and accidental. We do not cover loss caused by smoke from agricultural smudging or industrial operations.

8. **Vandalism or Malicious Mischief,** meaning only willful or malicious damage to or destruction of property. We do not cover loss to property on the **insured premises** if the dwelling has been **vacant** for more than 30 consecutive days immediately before the loss.

9. **Theft,** including damage from attempted theft, and loss of property from a known place only when it is likely that a theft occurred.
   a. **We do not cover:**
      (1) theft committed by any **insured** or by any other person regularly residing on the **insured premises;**
      (2) theft from the **insured premises** while the dwelling is under construction, until the dwelling is completed and occupied;
      (3) loss of a precious or semi-precious stone from its setting;
      (4) theft from that part of the **insured premises** while rented by you to other than an **insured;**
      (5) theft from premises which are **vacant** for more than 30 consecutive days immediately before the loss;
      (6) loss of personal property obtained voluntarily from any **insured** by swindling, fraud, trick or false pretense; or
      (7) loss resulting from the theft of any credit/debit card or similar device except as provided under Supplementary Coverages.
   b. **We do not cover theft occurring away from the insured premises** of:
      (1) any type of watercraft, including their trailers, equipment and accessories, and outboard motors;
      (2) trailers, campers and camper bodies; or
      (3) other property while on the part of any other residential type premises owned, rented, used or occupied by any **insured,** except while an **insured** is living there temporarily.
      Property of a student, who is an **insured,** is covered while at a residence occupied by the student while away at school.

10. **Breakage of Glass,** meaning damage to personal property caused by breakage of glass which is a part of any building on the **insured premises,** but excluding loss or damage to the glass.
    We do not cover loss on the **insured premises** if the dwelling has been **vacant** for more than 30 consecutive days immediately before the loss.

11. **Falling Objects. We** do not cover loss to:
    a. the property inside a building, unless the falling object first damages the outside of the building;
    b. outdoor equipment and yard fixtures not permanently installed; or
    c. the object which falls.

12. **Weight of Ice, Snow or Sleet.** We do not cover loss to property outside of a building.

13. **Sudden and Accidental Tearing Apart, Burning, Bursting or Bulging** of a heating, air-conditioning or automatic fire protection sprinkler system or a water heater. We do not cover loss:
    a. caused by continuous or repeated seepage or leakage which occurs over a period of weeks, months or years; or
    b. caused by or resulting from freezing.

14. **Accidental Discharge or Overflow of Water or Steam** from a plumbing, heating, air-conditioning or automatic fire protection sprinkler system or household appliance. (Gutters and downspouts are not part of a plumbing system.) We do not cover loss:
    a. caused by continuous or repeated seepage or leakage which occurs over a period of weeks, months or years;
    b. caused by or resulting from freezing;
    c. on the **insured premises** caused by accidental discharge or overflow which occurs away from the **insured premises;**
    d. to the system or appliance from which the water or steam escaped; or
    e. caused by or resulting from water which backs up through sewers or drains or water which enters into and overflows or accidentally discharges from within a sump pump, sump pump well, sump pump well discharge system or other type system designed to remove subsurface water which is drained from the foundation area.

15. **Freezing** of a plumbing, heating, air-conditioning or automatic fire protection sprinkler system or household appliance.
    We do not cover loss on the **insured premises** while the residence is **vacant,** unoccupied or under construction. This exclusion does not apply if **you** have taken precaution to:
    a. maintain heat in the building; or
    b. shut off the water supply and drain the system and appliances of water.

16. **Sudden and Accidental Damage from Artificially Generated Electrical Currents.**

17. **Volcanic Eruption** other than loss caused by earthquake, land shock waves or tremors.
    We will also pay for the cost to remove the ash, dust or particulate matter which has caused direct loss to property inside a dwelling.
    All eruptions that occur within a 72-hour period will be considered as one volcanic eruption.

Denby/AF 001630
Tyson & Mendes, LLP

CCD1612156283IM2110D

# EXCLUSIONS - SECTION I

## PART A

The following exclusions apply to Coverage A - Dwelling and Dwelling Extension, Coverage B - Personal Property, Coverage C - Loss of Use and the Supplementary Coverages - Section I. **We** do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

1. **Earth Movement,** meaning any loss caused by, resulting from, contributed to or aggravated by earthquake; landslide; subsidence; sinkhole; erosion; mudflow; earth sinking, rising, shifting, expanding or contracting; volcanic eruption, meaning the eruption, explosion or effusion of a volcano.

   This exclusion applies whether or not the earth movement is combined with water or rain.

   We do cover only direct resulting loss when caused by:
   a. fire;
   b. explosion other than the explosion of a volcano; or
   c. if an insured peril, breakage of glass or safety glazing material which is a part of a building.

2. **Intentional Loss,** meaning any loss or damage arising out of any act committed:
   a. by or at the direction of any **insured;** and
   b. with the intent to cause a loss.

3. **Neglect** of any **insured** to use all reasonable means to protect covered property at and after the time of loss.

4. **Nuclear Hazard,** meaning nuclear reaction, radiation, radio-active contamination or any consequence of any of these. Loss caused by nuclear hazard is not considered loss by perils of Fire, Explosion or Smoke. Direct loss by fire resulting from nuclear hazard is covered.

5. **Ordinance, Law or Regulation,** meaning enforcement of any ordinance, law or regulation which regulates the construction, repair or demolition of a building or other structure, unless specifically provided under this policy. This includes, but is not limited to the removal and disposal of damaged or undamaged property which results from such enforcement.

   We do cover loss caused by actions of civil authorities to prevent the spread of a fire caused by an insured peril.

6. **Pollution,** meaning any actual, alleged or threatened discharge, dispersal, release, escape, seepage, trespass, wrongful entry or migration of **pollutants** from any source.

7. **Power Failure,** meaning the failure of power or other utility service if the failure takes place away from the **insured premises.** If a Peril Insured Against ensues on the **insured premises, we** will pay only for loss caused by that peril.

8. **War** (declared or undeclared), civil war, insurrection, rebellion, revolution or discharge of a nuclear weapon or device, even if accidental.

9. **Water Damage,** meaning:
   a. flood, surface water, waves, tidal water or overflow of a body of water, from any cause. We do not cover spray from any of these, whether or not driven by wind;
   b. water from any source which backs up through sewers or drains, or water which enters into and overflows or accidentally discharges from within a sump pump, sump pump well, sump pump well discharge system or other type system designed to remove subsurface water which is drained from the foundation area; or
   c. regardless of its source, water below the surface of the ground. This includes water which exerts pressure on or flows, seeps or leaks through any part of a building or other structure, sidewalk, driveway or swimming pool.

   We do cover direct loss that follows, caused by Fire or Explosion.

## PART B

The following exclusion applies to Coverage A - Dwelling and Dwelling Extension, Coverage B - Personal Property, Coverage C - Loss of Use and the Supplementary Coverages - Section I.

1. **Fraud.** We will not provide coverage for all or any part of a loss if, before or after the loss, any **insured** has committed fraud. Fraud means any concealment, misrepresentation or attempt to defraud by any **insured** either in causing any loss or in presenting any claim under this policy.

## PART C

The following exclusions apply to Coverage A - Dwelling and Dwelling Extension. **We** do not insure for loss caused by any of the following.

1. **Acts or Decisions,** including the failure to act or decide, of any person, group, organization or governmental body.

2. **Planning, Construction or Maintenance,** meaning faulty, inadequate or defective:
   a. construction, reconstruction, repair, remodeling or renovation;
   b. materials used in construction, reconstruction, repair, remodeling or renovation;
   c. design, workmanship or specifications;
   d. siting, surveying, zoning, planning, development, grading or compaction; or
   e. maintenance;
   of part or all of the **insured premises** or any other property.

3. **Weather Conditions** which contribute in any way with a cause or event excluded in Part A above to produce the loss.

However, we do cover any resulting loss to property described in Coverage A - Dwelling and Dwelling Extension not excluded or excepted in this policy.

# CONDITIONS - SECTION I

The following conditions apply to all of Section I of this policy.

1. **Abandoned Property. You** may not abandon property to **us** unless **we** specifically agree to it.

2. **Arbitration.** In making a claim under the property coverages, if **you** or **we** cannot agree as to the amount of liability, the controversy may be settled by arbitration. Either party may make this demand by written request made within 60 days after receipt of the properly completed proof of loss by **us.** The procedure is as follows:

   a. The arbitration will be conducted in accordance with the rules of the American Arbitration Association, unless other means of conducting the arbitration, and its expenses, are agreed to between the parties. It is the obligation of the requesting party to contact the American Arbitration Association, or other forum agreed on to initiate the arbitration proceedings.
   b. Judgment upon the award rendered by the arbiters may be entered in any court having jurisdiction.
   c. The expenses of the American Arbitration Association will be paid by the party requesting it.
   d. All parties agree to be bound by any award made by the arbiters.

Denby/AF 001631
Tyson & Mendes, LLP

CCD161215628312M120311D

3. **Contract of Sale Clause.** If a contract for sale of the property described in this policy has been made between the **insured** and the titleholder is also covered, but without any increase in the **limit**, and subject to all other terms of this policy, including any mortgage clause forming a part of this policy. If there is other insurance on the property described, we will not be liable for a greater part of any loss than the amount covered bears to the whole amount of insurance on the property, whether collectible or not.

4. **Dwellings Under Construction.** This policy may cover a dwelling under construction. If so, until the dwelling is completed and occupied, the **limit** will be determined by the actual value of the dwelling at the time of loss, but not greater than the **limit** shown in the Declarations.

5. **Glass or Safety Glazing Replacement.** Damage to glass caused by a Peril Insured Against will be settled on the basis of replacement with safety glazing when required by law.

6. **Insurable Interest and Our Liability.** In the event of a covered loss, we will not pay for more than the insurable interest an **insured** has in the covered property, nor more than the amount of coverage afforded by this policy in any one loss.

7. **Loss Deductible.** We will pay only that part of a covered loss over any deductible which applies.

8. **Loss Payable Clause.** Loss will be adjusted only with the **insured** named and payable to the **insured** and the lienholder shown in the Declarations as their respective interests may appear, subject to all the terms of this policy.

9. **Loss Payment.** We will adjust all losses with **you**. We will pay **you** unless some other party is named in the policy or is legally entitled to receive payment. Loss will be payable 30 days after we receive **your** properly completed proof of loss and:
   a. we reach agreement with **you**;
   b. there is an entry of a final judgment; or
   c. there is a filing of an arbitration award with **us**.

10. **Loss to a Pair or Set.** We may repair or replace any part of the pair or set to restore it to its value before the loss, or we may pay the difference between the actual cash value of the property before and after the loss.

11. **Loss Value Determination.**
   a. **Personal Property, Structures, Awnings, Carpeting, Household Appliances and Outdoor Antennas.**
      (1) Loss to covered property not covered by Option 14 - Personal Property Replacement Coverage will be settled subject to the following:
      We will pay the smaller of:
      (a) the actual cash value* at the time of loss but not more than the cost to repair or replace the damaged property with property of like kind and quality; or
      (b) any policy **limit** which applies.
   *The term "Actual Cash Value" means: The amount which it would cost to repair or replace covered property with material of like kind and quality, less allowance for physical deterioration and depreciation, including obsolescence.
      (2) Loss to covered property covered by Option 14 - Personal Property Replacement Coverage will be settled as provided under Option 14 - Personal Property Replacement Coverage.
   b. **Buildings Which Have a Permanent Foundation and Roof.**
      Buildings which have a permanent foundation and roof will be settled at replacement cost without deduction for depreciation, subject to the following:

(1) Increased Building Replacement Coverage.
   If at the time of loss, the Increased Building Replacement Coverage as provided under the Supplementary Coverages - Section I applies, we will pay the full cost to repair or replace the damaged building without deducting for depreciation and without regard to the **limit**, but not exceeding the smaller of:
   (a) the cost to replace the damaged building with like construction for similar use on the same premises; or
   (b) the amount actually and necessarily spent for repair or replacement of the damaged building.

(2) Actual Cash Value.
   If at the time of loss, the Increased Building Replacement Coverage as provided under the Supplementary Coverages - Section I does not apply and the building is not repaired or replaced, we will pay the actual cash value at the time of loss of that part of the building damaged up to the **limit** applying to the building, but not exceeding the replacement cost of the damaged building.

(3) Replacement Cost.
   (a) If at the time of loss, the Increased Building Replacement Coverage as provided under the Supplementary Coverages - Section I does not apply and the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately prior to the loss, and the building is repaired or replaced, we will pay the full cost to repair or replace the damaged building without deducting for depreciation, but not exceeding the smallest of:
      i. the **limit** in this policy for the building, including any additional amount of insurance as provided by the Inflation Protection Coverage;
      ii. the cost to replace the damaged building with like construction for similar use on the same premises; or
      iii. the amount actually and necessarily spent for repair or replacement of the damaged building.
   (b) If at the time of loss, the Increased Building Replacement Coverage as provided under the Supplementary Coverages - Section I does not apply and the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately prior to the loss, and the building is repaired or replaced, we will pay the larger of the following amounts, but not exceeding the **limit** under this policy applying to the building:
      i. the actual cash value of that part of the building damaged; or
      ii. the amount of insurance on the building divided by 80% of its full replacement cost times the amount of the loss.
   (c) To determine the full replacement cost of the covered building immediately prior to the loss:
      i. where there is a basement, do not include the value of excavations, foundations, piers and other supports which are below any basement floor nor underground pipes, wiring and drains; or
      ii. where there is no basement, do not include the value of underground pipes, wiring and drains.
   c. **Procedures to Claim Replacement Coverage.**
      If **you** receive an actual cash value settlement for damaged or stolen property covered by replacement coverage and **you** have not reached **your limit**, **you** may make a further claim under this condition for any additional payment on a replacement cost basis provided:

HO-5 (AZ) Ed. 6/94

Stock No. 03777

Denby/AF 001632
Tyson & Mendes, LLP

CCD1612156283 1M2112D

(1) **you** notify **us** within 180 days after the loss of **your** decision to repair or replace the damaged or stolen property; and

(2) repair or replacement is completed within one year of the date of loss.

**12. Mortgage Clause.**
The word "mortgagee" includes trustee or contract of sale titleholder.

If a mortgagee is named in this policy, any loss payable on buildings will be paid to the mortgagee and **you**, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages. If **we** deny **your** claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

a. notifies **us** of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

b. pays any premium due under this policy on demand if **you** have neglected to pay the premium; and

c. submits a signed, sworn statement of loss within 60 days after receiving notice from **us** of **your** failure to do so.

As to only the interest of a lienholder or mortgagee declared in this policy, this insurance will terminate only if **we** give such lienholder or mortgagee at least 10 days written notice of termination. If **we** pay the mortgagee for any loss and deny payment to **you**:

a. **we** are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

b. at **our** option, **we** may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, **we** will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

**13. No Benefit to Bailee.** This insurance will not, in any way, benefit any person or organization who may be caring for or handling property for a fee.

**14. Other Insurance.** If both this and other insurance apply to a loss, **we** will pay **our** share. **Our** share will be the proportionate amount that this insurance bears to the total amount of all applicable insurance.

**15. Our Settlement Options.**
In the event of a covered loss, **we** have the option to:

a. make a cash settlement for all or part of the damaged, destroyed or stolen property; or

b. pay the cost to repair, rebuild or replace all or the necessary part(s) of the damaged, destroyed or stolen property with like property, as of the time of loss, less an allowance for depreciation when replacement cost coverage doesn't apply.

**We** may take the salvage of all or any part of the covered property at its agreed or appraised value. Property paid for or replaced by **us** becomes **ours**, if **we** choose.

If **we** give **you** notice within 30 days after **we** receive an acceptable proof of loss, **we** may repair or replace any part of the damaged property with like property.

**16. Permission Granted to You. You** may make alterations, additions and repairs to **your** building and complete structures under construction. The **insured premises** may be **vacant** or unoccupied without limit of time, except where this policy specifies otherwise. A dwelling under construction is not considered **vacant**.

**17. Recovered Property.** If **you** or **we** recover any property for which **we** have made payment under this policy, **you** or **we** will notify the other of the recovery. At **your** option, the property will be returned to or retained by **you** or it will become **our** property. If the recovered property is returned to or retained by **you**, the claim payment, or any lesser amount to which **we** agree, must be refunded to **us**.

**18. Suit Against Us. We** may not be sued unless there is full compliance with all the terms of this policy. Suit must be brought within one year after the loss or damage occurs.

**19. What You Must Do in Case of Loss.** In the event of a loss to property that this insurance may cover, **you** and any person claiming coverage under this policy must:

a. give notice as soon as reasonably possible to **us** or **our** agent. Report any theft to the police immediately. If the loss involves a **credit/debit card**, written notice must also be given to the company that issued the card;

b. protect the property from further damage, make reasonable and necessary repairs to protect the property and keep records of the cost of these repairs;

c. promptly separate the damaged and undamaged personal property. Give **us** a detailed list of the damaged property, showing the quantities, when and where acquired, original cost, current value and the amount of loss claimed;

d. as often as **we** reasonably require:

(1) show **us** the damaged property before permanent repairs or replacement is made;

(2) provide **us** with records and documents **we** request and permit **us** to make copies; and

(3) let **us** record **your** statements and submit to examinations under oath by any person named by **us**, while not in the presence of any other **insured**, and sign the transcript of the statements and examinations;

e. submit to **us**, within 60 days after **we** request, **your** signed, sworn proof of loss which sets forth, to the best of **your** knowledge and belief:

(1) the date, time, location and cause of loss;

(2) the interest **you** and others have in the property, including any encumbrances;

(3) the actual cash value and amount of loss of each item damaged or destroyed;

(4) other insurance that may cover the loss;

(5) changes in title, use, occupancy or possession of the property during the policy period;

(6) the plans and specifications of any damaged dwelling or structure **we** may request;

(7) detailed estimates for repair of the damage;

(8) receipts for any increased costs to maintain **your** standard of living while **you** reside elsewhere, and records pertaining to any loss of rental income; and

(9) evidence supporting a claim under the **Credit/Debit Card**, Forgery and Counterfeit Money protection. This should state the cause and amount of loss.

## LIABILITY COVERAGES - SECTION II

### COVERAGE D - PERSONAL LIABILITY COVERAGE

**We** will pay, up to **our limit**, compensatory damages for which any **insured** is legally liable because of **bodily injury** or **property damage** caused by an **occurrence** covered by this policy.

**Defense Provision.**
If a suit is brought against any **insured** for damages because of **bodily injury** or **property damage** caused by an **occurrence** to which this policy applies, **we** will provide a defense at **our** expense by counsel of **our** choice. **We** will defend any suit or settle any claim for damages payable under this policy as **we** think proper.

HO-5 (AZ)   Ed. 6/94

Stock No. 03777

Denby/AF 001633
Tyson & Mendes, LLP

CCD161215628331M2113D

**OUR** OBLIGATION TO DEFEND ANY CLAIM OR SUIT ENDS WHEN THE AMOUNT WE HAVE OFFERED OR PAID FOR DAMAGES RESULTING FROM THE **OCCURRENCE** EQUALS **OUR** LIMIT.

### COVERAGE E - MEDICAL EXPENSE COVERAGE

We will pay the **medical expenses** which are incurred or medically ascertained within three years from the date of an accident causing **bodily injury** covered by this policy. This coverage applies only:

1. to a person on the **insured premises** with the permission of any **insured**; or
2. to a person away from the **insured premises** if the **bodily injury**:

   a. arises out of a condition on the **insured premises** or the ways immediately adjoining;
   b. is caused by the activities of any **insured**;
   c. is caused by a person while performing duties as a **domestic employee** of any **insured**;
   d. is caused by an animal owned by or in the care of any **insured**; or
   e. is suffered by a **domestic employee** in the course of employment by any **insured**.

## SUPPLEMENTARY COVERAGES - SECTION II

We will pay the following in addition to the **limits**. All terms of this policy remain unchanged, except where modified by the Supplementary Coverage.

1. **Claim and Defense Expenses.** We will pay the expenses described below for a claim or suit we are obligated to defend under the Personal Liability Coverage:

   a. all expenses we incur and costs taxed against any **insured**;
   b. premiums on bonds required in any suit we defend, but not for bond amounts more than **our limit**. We need not apply for or furnish any bond;
   c. reasonable expenses (other than loss of earnings) any **insured** incurs at **our** request;
   d. any **insured's** loss of earnings (but not loss of other income) up to $200 per day, to attend trials or hearings at **our** request;
   e. prejudgment interest awarded against any **insured** on the part of the judgment that we are obligated to pay. However, we will not pay any such interest which accrues after such time that we make an offer to pay **our limit**;
   f. interest accruing on **our** share of the amount of any judgment between the time the judgment is entered and the time we pay or tender or deposit in court that part of the judgment which does not exceed **our limit**.

2. **Damage to Property of Others.** We will pay up to $1,000 per **occurrence** for **property damage** to property of others caused by any **insured**, even if not negligent or legally liable.
   At **our** option, we will either:

   a. pay the actual cash value of the property; or
   b. repair or replace the property with other property of like kind and quality.

   We will not pay for **property damage**:

   a. to the extent of any amount recoverable under Section I of this policy;
   b. caused intentionally by any **insured** who has attained the age of 13;
   c. to property, other than a rented golf cart, owned by or rented to any **insured**, a tenant of any **insured** or a resident in your household; or
   d. resulting from:

      (1) **business pursuits**;
      (2) any act or omission in connection with premises owned, rented or controlled by any **insured**, other than an **insured premises**; or
      (3) the ownership, maintenance or use of a land motor vehicle, aircraft, **watercraft** or iceboat.

3. **Emergency First Aid.** We will pay reasonable expenses incurred by any **insured** for first aid to persons, other than **insureds**, at the time of the accident, for bodily harm covered under this policy.

4. **Loss Assessments.** We will cover an amount up to $1000 for **your** share of special loss assessments charged during the policy period and levied against **you** by a corporation or association of property owners in accordance with the governing rules of the association, when the assessment is made as a result of:

   a. each **occurrence** to which Section II of this policy would apply; or
   b. damages which the association may be obligated to pay because of any personal injury arising out of:

      (1) false arrest, detention or imprisonment;
      (2) malicious prosecution;
      (3) libel, slander, humiliation or defamation of character;
      (4) invasion of privacy, wrongful eviction or wrongful entry.

   This $1000 **limit** is the most we will pay for any one loss, regardless of the number of assessments.
   This coverage applies only to loss assessments charged against **you** as owner or tenant of the **insured premises**.
   We do not cover loss assessments charged against **you** or a corporation or association of property owners by any governmental body.
   Section II - Coverage D - Personal Liability Exclusion 2 does not apply to this coverage.
   In the event of an assessment, this coverage is subject to all other terms of this policy. This coverage is excess insurance over any insurance collectible under any policy or policies covering the association of property owners.

## EXCLUSIONS - SECTION II

**Coverage D - Personal Liability** and **Coverage E - Medical Expense** do not apply to:

1. **Abuse.** We will not cover **bodily injury** or **property damage** arising out of or resulting from any actual or alleged:

   a. sexual molestation or contact;
   b. corporal punishment; or
   c. physical or mental abuse of a person.

2. **Acts or Omissions.** We will not cover **bodily injury** or **property damage** arising out of any act or omission of any **insured** as an officer or member of the board of directors of any corporation, municipality, political unit or other organization, except the acts of an unpaid volunteer director, officer

or trustee of a religious, charitable or civic non-profit organization. An elected, public official does not qualify as an unpaid volunteer director, officer or trustee.

3. **Aircraft.**

   a. We will not cover **bodily injury** or **property damage** arising out of the ownership, supervision, entrustment, maintenance, operation, use, loading or unloading of any type of aircraft, glider, balloon, parachute or other air conveyance and their facilities. We do cover model aircraft not used or designed for transporting cargo or persons.

HO-5 (AZ) Ed. 6/94                    Page 10 of 16                    Stock No. 03777

Denby/AF 001634
Tyson & Mendes, LLP

CCD161215628331M2114D

This exclusion does not apply to **bodily injury** to any **domestic employee** arising out of and in the course of employment by any **insured**.

b. We will not cover **bodily injury** or **property damage** arising out of any vicarious parental liability, whether or not statutorily imposed by law, for the actions of a child or minor regarding any type of aircraft described in a. above.

4. **Business.** We will not cover **bodily injury** or **property damage** arising out of **business** pursuits or the rental or holding for rental of any part of any premises except:
   a. activities which are normally considered non-**business**;
   b. the rental or holding for rental of an **insured premise**:
      (1) on an occasional basis if used only as a residence;
      (2) in part, for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or
      (3) in part, as an office, school, studio or private garage;
   c. the additional premises of a one or two family dwelling when specifically insured under Option 7 - Additional Premises Coverage; or
   d. the occasional or part-time **business** activities of any self-employed **insured** under 19 years of age.

   This exclusion does not apply to **bodily injury** to any **domestic employee** arising out of and in the course of employment by any **insured**.

5. **Communicable Disease.** We will not cover **bodily injury** arising out of the actual or alleged transmission of a communicable disease.

6. **Controlled Substances.** We will not cover **bodily injury** or **property damage** arising out of the use, sale, manufacture, delivery, transfer, possession or administration of a controlled substance(s) as defined by 21 U.S.C.A. Sections 811 and 812. Controlled substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs. However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the orders of a licensed physician.

7. **Employees.** We will not cover **bodily injury** to any employee (other than a **domestic employee**) of any **insured** arising out of and in the course of their employment by any **insured**.

8. **Illegal Consumption of Alcohol.** We will not cover **bodily injury** or **property damage** arising out of the **insured's** knowingly permitting or failing to take action to prevent the illegal consumption of alcohol beverages by an underage person.

9. **Imputed Liability.** We will not cover **bodily injury** or **property damage** arising out of any liability imputed to any **insured** which is otherwise excluded in this policy.

10. **Intentional Injury.** We will not cover **bodily injury** or **property damage** caused intentionally by or at the direction of any **insured** even if the actual **bodily injury** or **property damage** is different than that which was expected or intended from the standpoint of any **insured**.

11. **Intra-insured Suits.** We will not cover **bodily injury** to any **insured**.

12. **Nuclear Energy.** We will not cover a nuclear energy **occurrence** for which any **insured** under this policy:
    a. is also an **insured** under a nuclear energy liability policy; or
    b. would be an **insured** under that policy but for the exhaustion of its **limit**.
    A nuclear energy liability policy is one issued by:
    a. American Nuclear Insurers;
    b. Mutual Atomic Energy Liability Underwriters;
    c. Nuclear Insurance Association of Canada;
    or any of their successors.

13. **Pollution Damage.** We will not cover **bodily injury** or **property damage** arising out of the actual, alleged or threatened discharge, dispersal, release, escape, seepage, trespass, wrongful entry, migration, ingestion, inhalation or absorption of **pollutants** from any source.

    We will not pay for any loss, cost, expense, fine or penalty to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or dispose of **pollutants**, whether or not such actions are done voluntarily or at the direction, request or demand of any governmental body or agency, any other authority, person or organization, or as a result of any suit.

14. **Premises Owned, Rented or Controlled.** We will not cover **bodily injury** or **property damage** arising out of any act or omission occurring on or in connection with any premises owned, rented or controlled by any **insured** other than an **insured premises**.
    This exclusion does not apply to **bodily injury** to any **domestic employee** arising out of and in the course of employment by any **insured**.

15. **Professional Liability.** We will not cover **bodily injury** or **property damage** arising out of the rendering or failing to render professional services.

16. **Vehicles.**
    a. We will not cover **bodily injury** or **property damage** arising out of the ownership, supervision, entrustment, maintenance, operation, use, loading or unloading of any type of motor vehicle, motorized land conveyance or trailer, except:
       We will provide specific coverage on only the following types owned or operated by or rented or loaned to any **insured**:
       (1) a motor vehicle or motorized land conveyance which is not subject to motor vehicle registration and is:
           (a) used for the service of the insured residence;
           (b) designed to assist the handicapped; or
           (c) kept in dead storage on the **insured premises**;
       (2) a motorized golf cart while used for golfing purposes on a golf course;
       (3) a motorized land conveyance including a motorized bicycle, tricycle or similar type of equipment designed principally for recreational use off public roads, which is not subject to motor vehicle registration and is:
           (a) not owned or leased by an **insured**; or
           (b) owned or leased by an **insured** and while on the **insured premises**;
       (4) a trailer of the boat, camp, home or utility type when not attached to or towed by or carried on a motor vehicle or motorized land conveyance.
       This exclusion does not apply to **bodily injury** to any **domestic employee** arising out of and in the course of employment by any **insured**.
    b. We will not cover **bodily injury** or **property damage** arising out of any vicarious parental liability, whether or not statutorily imposed by law, for the actions of a child or minor regarding any type of **vehicle** described in a. above.

17. **Violation of Law.** We will not cover **bodily injury** or **property damage** arising out of:
    a. violation of any criminal law for which any **insured** is convicted;
    b. violation of any building or housing code for which any **insured** is convicted; or
    c. violation of any criminal law for which any **insured** is not convicted due to mental incapacity.

Denby/AF 001635
Tyson & Mendes, LLP

CCD16121562831M2115D

18. **War.** We will not cover any **occurrence** due to:
    a. war, including undeclared war;
    b. civil war, insurrection, rebellion or revolution; or
    c. warlike act by a military force or military personnel, destruction or seizure or use for a military purpose;
    and including any consequence of any of these.
    Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

19. **Watercraft.**
    a. We will not cover **bodily injury** or **property damage** arising out of the ownership, supervision, entrustment, maintenance, operation, use, loading or unloading of a watercraft:
       (1) with inboard or inboard-outdrive motor power owned by any **insured**;
       (2) with inboard or inboard-outdrive motor power of more than 50 horsepower rented to any **insured**;
       (3) that is a sailing vessel, with or without auxiliary power, 26 feet or more in length owned by or rented to any **insured**;
       (4) that is an iceboat, airboat, air cushion or similar type of craft; or
       (5) powered by one or more outboard motors with more than 50 total horsepower, owned by any **insured**.

       This exclusion does not apply while such crafts are stored on the **insured premises** nor to **bodily injury** to any **domestic employee** arising out of and in the course of employment by any **insured**.
    b. We will not cover **bodily injury** or **property damage** arising out of any vicarious parental liability, whether or not statutorily imposed by law, for the actions of a child or minor regarding any type of watercraft described in a. above.

20. **Workers Compensation.** We will not cover any obligation of the **insured** under a workers compensation, disability benefits, unemployment compensation law or any other similar law.

**Coverage D - Personal Liability** does not apply to:

1. **Contractual Liability.** We will not cover personal liability under any contract or agreement.

This exclusion does not apply to written contracts:
    a. directly relating to the ownership, maintenance or use of the **insured premises** not excluded in 2 below or elsewhere in this policy; or
    b. in which the **insured** assumes the liability of others prior to the occurrence.

2. **Loss Assessments.** We will not cover personal liability for **your** share of any loss assessment charged against all members of a corporation or association of property owners other than as provided by Supplementary Coverages - Section II, under Loss Assessments.

3. **Property Owned or Controlled.** We will not cover **property damage** to:
    a. property owned by any **insured**;
    b. property borrowed, used or occupied by, rented to or in the care of any **insured**; or
    c. property owned by a corporation or association of property owners of which any **insured** is a member.
    We will, if any **insured** is legally obligated, pay for **property damage** to item b above caused by fire, smoke or explosion.

4. **Punitive Damages.** We will not cover punitive or exemplary damages.

**Coverage E - Medical Expense** does not apply to:

1. **Domestic Employees.** We will not cover **bodily injury** to a **domestic employee** if it occurs off the **insured premises** and does not arise out of or in the course of the **domestic employee's** employment by any **insured**.

2. **Nuclear Hazard.** We will not cover **bodily injury** from any nuclear reaction, radiation or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

3. **Residents.** We will not cover **bodily injury** to any **insured** or other person, other than a **domestic employee**, regularly residing on any part of the **insured premises**.

## CONDITIONS - SECTION II

The following conditions apply to all of Section II of this policy.

1. **Bankruptcy of any Insured.** Bankruptcy or insolvency of any **insured** will not relieve **us** of **our** obligations under this policy.

2. **Limit of Liability.** Regardless of the number of **insureds**, claims made or persons injured, **our** total liability under Coverage D - Personal Liability for all damages resulting from any one **occurrence** will not exceed the Coverage D - Personal Liability **limit** stated in the Declarations.
   All **bodily injury** and **property damage** resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions will be considered to be the result of one **occurrence**.
   **Our** total liability under Coverage E for all medical expenses payable for **bodily injury** to one person as the result of one accident will not exceed the Coverage E **limit** stated in the Declarations.

3. **No Admission of Liability With Medical Expense Coverage.** Payment under this coverage is not an admission of liability by any **insured** or **us**.

4. **Other Insurance - Coverage D - Personal Liability.** This insurance is excess over any other collectible insurance. However, if the other insurance is specifically written as excess insurance over this policy, the **limits** of this policy apply first.

5. **Severability of Insurance.** This insurance applies separately to each **insured**. This condition will not increase **our limit** for any one **occurrence**.

6. **Suit Against Us.** No legal action can be brought against **us**:
    a. unless there has been full compliance with all the terms of this policy; and
    b. until the obligation of any **insured** has been determined by final judgment or by agreement signed by **us**.
    No person or organization has the right to join **us** as a party to any legal action against any **insured**.

7. **What You Must Do in Case of Loss.** In the event of an accident or **occurrence** which this insurance may cover, **you** and any person claiming coverage under this policy must:
    a. give prompt notice to **us** or **our** agent, including:
       (1) the identity of the policy and **insured**;
       (2) the time, place and circumstances of the accident or **occurrence**;

Denby/AF 001636
Tyson & Mendes, LLP

CCD161215628311M2116D

(3) names and addresses of any claimants and witnesses; and

(4) as often as we reasonably require, let **us** record **your** statements and submit to examinations under oath by any person named by **us**, while not in the presence of any **insured**, and sign the transcript of the statements and examinations;

b. promptly forward to **us** any notice, demand or legal paper relating to the accident or **occurrence**;

c. at **our** request, assist **us** in:
   (1) making settlement;
   (2) enforcing any right of contribution or indemnity against any person or organization who may be liable to any **insured**; and
   (3) any matter relating to a claim or suit;

d. under the Damage to Property of Others coverage, give **us** a sworn statement of the loss. This must be made within 60 days after **our** request. Also, be prepared to show **us** any damaged property under any **insured's** control;

e. not voluntarily make any payment, nor assume any obligation or incur expenses except for Emergency First Aid, except at **your** own cost.

Under Coverage E – Medical Expense, the injured person or someone acting on their behalf will:

a. give **us** prompt written proof of claim, under oath if required;

b. authorize **us** to obtain copies of medical reports and records; and

c. permit doctors we select to examine the injured person when we may reasonably require.

## GENERAL CONDITIONS

Unless otherwise noted, the following conditions apply to all sections of this policy.

1. **Assignment.** Assignment of this policy will not be valid unless we give **our** written consent.

2. **Cancelation.**
   a. **You** may cancel this policy at any time by returning it to **us** or advising **us** of the current or future date when it should be canceled.
   b. **We** may cancel this policy by notifying **you** in writing of the date cancelation takes effect and the reason for cancelation. This cancelation notice will be mailed to **you** at the mailing address shown in the Declarations. Proof of mailing will be sufficient proof of notice. Cancelation by **us** may only be for the following reasons:
      (1) When **you** have not paid the premium, whether payable to **us** or to **our** agent or under any finance or credit plan, we may cancel at any time by notifying **you** at least 10 days before the date cancelation takes effect.
      (2) When this policy has been in effect for less than 60 days and is not a renewal with **us**, we may cancel for any reason other than nonpayment by notifying **you** at least 10 days before the date cancelation takes effect.
      (3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with **us**, we may cancel for one or more of the following reasons:
         (a) **you** are convicted of a crime arising out of acts that increase the hazard insured against;
         (b) acts or omissions by an **insured** or representative of the **insured** constituting fraud or material misrepresentation in obtaining the policy, continuing the policy, or presenting a claim under the policy;
         (c) discovery of grossly negligent acts or omissions by an **insured** substantially increasing any of the hazards insured against;
         (d) substantial change in the risk assumed by **us**, since the policy was issued;
         (e) the director of insurance determines that we would violate Arizona insurance laws by continuing coverage; or
         (f) **your** failure to take reasonable steps to eliminate or reduce any conditions in or on the **insured premises** which contributed to a loss in the past or will increase the possibility of future losses.
      This can be done by notifying **you** at least 30 days before the date cancelation takes effect.
      (4) When this policy is written for a period longer than one year, we may cancel for any reason at anniversary by notifying **you** at least 30 days before the date cancelation takes effect.

   c. When this policy is canceled, the premium for the period from the date of cancelation to the expiration date will be refunded pro rata.
   d. If the return premium is not refunded with the notice of cancelation or when this policy is returned to **us**, **we** will refund it within a reasonable time after the date cancelation takes effect.

3. **Concealment or Fraud.** With respect to all **insureds**, we will not provide coverage if, before or after a loss, any **insured** has:
   a. Intentionally concealed or misrepresented any material fact or circumstance;
   b. Engaged in fraudulent conduct; or
   c. Made false statements;
   relating to this insurance.

4. **Conformity to State Law.** If any part of this policy is contrary to a law of the state in which the described property is located, we agree to alter that part of **our** policy and make it conform with that state law. However, all other parts of this policy will remain in force and unaltered.

5. **Cooperation. You** must cooperate with **us** in performing all acts required by this policy.

6. **Inspection. We** are permitted but not obligated to inspect **your** property and operations. **Our** inspection or any resulting advice or report does not warrant that **your** property or operations are safe or healthful or are in compliance with any law, rule or regulation.

7. **Liberalization Clause.** Forms or endorsements may be revised during the policy period. If any coverage is broadened under this policy without additional premium, the broadened coverage will apply.

8. **Membership, Voting, Annual Meeting and Participation. You** are a member of the American Family Mutual Insurance Company of Madison, Wisconsin, and are entitled to one vote either in person or by proxy at its meetings. The Annual Meetings are held at its Home Office in Madison, Wisconsin, on the first Tuesday of March at 2:00 P.M. Notice printed in this policy will be **your** notification of the time and place. If any dividends are distributed, **you** will share in them according to law and under conditions set by the Board of Directors.

9. **Non-Renewal. We** may elect not to renew this policy. **We** may do so by delivering to **you** or mailing to **you** at the mailing address shown in the Declarations, written notice, including **our** reason for refusing to renew, at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

Denby/AF 001637
Tyson & Mendes, LLP

CCD16121562831M2117D

If **our** non-renewal is based on the condition of the premises, **you** will be given 30 days' notice to remedy the identified conditions. If the identified conditions are remedied, coverage will be renewed. If the identified conditions are not remedied to **our** satisfaction, **you** will be given an additional 30 days, upon payment of premium, to correct the defective conditions.

This provision will not apply and this policy will terminate:
a. At the end of the policy period, if **you** have agreed to non-renewal; or
b. On the effective date of any other insurance policy, if **you** have accepted the other policy and it was issued as a replacement for this policy.

10. **Option and Endorsement Changes.** Any option or endorsement made a part of this policy, whether at the time of issue or during the policy period, amends the terms of this policy. Where the policy terms differ from similar terms in any option or endorsement, the terms of that option or endorsement will prevail.

11. **Policy Non-Assessable.** This policy is non-assessable.

12. **Policy Period, Renewal of Coverage, Premiums and Changes.** Insurance begins and ends at 12:01 A.M. Standard Time at the location of the property described and on the dates shown in the Declarations.
This policy may be continued for successive policy periods by payment of the required premium on or before the effective date of each renewal period. If the premium is not paid when due, this policy expires at the end of the last policy period for which the premium was paid.
The premium for each policy period will be based on **our** current manuals. This premium is determined by information in **our** possession at the inception of each policy period. Any changes in this information during that policy period which

would affect the rating of **your** policy, will allow **us** to make an additional charge or refund on a pro rata basis. If a premium adjustment is necessary, **we** will make the adjustment as of the effective date of the change.

**You** are responsible for the payment of all premiums and will be the payee for any return premiums **we** pay.

If this policy form or any endorsement attached is revised, **we** may substitute or add, at any anniversary date, forms or endorsements which are authorized for use on this policy in accordance with **our** manual rules in effect at the time. As to only the interest of a lienholder or mortgagee declared in this policy, this insurance will terminate only if **we** give such lienholder or mortgagee at least 10 days written notice of termination.

If this policy replaces coverage in other policies terminating at 12:00 Noon Standard Time on the inception date of this policy, this policy will be effective at 12:00 Noon Standard Time instead of at 12:01 A.M. Standard Time.

13. **Subrogation.** An **insured** may waive in writing before a loss all rights of recovery against any person. If not waived, **we** may require an assignment of rights of recovery for a loss to the extent that payment is made by **us**.
If an assignment is sought, an **insured** must sign and deliver all related papers and cooperate with **us**.
Where prohibited by law, subrogation does not apply under Section II to Medical Expense Coverage or Damage to Property of Others.

14. **Waiver or Change of Policy Provisions. You** are authorized to request changes in this policy, on behalf of all **insureds**, if **we** agree to those changes. A provision of this policy is waived or changed only if **we** put it in writing.
**Our** request for arbitration or examination does not waive **our** rights.

## ADDITIONAL PROTECTION YOU MAY BUY

Each option **you** choose and for which **you** pay an additional premium, where applicable, applies only as indicated and will be identified in the Declarations.
These coverages are subject to all terms of this policy, except where modified by the option chosen.

**OPTION 1 - EARTHQUAKE AND VOLCANIC ERUPTION COVERAGE.**
**We** will cover direct loss caused by earthquake or volcanic eruption to property described in Coverage A - Dwelling and Dwelling Extension and Coverage B - Personal Property and covered by this policy. This Volcanic Eruption Coverage replaces the peril Volcanic Eruption.
1. One or more earthquake shocks that occur within a 72-hour period will constitute a single earthquake.
2. One or more volcanic eruptions that occur within a 72-hour period will constitute a single volcanic eruption.

**Special Deductible**
The following is the only deductible that applies to each loss caused by earthquake or volcanic eruption:
**We** will pay only that part of the loss over _____ percent (shown in the Declarations) of the total amount of insurance that applies to the destroyed or damaged property. This deductible will apply separately to loss under Coverage A - Dwelling and Dwelling Extension, and Coverage B - Personal Property. If the **limit** on certain property is increased by endorsement and the property is destroyed or damaged, the new total **limit** will be used in calculating and applying this deductible. The total deductible amount will not be less than $250 in any one loss.

**Special Exclusions**
1. **We** do not cover loss resulting directly or indirectly from flood of any nature or tidal wave, whether caused by, resulting from, contributed to or aggravated by earthquake or volcanic eruption.

2. **We** do not cover loss to exterior masonry veneer when rated as frame. In these situations, the value of exterior veneer will be deducted before applying the deductible clause. For the purpose of this exclusion, stucco will not be considered masonry veneer.

This coverage does not increase the **limits** stated in this policy.

**OPTION 2 - EXTENDED COVERAGE ON JEWELRY, WATCHES AND FURS.**
Jewelry, watches, precious and semi-precious stones, gems and furs will be insured for risks of accidental direct physical loss or damage, subject to the following additional exclusions and limitations:
1. the insurance provided by this coverage applies instead of and not in addition to that provided in Coverage B - Personal Property;
2. **our** limit for any covered loss will be $1500 on any one article, $2500 in the aggregate;
3. **we** do not cover loss or damage caused by mechanical or electrical breakdown, wear and tear, gradual deterioration, insects, vermin or inherent vice;
4. if any property covered consists of two or more parts, **we** will only be liable for the value of the part lost or damaged. The Loss to a Pair or Set condition under Conditions - Section I does not apply to loss under this Option.

Any deductible shown in the Declarations also applies to loss under this coverage.

Denby/AF 001638
Tyson & Mendes, LLP

CCD1612156283IM2118D

**OPTION 3 - HOME DAY CARE.**
(Applies only to the described premises.)
The Section II Coverages are extended to cover an **insured** who provides home day care. The definition of **insured premises** is amended to include that part of the premises occupied for home day care. Section II Exclusion 4 **Business** is amended to add:

    e.  home day care service regularly provided by an **insured** on the **insured premises** for which an **insured** receives monetary or other compensation.

        This coverage does not apply to **bodily injury** or **property damage** arising out of the supervision, entrustment, maintenance, use, loading or unloading of:

        (1)  saddle animals and vehicles for use with them;
        (2)  any type of aircraft, glider, balloon, parachute or other air conveyance;
        (3)  any type of motor vehicle or motorized land conveyance; or
        (4)  watercraft of all types;
        owned, operated, or hired by or for the **insured** or employee or used by the **insured** for the purpose of instruction in their use.

**OPTION 4 - EXTENDED WATERCRAFT LIABILITY AND MEDICAL EXPENSE COVERAGE.**
The Section II Coverages are extended to cover the watercraft powered by outboard motor(s), owned by an **insured** and described in the Declarations.
Exclusion 19a(5) does not apply to such described watercraft.

**OPTION 5 - OFFICE, SCHOOL OR STUDIO USE.**
(Applies only to the occupancy by the **insured** as shown in the Declarations or Additional Protection Schedule Endorsement.)
1.  Section I: Coverage B - Personal Property is extended for up to an additional $5000 to cover **business** personal property of this described incidental occupancy. This includes equipment, supplies, stock of merchandise in storage and furnishings usual to the described occupancy while such property is on the **insured premises**.
    Any deductible shown in the Declarations also applies to loss under this coverage.
2.  Section II: The **insured premises** will not be considered **business** property because an **insured** occupies a part of it as an incidental office, school or studio as described. Section II Exclusion 4 **Business** is amended to add:
    e.  **business** pursuits of an **insured** which are necessary or incidental to the use of the **insured premises** as the described office, school or studio.

**OPTION 6 - BUSINESS PURSUITS.**
The Section II Coverages are extended to cover the **business** pursuits of an **insured** who is a clerical office employee, salesperson, collector, messenger or teacher as described in the Declarations or Additional Protection Schedule Endorsement. This coverage does not apply:
1.  to **bodily injury** or **property damage** arising out of the **business** pursuits of an **insured** in connection with a *business owned or financially controlled by such insured* or by a partnership or joint venture of which such **insured** is a partner or member;
2.  to **bodily injury** or **property damage** arising out of the rendering or failing to render professional services (other than teaching);
3.  to **bodily injury** to a fellow employee of an **insured** injured in the course of employment;
4.  when the **insured** is a member of the faculty or teaching staff of any school or college to **bodily injury** or **property damage**

arising out of the supervision, entrustment, maintenance, use, loading or unloading of:
    a.  saddle animals and vehicles for use with them;
    b.  any type of aircraft, glider, balloon, parachute or other air conveyance;
    c.  any type of motor vehicle or motorized land conveyance; or
    d.  watercraft of all types;
    owned, operated, or hired by or for the **insured** or employer or used by the **insured** for the purpose of instruction in their use.

**OPTION 7 - ADDITIONAL PREMISES COVERAGE.**
The Section II Coverages are extended to cover the one or two family dwelling(s) shown in the Declarations or Additional Protection Schedule Endorsement. Item b in the definition of **insured premises** is amended to include such premises.

**OPTION 12 - NAMED ADDITIONAL INSURED(S).**
The definition of **insured** in this policy includes the person or organization named as an additional **insured** in the Declarations or Additional Protection Schedule Endorsement with respect to:
1.  Section I: Coverage A - Dwelling and Dwelling Extension;
2.  Section II: Coverage D - Personal Liability and Coverage E - Medical Expense but only with respect to ownership, maintenance or use of the **insured premises**.
The interest of the named additional **insured(s)** will be terminated only if we give such additional **insured** at least 10 days written notice of termination.
This option applies only with respect to the location shown in the Declarations or Additional Protection Schedule Endorsement.

**OPTION 13 - OTHER STRUCTURES.**
**Our limit** for covered other structures under Coverage A - Dwelling Extension is amended to include the additional **limit(s)** shown in the Declarations or Additional Protection Schedule Endorsement.

**OPTION 14 - PERSONAL PROPERTY REPLACEMENT COVERAGE.**
We will pay the cost of repair or replacement of property listed below and owned by an **insured**, without deducting for depreciation.
1.  This coverage applies to:
    a.  awnings;
    b.  carpeting;
    c.  household appliances;
    d.  outdoor antennas;
    e.  other structures covered under the Dwelling Extension that are not buildings and buildings without a permanent foundation;
    f.  personal property under Coverage B - Personal Property and not excluded below.
2.  This coverage does not apply to:
    a.  **business** property and property of others, on or off the described premises;
    b.  records, films, tapes or other magnetic recordings;
    c.  paintings, etchings, pictures, tapestries, statuary, articles made of marble, bronzes, antiques, rare books and papers, porcelains, rare glassware or any other property which because of its inherent nature, cannot be replaced with new property;
    d.  property whose age or history contributes substantially to its value including, but not limited to, memorabilia, souvenirs and collectors items;
    e.  property which because of age or condition has become obsolete or unusable for its originally intended purpose;
    f.  land motor vehicle equipment and accessories for vehicles **you** no longer own;
    g.  property not maintained in good or workable condition;
    h.  property that is outdated or obsolete and is stored or not being used.

Denby/AF 001639
Tyson & Mendes, LLP

CCD1612156283lM2119D

3. **Loss Value Determination.** The Loss Value Determination condition in Conditions - Section I is amended to add the following as item a(2):
a. (2) Loss to covered property covered by Option 14 - Personal Property Replacement Coverage will be settled subject to the following:
   **We** will pay the cost of repair or replacement but not exceeding the smallest of:
   (a) the actual cash value at the time of loss up to the **limit** applying to the property, if the property is not actually repaired or replaced;
   (b) the amount actually and necessarily spent for the replacement of an item with a similar item of like kind and quality at the time of loss;
   (c) the amount actually and necessarily spent for repair or restoration;
   (d) any policy **limit** which applies.

The following procedure applies to loss to covered property under this option:
   **Procedures to Claim Replacement Coverage.**
   If **you** receive an actual cash value settlement for damaged or stolen property covered by replacement coverage and

**you** have not reached **your limit**, **you** may make a further claim under this condition for any additional payment on a replacement cost basis provided:
(1) **you** notify **us** within 180 days after the loss of **your** decision to repair or replace the damaged or stolen property; and
(2) repair or replacement is completed within one year of the date of loss.

**OPTION 16 - PREMISES ALARM OR FIRE PROTECTION SPRINKLER SYSTEM.**
For a premium credit, **we** acknowledge the installation of an alarm system and/or an automatic fire protection sprinkler system approved by **us** on the **insured premises. You** agree to maintain the system(s) in working order and to notify **us** promptly of any changes made to or removal of the system(s).

IN WITNESS WHEREOF, this policy is signed at Madison, Wisconsin, on **our** behalf by **our** President and Secretary. If required by statute, it is countersigned on the Declarations page by **our** authorized representative.

President

Secretary

**This is not a complete and valid contract without an accompanying DECLARATIONS PAGE.**

Denby/AF 001640
Tyson & Mendes, LLP

CCD16121562831M2120D

# GOLD STAR HOMEOWNERS AMENDATORY ENDORSEMENT

This endorsement modifies such insurance as is afforded by this policy and replaces any Gold Star Homeowners Amendatory Endorsement previously a part of this policy.

This policy is amended as follows:

## DEFINITIONS

The following definition is added:

**Actual Cash Value.** The term "Actual Cash Value" means: The amount which it would cost to repair or replace damaged property with property of like kind and quality, less allowance for physical deterioration and depreciation, including obsolescence.

## SUPPLEMENTARY COVERAGES - SECTION I

The Supplementary Coverage of **Increased Building Replacement Coverage** is deleted and replaced by:

**Increased Building Limit Coverage. We** will settle covered losses to the dwelling under Coverage A - Dwelling and to detached garage(s) under Dwelling Extension at replacement cost up to a maximum of 120% of the **limit** applying to the damaged building, subject to the following provisions:

a.  **You** have insured **your** dwelling and detached garage(s) to a minimum of 100% of their replacement cost as estimated by **our** residential building cost guide.

b.  **You** have notified **us** within 90 days of the start of any new detached garage valued at $5,000 or more or any additions to or remodeling of a dwelling or detached garage which increase their replacement cost value by $5,000 or more. If **you** fail to notify **us** within 90 days, **our** payment will not exceed the **limit** applying to the building, as outlined in Conditions - Section I, under Loss Value Determination (shown below).

c.  **You** have paid any additional premium due for the increase in value.

The Increased Building Limit Coverage only applies to dwellings and detached garage(s) that are repaired or replaced after a covered loss. This coverage does not apply to dwellings or detached garage(s) under construction until completed and occupied.

## CONDITIONS - SECTION I

The **Loss Value Determination** condition is deleted and replaced by:

**Loss Value Determination.**

a.  **Personal Property, Structures, Awnings, Carpeting, Household Appliances and Outdoor Antennas.**

(1) Loss to covered property not covered by Option 14 - Personal Property Replacement Coverage will be settled subject to the following:

**We** will pay the smaller of:

(a) the actual cash value at the time of loss but not more than the cost to repair or replace the damaged property with property of like kind and quality; or

(b) any policy **limit** which applies.

(2) Loss to covered property covered by Option 14 - Personal Property Replacement Coverage will be settled as provided under Option 14 - Personal Property Replacement Coverage.

b.  **Buildings Which Have a Permanent Foundation and Roof Insured at 100% of Replacement Cost.**

Buildings insured at 100% of replacement cost will be settled at replacement cost, subject to the following:

(1) **Replacement Cost.**

If at the time of loss, the Increased Building Limit Coverage as provided under the Supplementary Coverages - Section I applies, **we** will pay the cost to repair the damaged portion or replace the damaged building, provided repairs to the damaged portion or replacement of the damaged building are completed, but not exceeding the smallest of:

(a) the cost to replace the damaged building with like construction for similar use on the same premises;

(b) the amount actually and necessarily spent for repair of the damaged portion or replacement of the damaged building; or

(c) 120% of the **limit** applying to the damaged building.

(2) **Actual Cash Value.**

If at the time of loss, the Increased Building Limit Coverage as provided under the Supplementary Coverages - Section I applies and the building is not repaired or replaced, **we** will pay the actual cash value at the time of loss of the damaged portion of the building up to the **limit** applying to the building.

c.  **Buildings Which Have a Permanent Foundation and Roof Insured for Less than 100% of Replacement Cost.**

Buildings insured for less than 100% of replacement cost will be settled, subject to the following:

Denby/AF 001641
Tyson & Mendes, LLP

CCD161215628831M2121D

(1) **Replacement Cost.**

If at the time of loss, the Increased Building Limit Coverage as provided under the Supplementary Coverages - Section I does not apply, **we** will pay the cost to repair the damaged portion or replace the damaged building, provided repairs to the damaged portion or replacement of the damaged building are completed, but not exceeding the smallest of:

(a) the cost to replace the damaged building with like construction for similar use on the same premises;

(b) the amount actually and necessarily spent for repair of the damaged portion or replacement of the damaged building; or

(c) the **limit** applying to the damaged building.

(2) **Actual Cash Value.**

If at the time of loss, the Increased Building Limit Coverage as provided under the Supplementary Coverages - Section I does not apply and the building is not repaired or replaced, **we** will pay the actual cash value at the time of loss of the damaged portion of the building up to the **limit** applying to the building.

d. **Procedures to Claim Replacement Coverage.**

If **you** receive an actual cash value settlement for damaged property covered by replacement coverage and **you** have not reached **your limit**, **you** may make a further claim under this condition for replacement cost, provided repairs to the damaged portion or replacement of the damaged building are completed within one year of the date of loss.

The following condition is added:

**Estimated Replacement Cost. Our** residential building cost guide may be used to develop an estimated replacement cost based on general information about **your** dwelling. It is developed from researched costs of construction materials and labor rates. This is the minimum amount for which to insure **your** dwelling. The actual cost to replace **your** dwelling may be different. **We** do not guarantee that this figure will represent the actual cost to replace **your** dwelling. **You** are responsible for selecting the appropriate amount of coverage. **You** may wish to obtain a detailed replacement cost appraisal or estimate from a contractor. **You** may select a coverage amount equal to that appraised value or that cost of construction, if the amount is greater than the replacement cost as estimated by **our** residential building cost guide, and **we** agree to that amount.

All other terms remain unchanged.

Denby/AF 001642
Tyson & Mendes, LLP

CCD1612156283IM2122D

## ARIZONA AMENDATORY HOMEOWNERS ENDORSEMENT

This endorsement modifies such insurance as is afforded by this policy and replaces any Arizona Amendatory Homeowners Endorsement previously a part of this policy.

This policy is amended as follows:

## DEFINITIONS

The following applies to all policies:

The definitions added in this endorsement are in bold print. However, definitions added in this endorsement do not appear in bold print in **your** policy.

The following is added:

**Fungi** mean any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by **fungi**.

**Pollutant** is deleted and replaced by the following:

**Pollutant.**
a.  This means any contaminant or irritant regardless if it is:
    (1)  man-made or natural;
    (2)  a solid, liquid, gas, compound; or
    (3)  thermal irritant.
b.  This includes but is not limited to:
    (1)  lead, mercury, radon, asbestos, formaldehyde;
    (2)  solvents, alkalis, acids;
    (3)  gasoline, diesel, alcohol, kerosene, heating oil, or any other type of petroleum based or bio-based fuel;
    (4)  garbage, refuse, other waste, material to be recycled; or
    (5)  any substance any governmental agency lists as a controlled chemical or hazardous substance.
c.  **Pollutant** does not mean:
    (1)  the excretion, secretion, or decomposition of any animal; or
    (2)  a contaminant or irritant from a fire loss covered by this policy.

**You** and **your** is deleted and replaced by the following:

**You** and **your** mean a named **insured** shown in the Declarations or, if living in the same household:
a.  a named **insured's** spouse; or
b.  a person who has entered into a domestic partnership or civil union with a named **insured** if such partnership or union:
    (1)  is recognized under the laws of the state in which a named **insured** resides;
    (2)  grants equivalent rights and responsibilities to its members as those granted to a spouse under state law; and
    (3)  has been registered with or filed with the state or local government responsible for recording such partnerships or unions.

## SUPPLEMENTARY COVERAGES – SECTION I

The following applies to all policies:

The following is added:

**Fungi or Bacteria.**
**Fungi** or bacteria must occur on the **insured premises** and be caused by or result from a cause of loss other than **fungi** or bacteria covered by this policy. The cause of loss and the actual loss itself must occur while this policy is in effect. **Fungi** or bacteria must cause direct physical loss to property covered by this policy.
**We** will pay up to the **limit** shown in the Declarations for:
a.  the reasonable and necessary costs for work actually performed to:
    (1)  clean up, remove and dispose of **fungi** or bacteria from covered property;
    (2)  repair, restore or replace covered property damaged by **fungi** or bacteria; and
    (3)  test the air or property to confirm the absence, presence or level of **fungi** or bacteria only to the extent that there is a reason to believe that there is the presence of **fungi** or bacteria on the **insured premises**; and
b.  a necessary increase in living expenses incurred by **you** so that **your** household can maintain its normal standard of living when a covered loss caused by **fungi** or bacteria makes that part of the **insured premises** where **you** reside uninhabitable.
    This coverage does not increase the **limit** applying to the property.
    No other coverages apply to **fungi** or bacteria.
    The **Fungi** or Bacteria exclusion does not apply to this coverage.

Denby/AF 001643
Tyson & Mendes, LLP

CCD16121562831M2123D

The following applies when this endorsement amends an ARIZONA HOMEOWNERS POLICY GOLD STAR SPECIAL DELUXE FORM (HO-5) or an ARIZONA HOMEOWNERS POLICY CONDO-UNIT FORM 6 (HO-6):

The following is added:

**Ordinance, Law or Regulation. We** will cover an amount up to 10% of the **limit** of liability that applies to Coverage A for the increased costs **you** incur due to the enforcement of any ordinance, law or regulation which requires or regulates:

a.    the construction, demolition, remodeling, renovation or repair of that part of the covered building or other structure on the **insured premises** damaged by a Peril Insured Against; or

b.    the demolition and reconstruction of the undamaged part of a covered building or other structure on the **insured premises**, when that building or other structure must be totally demolished because of damage by the Peril Insured Against to another part of that covered building or other structure.

This coverage includes any costs due to any ordinance, law or regulation **you** incur to remove debris resulting from the construction, demolition, remodeling, renovation, repair or replacement of property on the **insured premises** as stated above. This coverage does not apply unless **you** repair or rebuild **your** property at the present location.

**We** do not cover the loss in value to any covered building or other structure on the **insured premises** due to the requirements of any ordinance, law or regulation.

**We** do not cover the remodeling, removal or replacement of the undamaged part of the building or other structure necessary to complete the remodeling, repair or replacement of that part of the dwelling or other structure damaged by a Peril Insured Against.

The Pollution exclusion applies to this coverage whether or not actions are taken at the direction or request of any governmental body, agency or other jurisdiction or due to the requirements of any ordinance, law or regulation.

This coverage does not increase the **limit** applying to the damaged covered property.

The following applies to all policies:

The following is deleted:

**Pollutant Cleanup and Removal.**

The following applies when this endorsement amends an ARIZONA HOMEOWNERS POLICY GOLD STAR SPECIAL DELUXE FORM (HO-5):

**Refrigerated Food Products** is deleted and replaced by the following:

**Refrigerated Food Products. We** will pay for loss to food products in freezers or refrigerators on the **insured premises**, but not to exceed the total **limit** of $500 for each loss for all food products, when caused by power interruption or mechanical failure.

Power interruption or mechanical failure does not include:

a.    removal of the plug from an electrical outlet; or

b.    turning off an electrical switch unless caused by a Peril Insured Against.

This coverage does not increase the **limit** applying to the damaged property.

The Power Failure exclusion does not apply to this coverage.

The following applies when this endorsement amends an ARIZONA HOMEOWNERS POLICY BROAD FORM 2 (HO-2); ARIZONA HOMEOWNERS POLICY SPECIAL FORM 3 (HO-3); ARIZONA HOMEOWNERS POLICY RENTERS BROAD FORM 4 (HO-4) and ARIZONA HOMEOWNERS POLICY CONDO-UNIT FORM 6 (HO-6):

**Refrigerated Food Products** is deleted and replaced by the following:

**Refrigerated Food Products. We** will pay for loss to food products in freezers or refrigerators on the **insured premises**, but not to exceed the total **limit** of $250 for each loss for all food products, when caused by power interruption or mechanical failure.

Power interruption or mechanical failure does not include:

a.    removal of the plug from an electrical outlet; or

b.    turning off an electrical switch unless caused by a Peril Insured Against.

This coverage does not increase the **limit** applying to the damaged property.

The Power Failure exclusion does not apply to this coverage.

PERILS INSURED AGAINST – SECTION I

The following applies to all policies:

The following is added:

Whenever coverage is provided under Section I for the perils of **Fire or Lightning**, the words "accidental direct physical loss to property" are deleted and replaced by "direct physical loss to property."

**COVERAGE A – DWELLING AND DWELLING EXTENSION and COVERAGE A – REAL PROPERTY**

The following applies when this endorsement amends an ARIZONA HOMEOWNERS POLICY SPECIAL FORM 3 (HO-3); ARIZONA HOMEOWNERS POLICY GOLD STAR SPECIAL DELUXE FORM (HO-5); and ARIZONA HOMEOWNERS POLICY CONDO-UNIT FORM 6 (HO-6):

Denby/AF 001644
Tyson & Mendes, LLP

CCD161215628331M2124D

**LOSSES NOT COVERED** is deleted and replaced by the following:

**LOSSES NOT COVERED**
**We** do not cover loss to the property described in Coverage A resulting directly or indirectly from, or consisting of, or caused by one or more of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
1.  Losses excluded under EXCLUSIONS – SECTION I.
2.  Collapse, other than as provided in Supplementary Coverages – Section I, under Collapse.
3.  **Continuous or Repeated Seepage** or leakage of water or steam from within a plumbing, heating, air-conditioning or automatic fire protection sprinkler system or from within a household appliance which occurs over a period of weeks, months or years.
4.  **Freezing** of a plumbing, heating, air-conditioning or automatic fire protection sprinkler system or household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing while the residence is **vacant**, unoccupied or under construction, unless **you** have taken precaution to:
    a.  maintain heat in the building; or
    b.  shut off the water supply and drain the system and appliances of water.
5.  **Freezing, Thawing, Pressure or Weight of Water or Ice**, whether or not driven by wind, to:
    a.  a fence, pavement, patio, foundation, retaining wall, bulkhead, pier, wharf or dock; or
    b.  an outdoor swimming pool, outdoor sauna, outdoor whirlpool or hot tub, including filters, pipes, pumps and other related equipment.
6.  **Other Causes of Loss:**
    a.  wear and tear, marring, scratching, deterioration;
    b.  inherent vice, latent or inherent defect, mechanical breakdown;
    c.  smog, rust, corrosion, frost, condensation, wet or dry rot;
    d.  smoke from agricultural smudging or industrial operations;
    e.  settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings;
    f.  insects, arachnids, bats, birds, rabbits, rodents, domestic or farm animals. This also includes any costs to test for, clean up, or remediate any excretion, secretion, or decomposition of any of these animals. This exclusion does not apply to breakage of glass that is part of a building.
    If any of these cause water or steam to escape from a plumbing, heating, air-conditioning or automatic fire protection sprinkler system or household appliance, **we** cover loss caused by the water or steam. **We** will only pay for the tear out and repair of any surface part of a building or other structure that we deem necessary to access and repair any concealed part damaged by a loss covered by this policy.
    **We** do not cover loss to the system or appliance from which this water or steam escaped.
    For the purposes of this provision, a plumbing system or household appliance does not include a roof drain, sump, sump pump, gutter, downspout, drain tile or attached equipment.
7.  **Theft** in or from a dwelling while under construction, or of materials and supplies for use in the construction, until completed and occupied.
8.  **Vandalism or Malicious Mischief** or breakage of glass and safety glazing if the dwelling has been **vacant** for more than 60 consecutive days immediately before the loss. A dwelling under construction is not considered **vacant**.
However, **we** do cover any resulting loss to property described in Coverage A from items 2. through 8. above, not excluded or excepted in this policy.

The following applies when this endorsement amends an ARIZONA HOMEOWNERS POLICY SPECIAL FORM 3 (HO-3); ARIZONA HOMEOWNERS POLICY GOLD STAR SPECIAL DELUXE FORM (HO-5); ARIZONA HOMEOWNERS POLICY RENTERS BROAD FORM 4 (HO-4) and an ARIZONA HOMEOWNERS POLICY CONDO-UNIT FORM 6 (HO-6):

Under **COVERAGE B – PERSONAL PROPERTY**

**Vandalism or Malicious Mischief** is deleted and replaced by the following:

**Vandalism or Malicious Mischief**, meaning only willful or malicious damage to or destruction of property. **We** do not cover loss to property on the **insured premises** if the dwelling has been **vacant** for more than 60 consecutive days immediately before the loss.

The following applies when this endorsement amends an ARIZONA HOMEOWNERS POLICY BROAD FORM 2 (HO-2):

**Vandalism or Malicious Mischief** is deleted and replaced by the following:

**Vandalism or Malicious Mischief**, meaning only willful or malicious damage to or destruction of property. **We** do not cover loss to property on the **insured premises** if the dwelling has been **vacant** for more than 60 consecutive days immediately before the loss. A dwelling under construction is not considered **vacant**.

Denby/AF 001645
Tyson & Mendes, LLP

CCD161215628331M2125D

The following applies when the policy includes the Gold Star Elite Endorsement, END. 585 (AZ):

**LOSSES NOT COVERED – COVERAGE A AND COVERAGE B** is amended as follows:

**Other Causes of Loss** is deleted and replaced by the following:

**Other Causes of Loss:**
a.   wear and tear, marring, scratching, deterioration;
b.   inherent vice, latent or inherent defect, mechanical breakdown;
c.   smog, rust, corrosion, frost, condensation, wet or dry rot;
d.   smoke from agricultural smudging or industrial operations;
e.   settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings;
f.   birds, vermin, rodents, insects or domestic animals.
If any of these cause water or steam to escape from a plumbing, heating, air-conditioning or automatic fire protection sprinkler system or household appliance, we cover loss caused by the water or steam. We also cover the cost of tearing out and replacing any part of a building necessary to repair the system or appliance.
We do not cover loss to the system or appliance from which this water or steam escaped.
For the purposes of this provision, a plumbing system or household appliance does not include a roof drain, sump, sump pump, gutter, downspout, drain tile or attached equipment.

## EXCLUSIONS – SECTION I

The following applies when this endorsement amends an ARIZONA HOMEOWNERS POLICY BROAD FORM 2 (HO-2); ARIZONA HOMEOWNERS POLICY SPECIAL FORM 3 (HO-3) and ARIZONA HOMEOWNERS POLICY GOLD STAR SPECIAL DELUXE FORM (HO-5):

**PART A**
The following exclusions apply to Coverage A - Dwelling and Dwelling Extension, Coverage B - Personal Property, Coverage C - Loss of Use and the Supplementary Coverages - Section I. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

is deleted and replaced by the following:

**PART A**
The following exclusions apply to Coverage A - Dwelling and Dwelling Extension, Coverage B - Personal Property, Coverage C - Loss of Use and the Supplementary Coverages - Section I. We do not insure for loss consisting of, or caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

The following applies when this endorsement amends an ARIZONA HOMEOWNERS POLICY RENTERS BROAD FORM 4 (HO-4):

**PART A**
The following exclusions apply to Coverage B - Personal Property, Coverage C - Loss of Use and the Supplementary Coverages - Section I. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

is deleted and replaced by the following:

**PART A**
The following exclusions apply to Coverage B - Personal Property, Coverage C - Loss of Use and the Supplementary Coverages - Section I. We do not insure for loss consisting of, or caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

The following applies when this endorsement amends an ARIZONA HOMEOWNERS POLICY CONDO-UNIT FORM 6 (HO-6):

**PART A**
The following exclusions apply to Coverage A - Real Property, Coverage B - Personal Property, Coverage C - Loss of Use and the Supplementary Coverages - Section I. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

is deleted and replaced by the following:

**PART A**
The following exclusions apply to Coverage A - Real Property, Coverage B - Personal Property, Coverage C - Loss of Use and the Supplementary Coverages - Section I. We do not insure for loss consisting of, or caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

The following applies to all policies under:

**PART A**
**Earth Movement** is deleted and replaced by the following:

Denby/AF 001646
Tyson & Mendes, LLP

CCD16121562831M2126D

**Earth Movement.**
a.  This means any loss caused by, resulting from, contributed to, or aggravated by:
    (1)  earthquake;
    (2)  landslide, rockslide, avalanche, subsidence, sinkhole, erosion, mudflow, mudslide, lahar;
    (3)  earth sinking, rising, shifting, expanding, contracting;
    (4)  the eruption, explosion, or effusion of a volcano; or
    (5)  any of the following:
        (a)  site selection;
        (b)  machines;
        (c)  vehicles;
        (d)  mining;
        (e)  fracking;
        (f)  sequestration of carbon dioxide or any other gas, solid, or liquid; or
        (g)  earth moving, excavation, fill, or compaction.
b.  This exclusion applies whether or not earth movement:
    (1)  takes place at or away from the location of damaged property;
    (2)  combines with water, snow, ice, or rain; or
    (3)  is sudden, repeated, interrupted, gradual, or slow.
c.  However, **we** do cover an ensuing loss when such loss is caused by:
    (1)  fire;
    (2)  theft; or
    (3)  explosion other than the explosion of a volcano.

The following is added:

**Fungi or Bacteria,** meaning the presence, growth, proliferation, spread or any activity of **fungi** or bacteria.
This exclusion does not apply to Property Coverages – Section I when **fungi** or bacteria results from a covered fire or lightning loss.

**Intentional Loss** is deleted and replaced by the following:

**Intentional Loss**
a.  We do not provide coverage for any loss or damage arising out of any act committed:
    (1)  by or at the direction of the **insured**; and
    (2)  with the intent to cause a loss.
b.  However, **we** will not deny any **insured's** claim for an otherwise covered property loss when it is caused by an act of domestic abuse by any other **insured** and the **insured** making claim:
    (1)  cooperates in any investigation relating to the loss; and
    (2)  did not cooperate in or contribute to the creation of the loss.
c.  Any payment to an **insured** under this coverage is limited to that **insured's** interest in the property less any payments we first make to a mortgagee or other party with a secured interest in the property. We will not pay more than any **limit** that applies to the covered property.

The following is added:

**Loss in Value.**
We do not cover any loss in value of any property resulting from the repair or replacement of such property.

The following is added:

**Undamaged Part.**
We will not pay to repair or replace any undamaged part of any system when any other part of such system is damaged by a covered loss.

The following applies when this endorsement amends an ARIZONA HOMEOWNERS POLICY BROAD FORM 2 (HO-2); ARIZONA HOMEOWNERS POLICY SPECIAL FORM 3 (HO-3); ARIZONA HOMEOWNERS POLICY GOLD STAR SPECIAL DELUXE FORM (HO-5) and ARIZONA HOMEOWNERS POLICY CONDO-UNIT FORM 6 (HO-6):

Under:
**Part C**
The following is added:

**Hail Cosmetic Damage to Metal Roofing Components.**
We will not pay for any damage caused by hail to any metal vent, flashing, drip edge, ridge, valley, accessory, or trim unless such metal component:
a.  will no longer:
    (1)  prevent water from entering the building; or
    (2)  perform any other intended function; or
b.  is attached to a roof plane that has had its roofing surface damaged by hail to the extent that the roofing surface must be replaced. Roofing surface includes but is not limited to shingles, shakes, tiles, slates, panels, sheets, rolled materials, or any type of built-up surface.

END. 584D (AZ) Ed. 3/13                      Page 5 of 8                                Stock No. 15562

Denby/AF 001647
Tyson & Mendes, LLP

CCD1612156283IM2127D

However, this exclusion does not apply when we determine that such dwelling or other structure is a total loss.

## CONDITIONS – SECTION I

The following applies to all policies:

**Arbitration** is deleted and replaced by the following:

**Appraisal. If you** and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and disinterested appraiser within 20 days after receiving a written request from the other. The two appraisers will choose a competent and disinterested umpire. If they cannot agree upon an umpire within 15 days, **you** or we may request that the choice be made by a judge of a court of record in the state where the **insured premises** is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to **us**, the amount agreed upon will be the amount of loss. If they fail to agree within a reasonable time, they will submit their differences to the umpire. Written agreement signed by any two of these three will set the amount of the loss. The party selecting that appraiser will pay each appraiser. Other expenses of the appraisal and the compensation of the umpire will be paid equally by **you** and **us**.

**Loss Payment** is deleted and replaced by the following:

**Loss Payment.** We will adjust all losses with **you**. We will pay **you** unless some other party is named in the policy or is legally entitled to receive payment. Loss will be payable 30 days after we receive **your** properly completed proof of loss and:
a. we reach agreement with **you**;
b. there is an entry of a final judgment; or
c. there is a filing of an appraisal award with **us**.

The following applies when this endorsement amends an ARIZONA HOMEOWNERS POLICY BROAD FORM 2 (HO-2); ARIZONA HOMEOWNERS POLICY SPECIAL FORM 3 (HO-3); ARIZONA HOMEOWNERS POLICY GOLD STAR SPECIAL DELUXE FORM (HO-5) and ARIZONA HOMEOWNERS POLICY CONDO-UNIT FORM 6 (HO-6) or when a policy includes the Gold Star Homeowners Amendatory Endorsement, END. 587A:

The following is added to **Loss Value Determination:**

Replacement cost coverage for a damaged dwelling, real property or structure does not include any cost to repair or replace damaged property due to the requirements of any ordinance, law or regulation, unless specifically provided under this policy.

The following applies when this endorsement amends an ARIZONA HOMEOWNERS POLICY BROAD FORM 2 (HO-2); ARIZONA HOMEOWNERS POLICY SPECIAL FORM 3 (HO-3); ARIZONA HOMEOWNERS POLICY GOLD STAR SPECIAL DELUXE FORM (HO-5) and ARIZONA HOMEOWNERS POLICY CONDO-UNIT FORM 6 (HO-6):

The following is added:

**Duplicate Payment.** The amount we pay **you** for any Loss Settlement under Coverage A:
a. will not duplicate any amount **we** have already paid **you** for any previous loss or losses to the same damaged property when such property has not been repaired or replaced; and
b. will be reduced by the amount **we** previously paid **you** that **you** have not actually spent to repair or replace such property.

The following is added:

**Matching of Undamaged Property.** We will not pay to repair or replace undamaged property due to mismatch between undamaged material and new material used to repair or replace damaged material because of:

a. texture, dimensional differences;
b. color, fading, oxidation, weathering differences;
c. wear and tear, marring, scratching, deterioration; or
d. obsolescence or discontinuation.

We do not cover the loss in value to any property due to mismatch between **undamaged** material and new material used to repair or replace damaged material.

## LIABILITY COVERAGES - SECTION II

The following applies to all policies:

Under:

**COVERAGE D - PERSONAL LIABILITY COVERAGE:**

The following is added:

**Dangerous Dog and Exotic Animal Liability Limit.**
The dangerous dog and exotic animal liability **limit** shown in the Declarations is the most we will pay for compensatory damages for which **an insured** is legally liable because of **bodily injury or property damage** caused by an **occurrence** arising out of:
a. a dangerous dog **you**, any **insured**, or any member of **your** household owns or has in his or her care, custody, or control.

END. 584D (AZ) Ed. 3/13                    Page 6 of 8                    Stock No. 15562

Denby/AF 001648
Tyson & Mendes, LLP

CCD161215628J1M2128D

    (1)  Dangerous dog means any dog;
       (a)  trained or used as an attack or guard dog;
       (b)  previously deemed to be vicious, aggressive, or dangerous as defined by any state or local law, regulation, or ordinance; or
       (c)  that has a prior history of biting or vicious act that:
          i.   resulted in death to a person;
          ii.  required any type of professional medical treatment; or
          iii.  was reported to any governmental agency.
    (2)  A dangerous dog does not mean a trained attack or guard dog that is currently, or was previously, owned by a governmental agency and is in **your**, any **insured's**, or any member of **your** household's, care, custody, or control.

b.  an exotic animal **you**, any **insured**, or any member of **your** household owns or has in his or her care, custody, or control.
    Exotic animal means a:
    (1)  non-domesticated feline;
    (2)  non-human primate;
    (3)  venomous or poisonous animal;
    (4)  caiman, alligator, or crocodile;
    (5)  bear;
    (6)  wolf;
    (7)  jackal;
    (8)  fox; or
    (9)  coyote;
    including any hybrid of these animals.

## EXCLUSIONS - SECTION II

The following applies to all policies:

Under:

**Coverage D - Personal Liability and Coverage E - Medical Expense** do not apply to:

**Abuse** is deleted and replaced by the following:

**Sexual Molestation or Misconduct, Corporal Punishment, Physical or Mental Abuse.**
We will not cover **bodily injury** or **property damage** arising out of or resulting from sexual molestation or misconduct, corporal punishment, physical or mental abuse.
a.  This includes any actual or alleged:
    (1)  sexual molestation or misconduct by any **insured:**
       (a)  including but not limited to personal interaction or photographic, video, or any other display of sexual activity;
       (b)  regardless of whether or not consent is given;
    (2)  corporal punishment; or
    (3)  physical or mental abuse resulting from acts or omissions of any **insured.**
b.  This exclusion applies regardless of:
    (1)  intent to cause injury; or
    (2)  the theory of relief pursued, asserted, or claimed by anyone seeking compensation under this policy.

The following is added:

**Excretion, Secretion, or Decomposition of any Animal. We** will not cover **bodily injury** or **property damage** arising out of or resulting from excretion, secretion, or decomposition of any animal.

**Illegal Consumption of Alcohol** is deleted and replaced by the following:

**Alcohol Supply to Underage Persons.**
We will not cover **bodily injury** or **property damage** arising out of any act or failure to act of any **insured** who:
a.  knowingly permits;
b.  takes action to enable; or
c.  fails to take reasonable action to prevent;
any person under the legal age to consume alcohol.

**Intentional Injury** is deleted and replaced by the following:

**Expected or Intended. We** will not cover **bodily injury** or **property damage** arising out of an expected or intended act or omission.
a.  This includes any type of **bodily injury** or **property damage** that an insured:
    (1)  intends; or
    (2)  may expect to result from any intentional act or omission.
b.  This exclusion applies even if the **bodily injury** or **property damage** is:
    (1)  of a different kind, quality, or degree than intended;
    (2)  to a different person or property than intended;

Denby/AF 001649
Tyson & Mendes, LLP

CCD161215628331M2129D

(3)  the result of a willful and malicious act, no matter at whom the act was directed;
(4)  unexpected or unforeseen by the person injured or the owner of the property damaged; or
(5)  sustained regardless of whether an **insured:**
    (a)  is under the influence of alcohol or any controlled substance;
    (b)  lacks the mental capacity to govern his or her conduct; or
    (c)  is deemed not to have had the mental capacity to form the legal intent to commit the act or omission.
c.  This exclusion applies regardless of the theory of relief pursued, asserted, or claimed by anyone seeking compensation under this policy.

**Pollution Damage** is deleted and replaced by the following:

**Pollution. We** will not cover **bodily injury** or **property damage** arising out of pollution.
a.  This includes any actual, alleged, or threatened:
    (1)  discharge, dispersal, release, escape, seepage, trespass, wrongful entry, migration; or
    (2)  ingestion, inhalation, or absorption;
    of any **pollutant** from any source.
b.  This includes any cost or expense to:
    (1)  abate, test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, remediate, dispose; or
    (2)  in any way respond to, or assess the effects;
    of any **pollutant** from any source.

Under:

**Coverage D - Personal Liability** does not apply to:

**Punitive Damages** is deleted and replaced by the following:

**Punitive, Statutorily Imposed, or Court Ordered Damages. We** will not cover punitive, statutorily imposed, or court ordered damages. This includes any Personal Liability for:
a.  punitive, exemplary, statutorily imposed, multiple, or aggravated damages;
b.  fines, penalties, or court ordered restitution; or
c.  awarded or statutorily mandated attorney fees related to a. or b. above.

### GENERAL CONDITIONS

The following applies to all policies:

The following is added to **Subrogation:**

If **we** pay an **insured** for a loss caused by an act of domestic abuse, the rights of that **insured** to recover damages from the perpetrator of the abuse are transferred to **us** to the extent of **our** payment. An **insured** may not waive such rights to recover against the perpetrator of the domestic abuse.

**Waiver or Change of Policy Provisions** is deleted and replaced by the following:

**Waiver or Change of Policy Provisions. You** are authorized to request changes in this policy, on behalf of all **insureds, if we** agree to those changes. A provision of this policy is waived or changed only if **we** put it in writing.
**Our** request for appraisal or examination does not waive **our** rights.

All other terms remain unchanged.

Denby/AF 001650
Tyson & Mendes, LLP

CCD161215628331M2130D

# FUNGI OR BACTERIA EXCLUSION ENDORSEMENT

This endorsement modifies such insurance as is afforded by this policy and replaces any Fungi or Bacteria Exclusion Endorsement previously a part of this policy.

This policy is amended as follows:

## DEFINITIONS

The following definition is added:

**Fungi** means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

## EXCLUSIONS - SECTION II

The following exclusion is added under **Coverage D - Personal Liability and Coverage E - Medical Expense** do not apply to:

**Fungi or Bacteria. We** will not cover **bodily injury** or **property damage,** arising out of or resulting from, in whole or in part, any actual, alleged or threatened ingestion of, inhalation of, contact with, exposure to, existence of, or presence of, any **fungi** or bacteria on or within a building or structure, including its contents. Such loss is excluded regardless of any other cause, event, material or product contributing concurrently or in any sequence to such injury or damage.

**We** will not pay for any loss, cost or expense to abate, test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, remediate, dispose of or in any way respond to, or assess the effects of **fungi** or bacteria, by any **insured** or by any other person or entity.

This exclusion does not apply to **bodily injury** or **property damage** arising out of any **fungi** or bacteria that are, are on, or are contained in, a good or product intended for consumption.

All other terms remain unchanged.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

END. 595 Ed. 6/02

Stock No. 20821

Denby/AF 001651
Tyson & Mendes, LLP

CCD16121562831M2131D

## ADDITIONAL PROTECTION SCHEDULE ENDORSEMENT

This endorsement modifies such insurance as is afforded by this policy and replaces any Additional Protection Schedule Endorsement previously a part of this policy.

| POLICY NUMBER | EFFECTIVE DATE | ADDITIONAL PREMIUM |
|---|---|---|
| 02BR-1139-01-73-PHGS-AZ | 04/19/2014 | $ |

| AGENT | | RETURN PREMIUM |
|---|---|---|
| CHRIS CAHILL | | $ |

**OPTION 5 - OFFICE, SCHOOL OR STUDIO USE**

Coverage B **Limit** for **business** personal property:    Additional **Limit**:    $
Description of Office, School or Studio Occupancy on the Premises:

**OPTION 6 - BUSINESS PURSUITS**

Description of Insured's business:

**OPTION 7 - ADDITIONAL PREMISES COVERAGE**

Description of Premises:                    Location:

**OPTION 12 - NAMED ADDITIONAL INSURED(S)**

Location of Premises:        Name and Address of Additional Insured(s):        Type of Interest:

**OPTION 13 - OTHER STRUCTURES**

Identification of Structure(s):                    Additional **Limit**:

Guest House                                $44,000.00

All other terms remain unchanged.

END. 436 Ed. 3/01                                Stock No. 18385

Denby/AF 001652
Tyson & Mendes, LLP