1
2
3
4
5
6

**JELLISON LAW OFFICES, PLLC**
18801 North Thompson Peak Parkway
Suite D235
Scottsdale, Arizona 85255
Telephone:  480.659.4244
JAMES M. JELLISON, ESQ., #012763
E: jim@jellisonlaw.com
E: admin@jellisonlaw.com
Attorney for Defendants David Engstrom, Jacob Robinson, Christopher Lapre, Brian Gragg, and Rory Skedel

7
8

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

9
10
11
12
13

| | |
|---|---|
| James W. Denby, *et. al.*,<br><br>                    Plaintiffs,<br>vs.<br><br>City of Casa Grande, et. al.,<br><br>                    Defendants. | Case No.:  2:17-cv-00119-MTL<br><br>**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT**<br><br>**(Oral Argument Requested)** |

14
15
16
17
18
19
20
21
22

        Defendants Engstrom, Robinson, Lapre, Gragg, and Skedel, through undersigned counsel, hereby submit their Motion to Dismiss Plaintiffs' Third Amended Complaint (hereinafter, the "Complaint").   Defendants raise the following issues for this Court's consideration:  1) Plaintiffs' Complaint fails to state a plausible *Monell* claim; 2) each individual Defendant is entitled to qualified immunity; 3) Plaintiff Torres' claims are barred by the statute of limitations; 4) Plaintiff Denby lacks standing to claim damages to real property; and 5) Plaintiffs lack standing to seek equitable or injunctive relief.  This Motion is supported by the accompanying Memorandum of Points & Authorities, and Statement of Conferral, Exhibit A.

23

**MEMORANDUM OF POINTS & AUTHORITIES**

24
25
26

        This case arises from law enforcement's December 17, 2014 entry into a residence located at 116 West 10th Street, Casa Grande, Arizona, pursuant to valid arrest and search warrants.  Consistent with the warrants, the regional SWAT team used progressively escalating

1

means to apprehend a felon, Ochoa, who had fled into the residence.  The final step was a tactical entry into the residence, with Ochoa ultimately located in the backyard. Plaintiffs allege Fourth Amendment excessive force upon real property and personal property, Fifth Amendment taking, and failure to intervene. For all of the following reasons, Plaintiffs' Complaint must be dismissed.

## I.      STANDARD OF REVIEW.

The Court must dismiss a complaint under Fed.R.Civ.P 12(b)(6) if it fails to state a cognizable legal theory or sufficient facts to support a cognizable legal theory.  *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990).  A complaint must contain sufficient factual matter, which, if accepted as true, states a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).   Facial plausibility exists if the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id.*  "Where a complaint pleads facts that are 'merely consistent' with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).   Although  in deciding a motion to dismiss the Court must accept the factual allegations in the complaint as true, *Shwarz v. U.S.*, 234 F.3d 428, 435 (9th Cir. 2000), the Court must not accept as true legal conclusions couched as factual allegations. *Papasan v. Allain,* 478 U.S. 265, 286 (1986); *see also, Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). For purposes of Rule 12(b)(6), the "plausible claim" standard also applies to the pleading of  §1983 *Monell*-based entity/official capacity claims.  *AE ex rel. Hernandez v. County of Tulare,* 666 F.3d 631, 637 (9th Cir. 2012); *Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir. 2011).

## II.    <u>STATEMENT OF MATERIAL FACTS</u>.[1]

On December 17, 2014, James Denby, Elizabeth Torres, and Wilma J. Logston allegedly resided at a single-family residence located at 116 West 10th Street, Casa Grande, Arizona.  (Doc. 256, ¶¶ 13, 14).   At that time, only Torres and Logston were the deeded owners.  (Doc. 256, ¶ 15).[2]  Allegedly, Torres and Logston intended Denby to be the intended sole grantee on the deed, but did not effectively quitclaim to Denby until July 10, 2017.  (Doc. 256, ¶¶ 16-20).  Denby allegedly held the insurance policy on the home, maintained it, and paid the property taxes prior to appearing on a corrected deed or title  (Doc. 256, ¶¶ 21-23).

On December 17, 2014, at approximately 3:05 p.m., Casa Grande Police Department ("CGPD") personnel were dispatched to a domestic disturbance call at 107 ½ W. 11th Street, Casa Grande, Arizona.  (Doc. 256, Doc. 31, ¶ 24).  Multiple CGPD Officers arrived shortly after the call.   (Doc. 256, ¶¶ 25-27). After arrival at the scene, the Officers learned the domestic disturbance involved Abram Ochoa, who had outstanding warrants for his arrest for theft and aggravated domestic violence/assault.  (Doc. 256, ¶ 27, ftnt. 1).  Ochoa's girlfriend, Adela Castillo, advised CGPD that Ochoa had potentially gone to 116 West 10th Street (the "subject residence") and that he sometimes possessed a "stun gun in the form of brass knuckles."[3]  (Doc. 256, ¶¶ 28-29).

---

[1] As they must for purposes of a Rule 12(b)(6) Motion, Defendants recite the non-conclusory, well-pled factual allegations in the Complaint, though they disagree the alleged facts are either true or accurate in reality.  The recited facts are the general ones.  The facts unique to the separate legal arguments will be discussed in this Motion's various sections.

[2] Logston was originally a named plaintiff and died, with Plaintiff Denby identified as her representative.  (Doc. 161).  However, there was no Fed.R.Civ.P. 25 substitution and pursuant to Denby's Motion (Doc. 187), Logston was dismissed from the action. (Doc. 188).

[3] Defendants are not entirely sure what this allegation means but take it, at a minimum, to report Ochoa's possession of some kind of stun gun.

CGPD Sergeant Engstrom was able to track Ochoa to the subject residence and, at 3:16-3:17 p.m. saw Ochoa opening the back door, then coming out of the residence, and going right back in; Engstrom reported his observation to non-party CGPD Officer Lujan. (Doc. 256, ¶¶ 31-34). Non-party CGPD Officer Wilson also reported seeing Ochoa exit the residence, look directly at Wilson, and then go back into the residence. (Doc. 256, ¶¶ 35-37). The occupant of the subject residence, non-party William Denby, Jr., exited the residence on crutches, and informed Lujan that Ochoa was in the house. (Doc. 256, ¶¶ 37-39). Williams offered to go back into the residence in an effort to request Ochoa to leave, but an unidentified CGPD Officer declined William Denby's offer. (Doc. 256, ¶¶ 37-39). Plaintiff James Denby allegedly arrived and provided an unidentified CGPD Officer with keys to drive and move a car away from the subject residence to provide more visibility for police. (Doc. 256, ¶¶ 42, 46).

CGPD tried to establish communications with Ochoa using a PA system, but there was no response from the residence. (Doc. 256, ¶¶ 48-49). At approximately 3:21 p.m., non-party CGPD Lt. Horn requested SWAT assistance for a barricaded subject. (Doc. 256, ¶ 53). By 4:21 p.m. two SWAT teams – Bravo and Charlie – arrived and began evaluating the scene and residence. (Doc. 256, ¶ 65).

A decision was made to bring in a vehicle called a Bearcat. (Doc. 256, ¶ 67). The Bearcat arrived on scene, and law enforcement personnel, non-party Lujan in particular, allegedly used it to drive over a fence, break windows and the front door, and, with its PA system, announce their presence and request Ochoa to come out of the subject residence. (Doc. 256, ¶¶ 70, 73). Ochoa did not respond. (Doc. 256, ¶ 75).[4] SWAT members then

_____

[4] At 5:00 p.m., a search warrant to enter the residence to locate and apprehend Ochoa was signed, although Plaintiffs' Complaint is not entirely clear at what time force was actually applied for the first time. (Complaint, ¶¶ 73-74, 79-82). Defendants maintain no force was applied to the residence until notification of a signed search warrant was received. Either way, Plaintiffs do not claim an unlawful entry.

deployed a tactical phone through the broken windows and wall in an attempt to contact Ochoa; also with no response. (Doc. 256, ¶¶ 76-77).

Next, non-party Miller and SWAT team Bravo deployed a medium-sized robot into the Residence, that was able to enter through the front door that had been pushed opened by the Bearcat. (Doc. 256, ¶ 83). The medium robot was able to clear a large portion of the house, with no sign of Ochoa. (Doc. 256, ¶ 84). On-site negotiators continued, but still failed, to make contact with Ochoa. (Doc. 256, ¶ 85).

After the medium robot was placed in the residence, SWAT announced via the PA system that Ochoa had five minutes to exit the residence, or that further force would be used. (Doc. 256, ¶ 86). The five minutes expired without contact with Ochoa. (Doc. 256, ¶ 87). At that point, Sgt. Lapre used chemical munitions, including OC and CS canisters, in an effort to force Ochoa out. (Doc. 256, ¶¶ 87-96). SWAT deployed a second robot into the residence that searched the house until 8:21 p.m. when its batteries expired. (Doc. 256, ¶¶ 97, 99). At 7:43 p.m., an unidentified person deployed a Noise Flash Diversionary Device ("NFDD"). (Doc. 256, ¶ 98).

At approximately 9:47 p.m., a tactical team entered the residence, with two additional NFDDs were deployed in the process. (Doc. 256, ¶¶ 103-104). The team determined Ochoa was no longer in the residence. (Doc. 256, ¶ 105). Plaintiffs allege unidentified members of the tactical team damaged personal property during the search including furniture, cushions, pillows, windows and window coverings, showers doors, bathroom mirrors, a toilet, and other items. (Doc. 256, ¶¶ 108-115, 131). Upon searching the remaining property, law enforcement discovered Ochoa hiding under the tarp on top of a car that Engstrom had reported moving earlier. (Doc. 256, ¶¶ 117-124).

III.    **LEGAL ANALYSIS.**

A. **PLAINTIFFS' COMPLAINT FAILS TO STATE A PLAUSIBLE *MONELL* CLAIM.**

Plaintiffs' Complaint persists in naming the remaining Defendants in both their individual and "official" capacities. (Doc. 256, ¶¶ 7 – 11). An official capacity suit against a municipal officer is "equivalent to a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Here, as to Lapre and Skedel, that municipality is the Pinal County Sheriff. As to Engstrom, Robinson, and Gragg, it is the City of Casa Grande.

There are, however, no well-pled fact allegations alleging a constitutional injury inflicted as a result of a policy, practice, or custom of the County Sheriff or City, or a municipal failure to train or supervise. *See, e.g., Chavez v. U.S.*, 683 F.3d 1102, 1113 (9th Cir. 2012). Plaintiffs' *Monell* well-pled fact allegations in its Third Amended Complaint are non-existent.

The Supreme Court has held that in order to impose liability on a municipality or other local government pursuant to § 1983, plaintiffs "must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson,* 563 U.S. 51, 60 (2011), quoting *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 691 (1978). Local government entities are "not vicariously liable under § 1983 for their employees' actions." *See id.; Iqbal v. Ashcroft,* 556 U.S. 662, 678 (2009) (holding that there is no *respondeat superior* liability under § 1983). Instead, it is only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell,* 436 U.S. at 694. Plaintiffs do not even make conclusory allegations about offending policies, customs, practices or final policy-maker action. Even if they had offered conclusory allegations, that would not be enough to support a municipal claim. *AE ex*

*rel. Hernandez v. County of Tulare,* 666 F.3d 631, 637 (9th Cir. 2012).   Nor do Plaintiffs plausibly state facts necessary for a constitutional failure to train claim - that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference' for purposes of failure to train." *Connick,* 563 U.S. at 62; *Flores v. County of L.A.,* 758 F.3d 1154, 1159 (9th Cir. 2014); *see also Mueller v. Auker,* 700 F.3d 1180, 1194 (9th Cir. 2012).   "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson,* 563 U.S. 51, 61 (2011).   "[A] municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  *Id., quoting City of Canton v. Harris,* 489 U.S. 378, 388 (1989).  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Connick.* 563 U.S. at 62.  A plaintiff "must demonstrate a 'conscious' or 'deliberate' choice on the part of a municipality in order to prevail on a failure to train claim.  *Flores v. County of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014). "[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable."  *City of Canton,* 489 U.S. at 391.   Any allegations in Plaintiffs' Complaint on this front are conclusory, and non-factual, at best.  *See,* Doc. 256, ¶¶ 124-126.

In short, Plaintiffs' Third Amended Complaint fails to state any well-pled facts supporting a *Monell* claim.  Accordingly, all claims against Engstrom, Robinson, Lapre, Gragg, and Skedel, Lapre, in their official capacities, must be dismissed.

## B. EACH DEFENDANT, BASED ON AN INDIVIDUALIZED ANALYSIS OF THEIR OWN CONDUCT, IS ENTITLED TO QUALIFIED IMMUNITY.

Qualified immunity is not merely a defense. Rather, it provides a sweeping protection applicable during the entirety of the litigation process. *Pearson v. Callahan,* 555 U.S. 223,

231 (2009); *Harlow v. Fitzgerald,* 457 U.S. 800, 819 (1982). The U.S. Supreme Court has repeatedly stressed the importance of qualified immunity, the standards guiding its proper application, and the need to apply those standards faithfully. *See White v. Pauly*, 137 S.Ct. 548 (2017); *Mullenix v. Luna,* 136 S.Ct. 305 (2015); *Reichle v. Howards,* 566 U.S. 658 (2012); *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2018-19, 2023 (2014); *Ashcroft v. al–Kidd,* 563 U.S. 731, 735 (2011). The Court has also instructed that qualified immunity be resolved "at the earliest possible stage of the litigation." *Wood v. Moss,* 134 S.Ct. 2056, 2065 n.4 (2014).[5]

Courts engage in a two-pronged analysis to determine whether qualified immunity applies to a § 1983 claim: "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 138 S.Ct. 577, 589 (2018), quoting *Reichle v. Howards*, 566 U.S. at 664. To be "clearly established," the law must be such that "*every* reasonable official would [have understood] that what he is doing violates that right." *Riechle v. Howards*, 566 U.S. at 663 (internal citation omitted) (emphasis added). "[E]xisting precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. at 741. To overcome qualified immunity, "[p]laintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* deputies *in this case* that *their particular conduct* was unlawful. To achieve that kind of notice, the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017). It bears emphasizing that the analysis must always be trained on the particular facts and circumstances under review. *Brooks v. Clark Cty*., 828 F.3d 910, 919–20 (9th Cir. 2016).

---

[5] Despite the amount of time and energy spent in litigation, the newly-minted complaint

"Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not [generally act unconstitutionally], deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018). "The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct." *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991).

With that, it is necessary to explore the law, including its clarity, or lack of clarity. Plaintiffs allege claims under the Fourth and Fifth Amendments. Defendants will start with the treatment of the Fifth Amendment when the government, exercising its police powers, destroys the property of an otherwise innocent property owner. The Ninth Circuit very recently grappled with the issue of whether a Fifth Amendment takings case can be based on the exercise of police powers, including police powers associated with tactical entry into an innocent person's home to extract a wanted felon. In *Pena v. City of Los Angeles*, No. 24-2422, 2025 WL 3074588 (9th Cir. Nov. 4, 2025), the Ninth Circuit addressed whether a Fifth Amendment remedy applied in the case of the destruction of a shop owner's property during pursuit of an armed fugitive who barricaded himself within the shop, resulting in officers' firing of dozens of tear gas canisters through the shop's walls, door, roof, and windows. The Ninth Circuit held that "when law enforcement officers destroy or damage private property in the necessary and reasonable defense of public safety, such destruction is exempt from the scope of the federal Takings Clause." 2025 WL 3074588, at *13. That an innocent property owner has no Fifth Amendment takings remedy for destruction of property in the exercise of police powers - even in cases of severe destruction during SWAT or tactical incidents - appears to be the majority rule. *Bennis v. Michigan,* 516 U.S. 442, 443–44 (1996); *Lech v.*

supersedes all previous versions and must be addressed anew.

*Jackson*, 791 F. App'x 711, 719 (10th Cir. 2019);  *Bachmann v. United States*, 134 Fed. Cl. 694, 696 (Fed. Cl. 2017); *Johnson v. Manitowoc Cty.*, 635 F.3d 331, 333–34, 336 (7th Cir. 2011); *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008); *Lawmaster v. Ward*, 125 F.3d 1341, 1344–46, 1351 (10th Cir. 1997).

Moving to the Fourth Amendment, we see some of the same concepts that arise with the Fifth Amendment.  "It is plain that while the destruction of property in carrying out a search is not favored, it does not necessarily violate the [F]ourth amendment." *U.S. v. Becker*, 929 F.2d 442, 446 (9th Cir. 1991). "[O]fficers executing search warrants on occasion must damage property in order to perform their duty." *Dalia v. United States,* 441 U.S. 238, 258 (1979).  Officers are not obligated to use the least destructive means possible to execute a search warrant. *Johnson v. Manitowoc County*, 635 F.3d 331, 335 (7th Cir. 2011).  "So long as the officer's conduct remains within the boundaries of reasonableness, an officer has discretion over the details of how best to proceed with a search warrant's execution." *Id.; citing Lawmaster v. Ward*, 125 F.3d 1341, 1349 (10th Cir. 1997). When judging the objective reasonableness of a use of force this Court may not use 20/20 hindsight.  *Graham v. Connor,* 490 U.S. 386, 396 (1989).

Unfortunately, Ninth Circuit case law provides little guidance as to what is clearly unreasonable when it comes to property damage connected with search warrant execution. In  *Mena v. City of Simi Valley*, 226 F.3d 1031 (9th Cir. 2000) the Ninth Circuit held that gratuitous destruction of property unrelated to a law enforcement objective could be unreasonable under the Fourth Amendment.  There, an officer broke open an unlocked door for no law enforcement purpose stating, "I like to destroy these kind[s] of materials, it's cool."  *Id.* at 1041.  In *San Jose Chapter of Hells Angels Motorcycle Club v. City of San Jose,* 402 F.3d 962, 971 (9th Cir. 2005) the Ninth Circuit found it unreasonable to conduct a search that exceeds the boundaries of what the warrant is seeking.   However, the Ninth Circuit after

both of these cases assessed the limited guidance provided.  In *West v. City of Caldwell*, 931 F.3d 978, 986–87 (9th Cir. 2019), the court addressed the Fourth Amendment limitations when law enforcement was required to flush out a felon from an innocent third party's residence.   Plaintiff and her children claimed they could not live in the house for two months because of the damage caused by the search, including broken windows and tear-gas-saturated possessions.  *West*, 931 F.3d at 982.  Yet, as of 2019, the Ninth Circuit Court of Appeals could find no controlling precedent proscribing the methods used, including the use of tear gas.  "Given that Defendants thought they had permission to enter Plaintiff's house to apprehend a dangerous, potentially armed, and suicidal felon barricaded inside, it is not obvious, in the absence of a controlling precedent, that Defendants exceeded the scope of Plaintiff's consent by causing the tear gas canisters to enter the house in an attempt to flush Salinas out into the open." *West*, 931 F.3d at 986.  More broadly, *West* concluded that "[w]e have found no Supreme Court or Ninth Circuit case clearly establishing that the procedure Defendants followed, including the use of tear gas and the resulting destruction, is unreasonable in those circumstances." *Id.*  The Ninth Circuit found that *Mena* was unhelpful in assessing the amount of force that can be used to extract a fleeing felon from a home because it was limited to demonstrably gratuitous force unrelated to a law enforcement purpose.

Then there is the failure to intervene allegations.  Hopefully, this Court can see the "spaghetti-on-the-wall" approach taken by Plaintiffs in the Complaint.   In Plaintiffs' world, every individual Defendant used excessive force *and* each of them also failed to intervene in everyone else's alleged use of excessive force.   The failure to intervene theory – both generally and as alleged by Plaintiffs in this case, runs afoul of the Supreme Court's instruction that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S.

662, 676 (2009).  This Court should reject failure to intervene as a constitutional theory of liability as being fundamentally flawed.  Even if recognized, however, it has limitations that must be honored. "[P]olice officers have a duty to intercede when their fellow officers violate the constitutional right of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). "[T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows." *U.S. v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994) *aff'd in part, rev'd in part,* 518 U.S. 81. (1996).  An officer who fails to intervene when his fellow officers use excessive force to effect a seizure would be responsible, like his colleagues, for violating the Fourth Amendment.  *Id.* However, officers are liable for a breach of this duty only if they had "a realistic opportunity" to intercede. *Cunningham*, 229 F.3d at 1289.  Failure to intervene cannot be present where an officer is physically incapable of preventing an incident, which includes an assessment of the officer's location when the incident occurred, and how long it took the incident to transpire. *Ting v. U.S.*, 927 F.2d 1504, 1512 (9th Cir. 1991).  "A failure-to-intervene claim also requires an underlying constitutional violation."  *Shepard v. Perez*, 609 Fed.Appx. 942, 942–43 (9th Cir. 2015). The obligation to intervene must, itself, be clearly established under the facts of the particular case.  *See, Penaloza v. City of Rialto,* 836 Fed.Appx. 547, 549 (9th Cir. 2020).

Given this morass of confusing and uncertain principles of when constitutional liability attaches to a police use of force on property, it is easy to see that qualified immunity is an issue that must be given serious attention, and that attention must be applied on an individualized basis.  *See, Cunningham, supra.*  When we take a look at the sparse allegations as to the remaining, individual Defendants, qualified immunity must be applied here as to each individual.

### *Sgt. Engstrom*

At 4:03 p.m., Sgt. Engstrom, who had been maintaining a perimeter position, was transferred to a tactical (SWAT) assignment.  (Doc. 256, ¶ 55).  For the next couple of hours, Engstrom was assigned to a perimeter position at the east wall of the subject residence.  (Doc. 256, ¶ 56).   After about an hour, Engstrom reported on the tactical channel that he observed movement coming from a tarp covering a car in the backyard, but was told by another, unidentified SWAT member that "a dog was loose in the area."  (Doc. 256, ¶ 57-59). Engstrom accepted the explanation, and continued to watch his assigned area.  (Doc. 256, ¶ 63).  He did not further investigate the tarp movement he had observed and reported.  (*Id.*). Engstrom is reported to have been part of the tactical team entering the home, but there are no allegations that he searched in a manner exceeding the scope of the warrants.  (Doc. 256, ¶ 119).

First, accepting as true for this Motion, that Sgt. Engstrom saw a tarp move, and accepted the explanation of another team member that "a dog was loose in the area" in deciding to not further an investigation is not a matter of constitutional dimension and is clearly neither a use of unreasonable force under the Fourth Amendment, or a taking under the Fifth Amendment.   Second, Plaintiffs have failed, completely, to allege that Sergeant Engstrom destroyed property gratuitously, and without a reasonable law enforcement objective, during the entry.   Third, there is no allegation that places Sergeant Engstrom in a a position to stop someone else's excessive use of force.   Finally, Sergeant Engstrom (and all the Defendants) challenges Plaintiff to show clearly established law that would have informed him that any of his alleged actions, or decision-making, was in violation of the U.S. Constitution.

### *Officer Robinson*

CGPD Officer Robinson provided security for Sgt. Lapre as he, Lapre, launched chemical munitions into the residence.   (Doc. 256, ¶ 90).   Robinson is not alleged to have

used force, or taken property by destruction, by any means.  Moreover, there are no facts he had the operational ability to interfere with the SWAT operation, had sufficient background to do so, or sufficient knowledge or training to make a decision to interfere.  Lapre's actions were, themselves, not violative of clearly established law under *West v. Caldwell, supra.* Accordingly, Robinson had no constitutional duty to intervene in the deployment of chemical munitions because no clearly established law compelled him to do so.  *See, Penaloza, supra.*

### Sgt. Lapre

At 3:38, Pinal County Sheriff's Sergeant Chris Lapre, a SWAT member, arrived on scene.  (Doc. 256, ¶ 54).   After the five-minute warning to Ochoa had expired without signs of movement or response, Lapre used the chemical munitions.  (Doc. 256, ¶¶ 87-88).  Lapre first used OC (pepper spray) canisters.  (Doc. 256, ¶¶ 87-89).   The OC deployment produced no voices, coughing, or movement from within the Residence.  (Doc. 256, ¶ 91).  Because there was no response to the OC, SWAT decided to escalate from OC to CS gas (tear gas). (Doc. 256, ¶¶ 92-93).  At least twenty-two 40mm canisters of OC and CS gas were deployed into the house.  (Doc. 256, ¶ 94).   Again, as of 2019, the Ninth Circuit could not say whether this use of force was clearly proscribed.  *See, West, supra.*  For Fifth Amendment purposes, the Ninth Circuit held, only two weeks ago, it was not proscribed under the Fifth Amendment.  As with the other individuals, Plaintiffs have failed to allege Lapre was ever in a position to reasonably intervene in someone else's clearly established use of excessive force. *See, Ting; see also, Penaloza.*

### Sgt. Gragg

Prior to the arrival of SWAT teams Bravo and Charlie, CGPD Sergeant Brian Gragg was in command.  (Doc. 256, ¶ 66).  There are no facts that Sergeant Gragg used any force, much less unconstitutional force, caused unconstitutional force to be exerted, or failed to intervene in anyone else's application of unconstitutional force, with knowledge and

opportunity to intervene. *See, Ting, supra.* There is no *respondeat superior* liability under §1983, so a defendant's position as the supervisor of someone who allegedly violated a plaintiff's constitutional rights does not make the supervisor liable. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978); *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989) (requiring personal participation in the alleged constitutional violations); *May v. Enomoto,* 633 F.2d 164, 167 (9th Cir. 1980) (holding that section 1983 liability must be based on the personal involvement of the defendant). Simply alleging Gragg as a supervisor is insufficient to deprive him of his entitlement to qualified immunity.

### Sgt. Skedel

When the tactical team made entry at 9:47 p.m., Skedel deployed two additional NFDDs for that process. (Doc. 256, ¶¶ 103-104). In *Boyd v. Benton,* 374 F.3d 773, 777 (9th Cir. 2004) a SWAT team deployed a flash-bang device when executing a raid. The SWAT team used the flash-bang device upon entry -without looking and into a dark apartment in which several people were sleeping - including Boyd, whom they injured when the device ignited. *Id.* at 778. The court, nonetheless, held it was not clearly established that use of flash-bangs under the circumstances was unreasonable, and applied qualified immunity. *Id.* at 784. Skedel deployed NFDDs with knowledge no innocent persons would be harmed. In *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 973 (7th Cir. 2003), the court found the deployment of flash-bang devices to be reasonable where the suspect had a criminal record that included aggravated assault, was known to be in the residence, and had access to weapons. The officers had ample reason to be concerned about their personal safety, and the flash bang devices were not used in the presence of innocent persons or children, and no personal injury resulted. *Id.* In *U.S. v. Myers,* 106 F.3d 936 (10th Cir. 1997), police obtained a warrant to search a residence that was suspected of housing a marijuana growing operation. The court found the use of a flash-bang device was reasonable where a background check

revealed that Mr. Myers, one of the occupants of the home, had prior convictions for burglary, theft, and cocaine trafficking. *Id.* at 940. Finally, in *Bing ex rel. Bing v. City of Whitehall, Ohio*, 456 F.3d 555, 569 (6th Cir. 2006), the court concluded the police use of pepper gas and a first flash-bang device was reasonable in an attempt to extract a dangerous felon from a residence, and while the use of a second flashbang device was not reasonable due to the presence of accelerants, qualified immunity still applied as the law was not clearly established under the circumstances.

Sgt. Skedel's deployment of two NFDD's in a volatile domestic violence/flight situation, with an armed, barricaded subject wanted on a felony arrest warrant is consistent with these authorities that find such use of force to be constitutionally permissible. Sgt. Skedel's use of force did not violate the Constitution, much less clearly established constitutional law. There is also no fact showing Sgt. Skedel failed to intervene in anyone else's known application of unconstitutional force, with knowledge and opportunity to intervene. *See, Ting, supra*.

## C. TORRES' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

Plaintiff Elizabeth Torres was an original party in this matter. (Doc. 1-1, pgs. 2-30 of 32; Doc. 31; Doc. 82). On May 1, 2018, Defendants filed their Motion to Dismiss the Second Amended Complaint, asserting that Plaintiff Elizabeth Torres did not have standing to bring suit in the case as she only alleged her residency in Maricopa County. (Doc. 83, pg. 4, nt. 2). On March 29, 2019, this Court dismissed Torres without prejudice, giving her until April 12, 2019 to file a Third Amended Complaint. (Doc. 106, pgs. 6-7, 10). Torres failed to seek an amendment by the deadline, and was only brought back into this case through Plaintiff Denby's Motion for Leave to Amend, filed over 6 years later, on August 8, 2025. (Doc. 249).

Defendants start with what it means to be dismissed without prejudice. "A statute of limitations is not tolled by the filing of a complaint subsequently dismissed without prejudice," as "the original complaint is treated as if it never existed." *Cardio-Medical Assocs. v. Crozer-Chester Med. Ctr.*, 721 F.2d 68, 77 (3rd Cir. 1983). A plaintiff obtains reinstatement of her claims not by reopening the old case but by re-filing a new case. *See Palmieri v. Defaria*, 88 F.3d 136, 140 (2nd Cir. 1996) (quoting *Empire Volkswagon v. World-Wide Volkswagon*, 814 F.2d 90, 94 (2nd Cir. 1987)). "Because [plaintiff's] claims were dismissed without prejudice, she is free to refile them in the district court. See *Chappelle v. Beacon Communications Corp.*, 84 F.3d 652, 654 (2d Cir. 1996). A plaintiff who re-files a case in order to reinstate his claims may have a problem with the statute of limitations. *See Rinieri v. News Syndicate Co.*, 385 F.2d 818, 821 (2rd Cir. 1967) ("Although a dismissal without prejudice permits a new action *(assuming the statute of limitations has not run)* ...."). *Ciralsky v. C.I.A.* 355 F.3d 661, *667 (D.C. Cir. 2004) (emphasis added). When a complaint is dismissed without prejudice, it is as if it never existed. This has two effects: To reinstate her case, a plaintiff must re-file a new action and the statute of limitations is not tolled. *See e.g., Weissmueller v. Breg Inc.*, No. CV-14-02802-PHX-JJT, 2016 WL 3916166, at *5 (D. Ariz. July 20, 2016). Therefore, the dismissal of a complaint without prejudice after the statute of limitations has run forecloses the plaintiff's ability to remedy the deficiency underlying the dismissal and refiling of the complaint. *Ahmed v. Dragovich*, 297 F.3d 201, 207 (3rd Cir. 2002), *cited in Brennan v. Kulick* 407 F.3d 603, 606 (3rd Cir. 2005).

Under Arizona law, a personal injury action must be "commenced and prosecuted within two years after the cause of action accrues." A.R.S. § 12-542(1). This statute is adopted for constitutional claims. In a case where the "complaint shows on its face that the cause of action is barred by the statute of limitations, the burden is on the plaintiff to show the

statute should be tolled." *Ulibarri v. Gersentberger*, 871 P.2d 698, 702 (App. 1993) (citing *Cooney v. Phoenix Newspapers, Inc.*, 770 P.2d 1185, 1187 (App. 1989)).

Here, Torres is well-beyond the two-year statute of limitations and missed the April, 2019 deadline to continue her presence in the existing case by filing an amended complaint. Her remedy after that was to re-file, which she did not.   In granting leave to amend, this Court did not conclude that Torres' claims were timely.  (Doc. 255).   They are not.   Torres must be dismissed from this action because her new claims in the Third Amended Complaint are asserted well beyond the statute of limitations.

### D. DENBY LACKS STANDING TO ASSERT A CLAIM FOR DAMAGES TO REAL PROPERTY.

Fourth Amendment rights are personal and may not be asserted vicariously. *Alderman v. U.S.*, 394 U.S. 165, 174 (1969); *Feliz v. Cty. Of Orange,* 2012 WL 12887770 (E.D. Cal., March 13, 2012).  The Fourth Amendment standing law applies to claims made against public officials and public entities. *See Longoria v. Pinal Cty.*, No. CV-15-00043-PHX-SRB, 2015 WL 13654010, at *2 (D. Ariz. Apr. 15, 2015); *Carlson v. Cnty. of L.A.*, No. CV 13-01472-JAK DFM, 2015 WL 365994, at *14 (C.D. Cal. Jan. 27, 2015).

Regarding real property, one who stands in the position of renter or lessee only, measures his or her damages based on the fair market value *of the lease* before and after a taking.  *Mobil Oil Corp. v. Phoenix Cent. Christian Church*, 138 Ariz. 397, 400 (App. 1983). Thus, a party who does not stand in the position of an owner is not entitled to damages related to the destruction or taking of the property that they occupy.  *See, id.*   Rather, the non-owner is limited to a damage claim for the loss of their rental or leasehold interest, if any.  In the Complaint, Denby does not allege any such damage.

In the Third Amended Complaint, Plaintiff Denby claims to have taken on responsibilities that a renter or lessee may be obligated, or not obligated, to assume.

However, he makes clear that he was not a titled owner of the residential real property at the time of the alleged damage.   In construing a deed, the court "must give effect to the contracting parties' intent." *Paulden Indus. LLC v. Big Chino Materials LLC*, 249 Ariz. 442, 444, ¶ 9 (App. 2020). "If the deed is unambiguous," the court must discern the parties' intent "from the four corners of the document." *Id.* (citation omitted). "[T]he parol evidence rule bars admission of extrinsic evidence" to interpret a written contract if such evidence "varies or contradicts the terms of [the] written contract." *Aztar Corp. v. U.S. Fire Ins. Co.*, 223 Ariz. 463, 478, ¶ 52 (App. 2010). The court may consider parol evidence when interpreting a written agreement only if "the court finds the writing is 'reasonably susceptible' to the interpretation suggested by the proponent of the extrinsic evidence." *Long v. City of Glendale*, 208 Ariz. 319, 328, ¶ 28 (App. 2004). The proponent of parol evidence cannot, in other words, offer extrinsic evidence under the guise of "interpreting" a written agreement "if the resulting 'interpretation' unavoidably changes the meaning of the writing." *Id.* at 329, ¶ 34.

Courts have long applied the parol evidence rule to bar the use of extrinsic evidence to show that real property was conveyed subject to use or ownership restrictions that do not appear in the conveyance instrument. *See IB Prop. Holdings, LLC v. Rancho Del Mar Apartments Ltd. P'ship*, 228 Ariz. 61, 67-68, ¶¶ 20-21 (App. 2011) (rejecting affidavits offered to show that easement granted for "pedestrian and passenger" vehicles was intended for emergency vehicles only because "the contract language [was] not reasonably susceptible to the interpretation" set forth in the affidavits) (cleaned up); *Valento v. Valento*, 225 Ariz. 477, 484, ¶¶ 21-22 (App. 2010) (holding that, where the deed's language was "unambiguous in that [the grantors] conveyed the property interest to [their son] and [his wife] jointly," the parol evidence rule prohibited testimony that the grantors intended the property to be gifted to their son alone).  Because, as alleged, the deed to the subject residence was unambiguously

for Torres and Logston only, accepting Denby's alleged extrinsic evidence would "unavoidably change[ ]" the deed's meaning. *See Long*, 208 Ariz. at 329, ¶ 34. The parol evidence rule therefore would preclude this Court from considering the alleged extrinsic evidence, even if true, when construing the deed.

As argued above, the Fifth Amendment does not afford damages, even to the property owner, caused by the exercise of police powers.   This applies to both Denby and Torres.   As to the Fourth Amendment, the alleged use of force on the real property in violation of the Fourth Amendment is "personal" to the property owner only.   Under the allegations of the Complaint, that "personal" damage was allegedly inflicted on Torres and Logston, not on Denby.

Denby's damages, if any, must be limited to the loss of his own personal property, if any, and exclude a claim for damages to real property that he did not own at the time the alleged constitutional injury was inflicted on the real property.

## E.   PLAINTIFFS LACK STANDING FOR EQUITABLE OR INJUNCTIVE RELIEF

Plaintiffs' Complaint seeks equitable or injunctive relief.  (Doc. 256, pg. 18).  The availability of such relief depends on whether Plaintiffs state a plausible claim that they are likely to suffer future injury from being involved in another matter involving alleged misconduct arising from the execution of a judicial search warrant of their alleged residence. *See, City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (prospective injunctive or equitable relief not available where alleged victim of improper chokehold was not subject to real and immediate threat of future chokehold); *B.C. v. Plumas Unified Sch. Dist.,* 192 F.3d 1260, 1264 (9th Cir. 1999) ("[t]o have standing to seek relief, [the plaintiff] must demonstrate a real or immediate threat that the defendants will *again* subject him to [another illegal search].")(emphasis added); *Imagineering v. Kiewit Pac. Co.,* 976 F.2d 1303, 1308–09 (9th Cir. 1992) ("[w]e conclude that the amended complaint failed to allege sufficient facts to

confer standing for purposes of injunctive relief. The complaint did not allege that the named plaintiffs would suffer the same purported injury in the future ...."); *Ashelman v. Pope,* 793 F.2d 1072, 1075 (9th Cir. 1986) (equitable relief unavailable where underlying proceedings concluded with no allegation of similar, future proceedings).  More specifically, Plaintiffs' request for equitable or injunctive relief requires a showing "that [they have] sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Lyons,* 461 U.S. at 102. Allegations of past illegal conduct directed at a plaintiff, alone, do not "show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Id.*  Plaintiffs must instead plead a real threat of future injury; to wit, a likelihood that they will again be involved in a search warrant execution alleged to be in violation of the Fourth Amendment. *See, id.*, at 102–03.

Plaintiffs allege nothing in their Third Amended Complaint to suggest repetition of the same kind of constitutional injury alleged in this matter remains both "real and immediate." The fact that the search and entry in this case occurred on December 17, 2014, and the October 9, 2025 Third Amended Complaint (nearly eleven years later) fails to state any intervening constitutional claim provides strong support that Plaintiffs cannot meet the *Lyons* standard required to maintain a claim for equitable or injunctive relief.  In the absence of any well-pled fact allegation that there is a real and immediate threat that Plaintiffs will be involved in a similar future event, they lack standing to claim equitable or injunctive. *See Lyons, supra.*

### IV.    CONCLUSION.

For all of the foregoing reasons, Plaintiffs' Complaint must be dismissed, in its entirety.

DATED this 19th day of November, 2025.

JELLISON LAW OFFICES, PLLC

s/James M. Jellison
James M. Jellison
*Attorney for Defendants Engstrom, Robinson,*
*Lapre, Gragg, and Skedel*

I hereby certify that on November 19, 2025,
I electronically transmitted the attached document
to the Clerk's Office using the
CM/ECF System for filing.

Robert T. Mills
Sean A. Woods
Mills + Woods Law PLLC
5055 North 12th Street
Suite 101
Phoenix, AZ 85014
*Attorneys for Plaintiffs*

s/James M. Jellison